UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------:

ACTORS EQUITY ASSOCIATION,

             Petitioner,                      08 Civ. 02843 (LAK)

     -against-

MATTHEW LOMBARDO, Individually,
And on Behalf of THE LOMBARDO
ORGANIZATION d/b/a TEA AT FIVE,

             Respondent.

------------------------------------------------------:

## PETITIONER'S STATEMENT OF
## UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1

      Pursuant to Local Rule 56.1, Petitioner Actors Equity Association ("Equity" or

"Petitioner") submits the following in support of its motion for summary judgment

pursuant to Local Rule 56.1:

      1.      The subject matter of this Arbitration is governed by the Agreement and Rules

Governing Employment in Midsize Theatres ("the Midsize Theatre Agreement" or "the

Rulebook"), effective April 24, 2005 through April 29, 2007.  Pet. Ex. B.[1]

      2.      The Producer, Matthew Lombardo and the Lombardo Organization, LLC

("Respondent" or "Lombardo"), individually and collectively, agreed to be bound to the terms of

the Rulebook through the execution of an Independent Producer's Agreement on August 22,

2006 for a production of the play "Tea At Five" at the Ordway McKnight Theatre in St. Paul,

Minnesota.  Pet. Ex. C.

---

[1] References to the Exhibits annexed to Equity's Petition to Confirm Arbitration Award are cited
to herein as "Pet. Ex. __, p. ___."  The Petition to Confirm Arbitration Award, dated March 12,
2008, and accompanying Exhibits are attached hereto.

**Stephanie Zimbalist and Tea At Five**

3.      Lombardo hired Stephanie Zimbalist ("the Actor" or "Zimbalist") to play the role of Katharine Hepburn in a production of a one-woman play entitled "Tea At Five" scheduled to run at the Ordway McKnight Theatre in St. Paul, Minnesota from September 19, 2006 through October 1, 2006.  Pet. Ex. A, p. 3.

4.      Zimbalist has been a long-standing Equity member, and is a highly accomplished Actor who has had an extremely successful acting career in television and film.  Pet. Ex. A, pp. 20-21.

5.      The Arbitrator found that Lombardo and Zimbalist (acting through her agents) memorialized the terms of her employment at the Ordway Theatre in an Individual Contract and Rider.  Pet. Ex. A, p. 14.

6.      Lombardo on behalf of the Lombardo Organization and individually, as Guarantor assumed responsibility for all contractual obligations in connection with the St. Paul production of "Tea At Five".  Pet. Ex. A ("Award of Arbitrator"). [2]

7.      Zimbalist fully satisfied all of her contractual obligations in connection with her appearance in the St. Paul production of "Tea At Five."  Pet. Ex. A, p. 13.

8.      Lombardo issued the performance checks due to Zimbalist in the full amount of salary, less working dues, pursuant to the terms of her Individual Contract and Rider – 2 checks in the amount of $6,581.25 – plus a reimbursement check in the amount of $727.80.  Pet. Ex. A, p. 14.

9.      Lombardo stopped payment on the performance and reimbursement checks he issued to Zimbalist.  Pet. Ex. A, pp. 14, 23.

---

[2] The "Award of the Arbitrator" is the first four unnumbered pages of the complete Arbitration Award and Opinion, dated January 7, 2008, included as part of Exhibit A annexed to the Petition.

10.    Lombardo failed to pay the $806.19 bill for the rental car he was obligated under the Contract and Rider to provide Zimbalist at no cost.  Pet. Ex. A ("Supplemental Award"), p. 2.

**The Arbitration Proceedings**

11.    Pursuant to Rule 5 of the Rulebook, Lombardo disputed a ruling issued by Equity on December 7, 2006 (amending a prior ruling issued on November 21, 2006) and filed an arbitration demand with the American Arbitration Association ("AAA").  Pet. Ex. A, pp. 5-6.

12.    An arbitration hearing was originally scheduled for June 29, 2007 in New York but was adjourned at Lombardo's request.  Pet. Ex. A, p. 6.

13.    Equity elected to have the hearing in Los Angeles, and the Arbitrator issued a ruling upholding Equity's right to determine the site of the arbitration pursuant to Rule 5(A).  Pet. Ex. A, p. 7.

14.    The hearing was rescheduled for October 21, 2007 in Los Angeles but was adjourned at Lombardo's request.  Pet. Ex. A, p. 9.

15.    Additional hearing dates were scheduled for November 19 and 20, 2007, in Los Angeles, and the hearing took place on November 19, 2007.  Pet. Ex. A, p. 9.

16.    The Arbitrator set December 12, 2007 as the due date for the submission of post-hearing briefs.  Both Equity and Lombardo timely filed post-hearing briefs.  Pet. Ex. A, pp. 8-9.

**The Arbitration Award**

17.    On January 7, 2008, the Arbitrator issued an Arbitration Opinion and Award.  Pet. Ex. A.

18.    The Arbitrator found that Lombardo committed multiple breaches of the collective bargaining agreement and violated the terms of the Individual Contract and Rider he had entered into with Zimbalist.  Pet. Ex. A., pp. 18-37.

19.    As a result of the Respondent's multiple breaches of the applicable agreements, the Arbitrator directed Lombardo to pay within ten (10) days of the date of the Award the following amounts:

(a) $15,000.00 in salary and $727.80 in reimbursed expenses to Zimbalist (less any amounts previously paid after payments by the original salary and expense checks were stopped);

(b) $33,000.00 to Actors Equity Association as liquidated damages for violations of the Midsize Theatre Agreement for failure to promptly remit accurate dues, pension deductions and accompanying reports, and for failure to submit weekly box office receipt statements, a program of the production, and box office statements; and

(c) $16,200.00 to the Equity-League Pension Fund for unremitted pension contributions ($1,200.00) and liquidated damages ($15,000.00); and

(d) $18,000.00 to the Actors Equity Foundation as liquidated damages for making false statements, for intentionally deceiving Equity regarding the actual contractual salary for Zimbalist and Stage Manager Christine Catti, and for concealing Zimbalist's Individual Contract Rider in violation of the Midsize Theatre Agreement.

Pet. Ex. A ("Award of Arbitrator"); See also Pet. Ex., pp. 33-37.

20.    The Arbitrator directed that: "All such payments shall be augmented by interest at the rate of six per cent per annum from the date such payments were originally due and owing until the date of this Award, and thereafter at the rate of nine per cent per annum until all sums ordered pursuant to this Award have been paid in full."  Pet. Ex. A ("Award of Arbitrator"); See also Pet. Ex. A, p. 35.

21.    The Arbitrator further directed that:  "In the event that either party finds it necessary to undertake further proceedings before this Arbitrator, or elsewhere, to enforce any aspect of this Award, the amounts recovered and the costs of enforcement shall be payable by the party against whom enforcement is successfully sought" and if one party pays the full cost of the Arbitrator's fees and expenses such party shall be entitled to recover from the non-paying party

its one-half share plus costs and counsel fees.  Pet. Ex. A ("Award of Arbitrator"); See also Pet. Ex. A, p. 36.

22.     On January 22, 2008, the Arbitrator issued a Supplemental Award to correct two inadvertent clerical errors in the original Award.  The Arbitrator amended the original Award to add to the payment owed to Zimbalist the amount of $806.19 for reimbursement of rental car expenses, and to clarify that Lombardo did not owe any monies to Stage Manager Christine Catti pursuant to her Individual Contract.  Pet. Ex. A ("Supplemental Award").

23.     By letter dated February 1, 2008, Equity demanded that Respondent pay the amounts due under the Awards in the amount of $88,626.08 (including the 6% interest).  Pet. Ex. E.  Respondent did not make any payment or otherwise respond.

24.     By letter dated February 15, 2008, Equity made a second demand to Lombardo for payment to Respondent and adjusted the amount owed to $89,290.77 to reflect the enhanced interest rate of 9%.  Pet. Ex. F.  Respondent did not make any payment or otherwise respond.

Dated: New York, New York
        June 9, 2008

                              SPIVAK LIPTON LLP


                              By: /s/  Hope Pordy
                                      Hope Pordy (HP 6253)
                              1700 Broadway, 21st Floor
                              New York, New York  10019
                              Tel:  212.765.2100
                              Fax:  212.541.5429
                              hpordy@spivaklipton.com
                              *Attorneys for Actors Equity Association*

SPIVAK LIPTON LLP
HOPE PORDY, ESQ.
1700 Broadway, 21st Floor
New York, New York 10019
Ph:    212.765.2100
Fax:   212.541.45429
*Attorneys for Petitioner Actors Equity Association*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------:

ACTORS EQUITY ASSOCIATION,

                      Petitioner,

            -against-

MATTHEW LOMBARDO, Individually,
And on Behalf of THE LOMBARDO
ORGANIZATION d/b/a TEA AT FIVE,

                      Respondent.

------------------------------------------------------:



08 Civ.

**PETITION TO CONFIRM
ARBITRATION AWARD**

           Petitioner, ACTORS EQUITY ASSOCIATION, by and through its counsel, SPIVAK

LIPTON LLP, respectfully alleges as follows:

### PRELIMINARY STATEMENT

           1.      This is a proceeding brought by Petitioner, Actors Equity Association, to confirm

an Arbitration Award  rendered on January 7, 2008, and a Supplemental Award rendered on

January 22, 2008 (collectively referred to herein as "the Awards"), by Arbitrator Daniel F. Brent,

and to enforce and collect the amounts due under the Awards.  True and correct copies of the

Arbitration Award and Supplemental Award are annexed hereto as Exhibit A.

## JURISDICTION & VENUE

2.       Jurisdiction of this Court is based on Section 301 of the Labor-Management

Relations Act of 1947, as amended, 29 U.S.C. § 185 (the "Taft-Hartley Act"), the Federal

Arbitration Act, as amended, 9 U.S.C. § 9, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

3.       Lombardo filed an arbitration demand with the New York office of the American

Arbitration Association ("AAA"), 1633 Broadway, Floor 10, New York, New York, in

accordance with the arbitration provisions of the applicable collective bargaining agreement and

the arbitration was administered by and through the AAA in New York.

4.       Venue is proper in this judicial district pursuant to LMRA § 301(a), 29 U.S.C. §

185(a).

## PARTIES

5.       Petitioner, Actors Equity Association ("the Union" or "Equity") is a labor

organization within the meaning of Section 2(5) of the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 152(5). Equity maintains an office at 165 West 46th Street, New York,

New York.

6.       Respondent Matthew Lombardo ("Lombardo") is an individual producer of

theatrical productions, including the production entitled "Tea At Five" and is a principal of the

Lombardo Organization. Lombardo is an individual signatory to agreements with Equity

concerning the employment of its members in connection with the production "Tea At Five."

Lombardo is an employer within the meaning of Section 2(2) of the LMRA, 29 U.S.C. § 152(2).

7.       The Lombardo Organization d/b/a Tea At Five ("The Lombardo Organization") is

a corporation licensed to do business in the State of New York. At the time of the arbitration, the

Lombardo Organization maintained a principal place of business at 675 West End Avenue, Suite

2

9D, New York, New York 10025, which was also Lombardo's primary residence. The

Lombardo Organization is an employer within the meaning of Section 2(2) of the LMRA, 29

U.S.C. § 152(2).

### FACTS

8.      Lombardo hired Actor Stephanie Zimbalist ("Zimbalist") to play the role of

Katharine Hepburn in a production of a one-woman play entitled "Tea At Five" which ran at the

Ordway McKnight Theatre in St. Paul, Minnesota from September 19, 2006 through October 1,

2006.

9.      The subject matter of this Arbitration is governed by the Agreement and Rules

Governing Employment in Midsize Theatres ("the Midsize Theatre Agreement" or "the

Rulebook"), effective April 24, 2005 through April 29, 2007.  A copy of the Midsize Theatre

Agreement is annexed hereto as Exhibit B.

10.      Lombardo and the Lombardo Organization, individually and collectively, agreed

to be bound to the terms of the Rulebook through the execution of an Independent Producer's

Agreement on August 22, 2006 for a production of the play "Tea At Five" at the Ordway

McKnight Theatre in St. Paul, Minnesota.  A copy of the Independent Producer's Agreement is

annexed hereto as Exhibit C.

11.      Lombardo and Zimbalist executed an Individual Midsize Theatre Contract and

Rider specifying, *inter alia*, the name of the play, the theatre at which the show will appear, the

role Zimbalist was hired to perform, the rehearsal dates, the location of rehearsals and

performances, the date of the first public paid performance, the closing date, compensation, and

the existence of a rider.

3

12.     Pursuant to Rule 5 of the Rulebook, the Producer disputed a ruling issued by Equity on December 7, 2006 (amending a prior ruling issued on November 21, 2006) and filed an arbitration demand with the New York office of the American Arbitration Association.  In response, Equity submitted an Answering Statement and an Amended Counterclaim.  A copy of the Producer's arbitration demand is annexed hereto as Exhibit D.

13.     Lombardo retained counsel, Leslie Ben-Zvi, Esq., a New York attorney, to assist with the arbitration, and Mr. Ben-Zvi participated in numerous phone conferences and submitted correspondence to the Arbitrator concerning the arbitration.  Mr. Ben-Zvi currently maintains a law office at 100 Wall Street, 23rd Floor, New York, New York 10005.

14.     An arbitration hearing before Arbitrator Daniel F. Brent ("the Arbitrator") took place on November 21, 2007.  The parties submitted post-hearing briefs to the Arbitrator on December 12, 2007.

15.     On January 7, 2008, the Arbitrator issued an Arbitration Opinion and Award. Relying on the evidence submitted by the parties during the November 21st hearing, the Arbitrator found that Lombardo committed multiple breaches of the collective bargaining agreement and violated the terms of the Individual Contract and Rider he had entered into with Zimbalist.

16.     As a result of the Respondent's multiple breaches of the applicable agreements, the Arbitrator directed Lombardo to pay within ten (10) days of the date of the Award the following amounts:

(a) $15,000.00 in salary and $727.80 in reimbursed expenses to Zimbalist (less any amounts previously paid after payments by the original salary and expense checks were stopped);

4

    (b) $33,000.00 to Actors Equity Association as liquidated damages for violations

of the Midsize Theatre Agreement for failure to promptly remit accurate dues,

pension deductions and accompanying reports, and for failure to submit

weekly box office receipt statements, a program of the production, and box

office statements;

    (c) $16,200.00 to the Equity-League Pension Fund for unremitted pension

contributions ($1,200.00) and liquidated damages ($15,000.00); and

    (d) $18,000.00 to the Actors Equity Foundation as liquidated damages for making

false statements, for intentionally deceiving Equity regarding the actual

contractual salary for Zimbalist and Stage Manager Christine Catti, and for

concealing Zimbalist's Individual Contract Rider in violation of the Midsize

Theatre Agreement.

17.    In addition to the amounts described above in paragraphs 16(a)-(d), the Arbitrator

directed that: "All such payments shall be augmented by interest at the rate of six per cent per

annum from the date such payments were originally due and owing until the date of this Award,

and thereafter at the rate of nine per cent per annum until all sums ordered pursuant to this

Award have been paid in full."

18.    The Arbitrator further directed that: "In the event that either party finds it

necessary to undertake further proceedings before this Arbitrator, or elsewhere, to enforce any

aspect of this Award, the amounts recovered and the costs of enforcement shall be payable by the

party against whom enforcement is successfully sought" and if one party pays the full cost of the

Arbitrator's fees and expenses such party shall be entitled to recover from the non-paying party

its one-half share plus costs and counsel fees.

5

19.    On January 22, 2008, the Arbitrator issued a Supplemental Award, upon motion by Equity, to correct two inadvertent clerical errors in the original Award.  Respondent advised the Arbitrator that he "agree[d] entirely" with Equity's motion and asked that the requested changes be made.  The Arbitrator granted the motion and amended the Award to add to the payment owed to Zimbalist the amount of $806.19 for reimbursement of rental car expenses, and to clarify that Lombardo did not owe any monies to Stage Manager Christine Catti pursuant to her Individual Contract.

20.    By letter dated February 1, 2008, Equity demanded that Respondent pay the amounts due under the Awards in the amount of $88,626.08 (including the 6% interest).  A copy of Equity's February 1st letter is attached hereto as Exhibit E.  Respondent did not make any payment or otherwise respond.

21.    By letter dated February 15, 2008, Equity made a second demand to Lombardo for payment to Respondent and adjusted the amount owed to $89,290.77 to reflect the enhanced interest rate of 9%.  A copy of Equity's February 15th letter is attached hereto as Exhibit F.  Respondent did not make any payment or otherwise respond.

22.    Since Respondent has failed and refused to voluntarily satisfy the Awards in the time since they have been issued, judgment is necessary to permit Equity to enforce the Awards on behalf of the affected Actor and Stage Manager, and its membership, in general.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests an order and judgment granting the

following relief:

(i)     Confirm the Arbitration Award and Supplemental Award issued by Arbitrator
        Daniel F. Brent on January 7, 2008 and January 22, 2008, respectively;

(ii)    Direct Respondent to pay the amounts set forth in the Awards:

    (a) $16,241.18 to Actor Stephanie Zimbalist for unpaid salary and unreimbursed
        expenses (inclusive of interest through February 15, 2008);

    (b) $33,000.00 to Actors Equity Association, plus interest as set forth in the
        Award;

    (c) $16,200.00 to the Equity-League Pension Fund, plus interest as set forth in the
        Award;

    (d) $18,000.00 to the Actors Equity Foundation, plus interest as set forth in the
        Award.

(iii)   Direct judgment be entered thereon;

(iv)    Award costs and disbursements of this proceeding to Petitioner; and

(v)     For such other further and different relief as to the Court may seem just and
        proper.

Dated: New York, New York
       March 12, 2008

                    SPIVAK LIPTON LLP

                    By:_____
                      Hope Pordy (HP 6253)
                  1700 Broadway, 21st Floor
                  New York, New York 10019
                  Ph:     212.765.2100
                  Fax:    212.541.5429
                  hpordy@spivaklipton.com
                  *Attorneys for Petitioner Actors Equity Association*

7

EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION

LABOR ARBITRATION TRIBUNAL

---

In the Matter of the Arbitration Between

THE LOMBARDO ORGANIZATION

and

ACTORS' EQUITY ASSOCIATION

AAA Case No.  13 300 02842 06

---

### AWARD OF ARBITRATOR

The undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, AWARDS as follows:

Based on the evidence submitted, The Lombardo Organization and Matthew Lombardo, as Guarantor, owe Stephanie Zimbalist, Christine Catti, Actors' Equity Association, and the Equity League Pension Fund monies regarding the production of "Tea at Five" pursuant to the Mid-Size Theatre Agreement or an individual contract with Stephanie Zimbalist or the Confidential Addendum dated August 31, 2006.

More specifically, The Lombardo Organization, or Matthew Lombardo as Guarantor pursuant to Union Exhibit 7, shall pay forthwith to Hope Pordy, Esquire on behalf of Stephanie Zimbalist the amount of $15,000 in salary and $727.80 in reimbursed expenses, less any amounts previously paid after payments by the original salary and expense checks were stopped. The Lombardo Organization, or Matthew Lombardo as Guarantor, shall pay to Actors' Equity Association the amount of $33,000.  This sum includes $15,000 liquidated damages for failure promptly to remit accurate dues and pension deductions and accompanying reports; and $18,000 liquidated damages for failure to submit weekly box office receipts statements, a program of the production, and box office statements as required by Rule 49.  In addition, The Lombardo Organization, or Matthew Lombardo as Guarantor, shall pay to the Equity-League Pension Fund the amount of $16,200 representing $1200 in unremitted pension payments for Ms. Zimbalist and $15,000 liquidated damages, and the amount of $18,000 to the Actors' Equity Foundation as liquidated damages for false statements in violation of sections of Rule 8(A); for intentionally deceiving Equity regarding the actual contractual salary of Ms. Zimbalist and Ms. Catti; and for concealing the Confidential Addendum Rider from Actors' Equity.

All such payments shall be augmented by interest at the rate of six pre cent per annum from the date such payments were originally due and owing until the date of this Award, and thereafter at the rate of nine per cent per annum until all sums ordered pursuant to this Award have been paid in full.

In the event that either party finds it necessary to undertake further proceedings before this Arbitrator, or elsewhere, to enforce any aspect of this Award, the amounts recovered and the costs of enforcement shall be payable by the party against whom enforcement is successfully sought.  All amounts due and owing to Actors' Equity, to Ms. Zimbalist, and to the Arbitrator shall be paid within ten days after the issuance of this Award.

The Arbitrator's fees and expenses, in the amount of $11,099, shall initially be paid equally by both parties, Actors' Equity and The Lombardo Organization, or Matthew Lombardo acting as Guarantor. However, the Arbitrator's fees and expenses, in the amount of $11,099, shall be considered part of the amounts due and owing pursuant to this Award.  Although the parties may have a contractual agreement with each other to split the costs of arbitration, including the Arbitrator's fees and expenses, both parties ultimately are jointly and severally liable for the entire cost of the arbitration in the event that the other party fails to

pay the Arbitrator promptly, in which case the party who pays an additional half share of the Arbitrator's fees and expenses shall be immediately entitled to contribution of the other party's one half share from the other party, plus the costs and counsel fees for obtaining such contribution.

The Arbitrator hereby retains jurisdiction to resolve any disputes that may arise regarding the computation, implementation or enforcement of the remedies ordered pursuant to this Award.

Princeton, New Jersey

January 7, 2008

_____
Daniel F. Brent, Arbitrator

State of New Jersey
County of Mercer

On this 7th day of January, 2008 before me personally came and appeared Daniel F. Brent, to me known and known to me to be the individual described in the foregoing instrument, and he acknowledged to me that he executed the same.

_____

An Attorney at Law of the
State of New Jersey

AMERICAN ARBITRATION ASSOCIATION

LABOR ARBITRATION TRIBUNAL

---

In the Matter of the Arbitration Between

THE LOMBARDO ORGANIZATION

and

ACTORS' EQUITY ASSOCIATION

AAA Case No.  13 300 02842 06

---

A hearing was held in the above-entitled matter on
November 19, 2007 at the offices of Actors' Equity Association in
Los Angeles, California before Daniel F. Brent, duly designated as
Arbitrator.  Both parties participated in the hearing, and were
afforded full and equal opportunity to offer testimony under oath, to
cross-examine witnesses, and to present evidence and arguments.
Matthew Lombardo, the principal of The Lombardo Organization
participated for a portion of the hearing by telephone conference call.
Actors' Equity Association was represented by counsel.  Both parties
submitted post-hearing briefs, and the record was declared closed on
December 12, 2007.

2

## APPEARANCES


For the Producer:

Matthew Lombardo


For the Union:

Hope A. Pordy, Esq. of Spivak, Lipton, Watanabe, Spivak, Moss and Orfan, Esqs.

Catherine V. Lamkey, Central Regional Director

Laura Lamoureux, Business Representative


## ISSUE SUBMITTED


Does the Producer, The Lombardo Organization, or Matthew Lombardo owe Stephanie Zimbalist, Christine Catti, Actors' Equity Association, or the Equity League Pension Fund any monies regarding the production of "Tea at Five" pursuant to the Mid-Size Theatre Agreement or an individual contract with Stephanie Zimbalist or the Confidential Addendum dated August 31, 2006?

If so, what shall be the remedy?

<u>NATURE OF THE CASE</u>

Matthew Lombardo wrote a play called "Tea at Five".  The play is a one-woman show depicting the life and character of the actress Katherine Hepburn.  The Lombardo Organization (the Producer), of which Mr. Lombardo is the principal, staged a production of "Tea at Five" at the Ordway McKnight Theatre in St. Paul, Minnesota to run for a period of approximately two weeks commencing on November 19, 2006.  Stephanie Zimbalist was engaged to play the lead role pursuant to an Standard Actors' Equity Association Mid-Size Theater Contract.  Ms. Zimbalist was instructed by The Lombardo Organization to learn the role using a rehearsal assistant in New York City in order to begin rehearsals in New York City commencing on August 29, 2006.

The instant dispute arose following a series of actions taken by Mr. Lombardo and The Lombardo Organization that precipitated an investigation by Actors Equity (Equity or the Union)), culminating in the imposition by Actors' Equity of claims for damages and penalties for breach of the Actors Equity Rule Book and for Lombardo's alleged failure to comply with the terms of the contractual arrangements between Ms. Zimbalist, and The Lombardo Organization.  According to Equity, the contract includes not only the first page of the standard Mid-Size Theatre Contract form, but also a two-page Confidential Addendum dated

August 31, 2006 providing salary and benefits for Ms. Zimbalist beyond the minimum scale set forth in the Mid-Size Theatre Contract. Equity contends that the Confidential Addendum constitutes a Rider to the Mid-Size Theatre Contract that was incorporated by reference, as indicated by a check in the appropriate box on the Standard Contract form.

The Lombardo Organization (Lombardo) contends that the Confidential Addendum was a separate agreement that was intended by Lombardo, with the collusion of Ms. Zimbalist, to be kept secret from Equity in order to reduce her deductions for Equity dues, and thus is not enforceable by Equity. The Lombardo Organization further alleges that Ms. Zimbalist breached a binding oral agreement to perform "Tea at Five" in productions to be staged by Lombardo in several cities in addition to St. Paul, and that her refusal to participate in such productions, including her demanding an exorbitant fee for in appearing in a production to be staged in Detroit and her failing to negotiate in good faith for a production possibly to be staged in Chicago, constituted a breach of contract that justified Lombardo's subsequent actions to minimize or to offset its losses. More particularly, Lombardo stopped payment on the last two weeks of salary checks payable under the terms of the Confidential Addendum for the St. Paul production that had been issued to Ms. Zimbalist, as well as a reimbursement check for her auto

expenses and other expenses payable pursuant to the contractual arrangements between Ms. Zimbalist and The Lombardo Organization.

Lombardo contends that the parties' contractual arrangement did not incorporate the Confidential Addendum, which cannot be enforced by Equity as the Confidential Addendum was never submitted by Lombardo to Equity for approval. Equity contends that Lombardo's admitted efforts to conceal the Confidential Addendum from Equity and to make a secret side arrangement with an Equity member contravenes the obligations set forth in Equity-governed agreements, including the Actors' Equity Rule Book, and constituted a breach of Equity's rules that Equity may punish by imposing substantial penalties established by the Rule Book.

Substantial monetary penalties were levied by Equity. Equity seeks to enforce these penalties against both The Lombardo Organization and against Mr. Lombardo, who signed the contract and other pertinent documents personally as Guarantor. Lombardo invoked an internal appeal proceeding provided by the Rule Book during which Lombardo disputed the monies that Equity and Ms. Zimbalist contend are owed to Actors Equity and to Ms. Zimbalist, and protested the liquidated damages imposed by Equity for breach of the Equity Rule Book.

6

The parties were unable to resolve the matter, and the dispute proceeded to arbitration pursuant to a Filing for Arbitration submitted to the American Arbitration Association by The Lombardo Organization. Actors' Equity also filed a claim on behalf of the production's Stage Manager, Christine Catti, for unpaid salary and pension contributions.

### PROCEDURAL HISTORY OF THE ARBITRATION

At the outset of the arbitration phase of the instant case, The Lombardo Organization was represented by Attorney Leslie Ben-Zvi. After consultation between the Arbitrator and counsel for Lombardo and for the Union through the American Arbitration Association, an arbitration hearing was scheduled to be convened in New York City on June 29, 2007.  Several days before this hearing, Mr. Lombardo requested a last minute postponement for reasons that, at his request, were conveyed solely to the Arbitrator and the American Arbitration Association Case Manager by Mr. Lombardo's attorney.  The Arbitrator evaluated the reasons underlying the request for a postponement, and granted the request, including the condition requested by Mr. Lombardo through his counsel, that the reason for the postponement remain confidential.

7

During a subsequent conference call explaining the reasons for granting this postponement and for maintaining the confidentiality of the basis for the postponement, a second hearing date was established for October 22, 2007. Ms. Zimbalist, a key witness, was scheduled to be engaged in rehearsals for, or performances of, a play on this date. Consequently, Equity sought to schedule this hearing in Los Angeles, and invoked the provision of the Equity Rule Book that permits Equity to establish any venue for an arbitration that Equity determines, including in Los Angeles. After considering the arguments submitted by attorneys for Equity and for The Lombardo Organization, the Arbitrator issued a written interim determination that Equity, pursuant to the Rule Book and under the pertinent written agreements governing the instant case, had the exclusive right to determine the venue for the arbitration hearings. The Arbitrator further determined that Equity's request to hold the hearings in Los Angeles was justified by the pertinent facts, particularly by Ms. Zimbalist's performance schedule, notwithstanding that Mr. Lombardo and his attorney would have either to travel to Los Angeles or to participate by video conference from the Equity office in New York. The hearing was then rescheduled for October 22, 2007 in Los Angeles.

Lombardo's attorney, Leslie Ben-Zvi, subsequently advised the AAA and the Arbitrator that he would be unable to participate in a hearing in Los Angeles on October 22nd because a trial in another matter involving a different client had been peremptorily scheduled in New York City by a United States District Court Judge.  Over Equity's strenuous objection, the Arbitrator granted a postponement of the October 22nd hearing to November 19 and 20, 2007 in Los Angeles, with the understanding that no further postponements would be permitted.  Mr. Lombardo thereafter advised the American Arbitration Association; the Arbitrator; and Hope Pordy, attorney for Equity that he would no longer be represented by counsel and that he would not appear personally at the hearings in Los Angeles because of conflicting professional commitments that had not been raised when the November 19 and 20th hearings were originally scheduled.

Mr. Lombardo's request for an additional postponement of the November dates until at least January 2008 was denied, but he was advised that he could participate in the hearing through the video teleconferencing facilities available at Equity's New York and Los Angeles offices or orally by telephone from any location of his choosing. Ultimately, Mr. Lombardo elected to participate by telephone in a portion of the November 19th hearing, giving his opening statement and his sworn testimony and subjecting himself to cross-examination.

After concluding his cross-examination by counsel for Equity,

Mr. Lombardo advised the Arbitrator and Equity's representatives that he

did not wish to call any other witnesses, submit any additional

documents, or listen to the remainder of the hearing.  Mr. Lombardo

declined to participate further in the November 19th arbitration hearing.


The Arbitrator granted Mr. Lombardo's request to receive copies of

all documents submitted into evidence.  These were forwarded to him by

counsel for Equity immediately after the hearing.  The record was

declared closed at the end of the November 19th hearing, except for the

submission of post-hearing written closing statements by both parties to

the American Arbitration Association not later than December 12, 2007.


After the close of the record, Mr. Lombardo attempted to submit

several website entries purporting to demonstrate that

Ms. Zimbalist, or her agents, had publicly committed to additional

performances of "Tea at Five".  Equity objected to the receipt of such

evidence after the record had been declared closed.  The Arbitrator

offered to hear further arguments on this issue in a subsequent

conference call, but this suggestion was not pursued by Lombardo.

The objection raised by Equity to receiving the proffered website entries into evidence was sustained, but not because the record was irrevocably closed after the November 19th hearing and not because Mr. Lombardo had stated on the record that he did not wish to submit any further evidence.  The additional material was not accepted into the evidentiary record primarily because no foundation was established in the Producer's proffer of this potential evidence to demonstrate that either Ms. Zimbalist or her agents were responsible for the statements allegedly appearing on these sites.  Thus, the additional material offered by Lombardo was deemed to have no relevant probative value sufficient to justify their admission into evidence, regardless of when during the proceedings they were submitted.  The Arbitrator has fully considered all relevant documentary and testimonial evidence in the record in rendering his Award.


## DISCUSSION AND ANALYSIS


In his testimony, Mr. Lombardo amply described his sincere belief that Ms. Zimbalist's agent had orally acknowledged the agent's understanding that Lombardo's offer of the Katherine Hepburn role in "Tea at Five" to Ms. Zimbalist was expressly predicated on

Mr. Lombardo's understanding that Ms. Zimbalist would perform the role in multiple cities. Mr. Lombardo testified that he assumed that, having accepted the role, Ms. Zimbalist had agreed to engage in a tour, or at least perform the role in multiple cities.

Mr. Lombardo testified credibly that he would not have invested the thirty thousand dollars associated with staging a production in a three hundred seat theatre such as the Ordway McKnight Theater only for a single production lasting two or three weeks. Nor would he have undertaken the expenses associated with teaching Ms. Zimbalist the role if he had understood that Ms. Zimbalist was going to perform this role only in the three hundred seat Ordway McKnight Theatre in St. Paul, Minnesota for two or three weeks.

Mr. Lombardo further testified describing his belief that the specific theatres, cities, and dates for Ms. Zimbalist's subsequent performances of "Tea at Five" would be negotiated subsequently, but that the underlying commitment to perform the play in additional venues had been mutually agreed upon, notwithstanding that no writing memorializes such an agreement. Ultimately, Mr. Lombardo's expectation was not realized by the successful negotiation of additional performances in multiple cities around the country.

12

Mr. Lombardo contended in his testimony that one's word is one's bond in the theatre business. However, the theatre business is also conducted on the basis of written agreements, including complex and comprehensive written contracts. Although Mr. Lombardo's expectations may have been sincerely held, his reliance an inferred oral commitment to perform a multiple city engagement without any subsequent memorialization establishing a mutual understanding of this commitment cannot be construed under traditionally accepted principles of contract law as reasonable reliance, even to his detriment, especially given the undisputed evidence that Mr. Lombardo was aware of Ms. Zimbalist's reluctance to undertake performances in multiple cities because of her mother's tenuous health at the time. Moreover, he knew that Ms. Zimbalist's agent had rejected a proposed run in Ft. Lauderdale, Florida because Ms. Zimbalist already had a conflicting commitment to perform elsewhere.

Ms. Zimbalist testified that her refusal to commit to performing the lead role in "Tea at Five", a role that she enjoyed performing, was predicated in large measure because she was reluctant to undertake to perform a one-woman show on a prolonged basis when she might have to cancel performances to attend to her mother, who was then critically ill. Ms. Zimbalist also testified credibly that she was concerned about the effect on her voice of the smoking on stage required by the part over a

protracted tour, and thus wanted to gauge the impact of her smoking throughout the performances during a short run in St. Paul before committing to a multi-city engagement.

Regardless of whether these justifications are viewed as self-serving and exaggerated, Lombardo has not demonstrated any mutuality of agreement that Ms. Zimbalist committed to a multi-city engagement or that identifiable bases for determining the future terms of any contract to perform "Tea at Five" in additional cities had been unequivocally established. Thus, no contract can be construed or inferred regarding any performances of "Tea at Five" beyond those at the Ordway McKnight Theatre in St. Paul, Minnesota. The contract governing the length of these performances is in evidence as Union Exhibit 10. It was undisputed that Ms. Zimbalist performed all of the obligations of the St. Paul run.

Mr. Lombardo admitted in his testimony that he first came to a clear realization while negotiations for additional performances in Detroit, and perhaps Chicago were on-going during the first week of the St. Paul performances that Ms. Zimbalist did not view herself as contractually committed to perform the role in these cities as soon as the theatres to be rented in each subsequent city and dates for additional performances had been determined and salary commensurate with the

capacity of the theatres had been negotiated.   Mr. Lombardo further admitted in his testimony that, following this realization, he unilaterally sought to recoup the thirty thousand dollars he had expended teaching Ms. Zimbalist the part and staging the St. Paul production based on his understanding that he had reached a binding oral agreement with Ms. Zimbalist, through her agent, to engage in a prolonged multi-city tour of his play.  Mr. Lombardo stopped payment on two checks of $6,581.25, representing a $7,500 weekly salary for two weeks, less a ten percent deduction for her agent's commission and a two and one-quarter percent deduction for Actors' Equity dues.  He also stopped payment on a check in the amount of $727.80 paid as reimbursement for Ms. Zimbalist's expenses (Union Exhibit 14).

After these adverse actions, Ms. Zimbalist contacted Actors Equity to protect her rights and to enforce her contractual agreement with The Lombardo Organization.  Equity initiated an investigation of the facts and circumstances surrounding the St. Paul production of "Tea at Five", and determined that Mr. Lombardo and his organization had failed to comply with Equity Rule Book requirements governing the employment of an Actors' Equity Association member; failed to submit its contract with Ms. Zimbalist to the Union in a timely manner; failed to disclose the Confidential Addendum dated August 31, 2006; failed to provide a security bond and ancillary documents in a timely manner in the form

and amount required by Equity; failed to pay Ms. Zimbalist and the stage manager, Christine Catti, their proper contractual salaries and expenses for the St. Paul run; and failed to transmit Union dues and pension contributions as required by the Mid-Size Theatre Agreement. Equity also found that Mr. Lombardo had made false statements to Equity representatives in violation of the agreements with Actors Equity governing his actions as Producer of "Tea at Five".

Testimony by Mr. Lombardo and by Ms. Zimbalist at the arbitration hearing established persuasively that Ms. Zimbalist reported as scheduled for rehearsal in New York City, having committed the play to memory so that she was "off book" by the first rehearsal as Mr. Lombardo had requested, and that she thereafter satisfactorily performed "Tea at Five" throughout the run in St. Paul. Her comments during a "talk back" to the audience may have been a cause of concern for the Producer, but such concern, even if legitimate, is immaterial and irrelevant to the Producer's obligation to pay Ms. Zimbalist for her performances pursuant to the total contractual arrangement between The Lombardo Organization and Ms. Zimbalist, as guaranteed personally by Mr. Lombardo (Union Exhibits 6 and 7). This total contractual agreement includes both the Standard Mid-Size Theatre Agreement and the Confidential Addendum.

Mr. Lombardo testified credibly describing his understanding that Ms. Zimbalist would perform "Tea at Five" not only in St. Paul, Minnesota, but also in other cities in subsequent productions. Parenthetically, Ms. Zimbalist testified that she would be thrilled to continue performing this role to the mutual benefit of Mr. Lombardo and Ms. Zimbalist because she found it professionally satisfying.  Regardless of the future relationship between The Lombardo Organization and Ms. Zimbalist regarding "Tea at Five", the past relationship clearly is defined by a contractual agreement that includes the Mid-Size Theatre Contract Standard Form and the Confidential Addendum (Union Exhibits 10A and 10B) as a single unified contractual agreement that Actors' Equity is entitled to enforce.  To hold otherwise would require the Arbitrator to ignore the participation of the parties in agreeing to a salary commensurate with Ms. Zimbalist's skill, experience, and reputation, and would further require the Arbitrator to impute a term and condition that does not exist in the writings signed by the parties, namely that the salary arrangement for St. Paul was unambiguously predicated on Ms. Zimbalist's assuming a contractual obligation subsequently to perform this play in additional venues.

The necessity of reducing complex agreements to writing in order to avoid misunderstanding and to facilitate enforcement of future compliance is not inconsistent with the requisite element of honest and

fair dealing in all contractual relationships, and the prevalent practice of

keeping one's word in the theater world described by Mr. Lombardo.

One party's inferred understanding of an incomplete oral transaction

cannot, however, outweigh the industry's widespread reliance on written

agreements for memorializing mutual understandings into contractual

terms.  Nor can the absence of any meaningful reference to future

performances in the Confidential Addendum, which further memorializes

the detailed terms of the parties' agreement, be ignored when assessing

the reasonableness and enforceability of Mr. Lombardo's assumptions.


Mr. Lombardo undoubtedly would not have undertaken to expend

substantial financial resources if he understood that Ms. Zimbalist would

limit her performances to two weeks in St. Paul.  His optimism that

additional venues could be negotiated was reasonable in view of

Ms. Zimbalist's expressed enthusiasm for the role, but no contract or

other binding agreement to perform in other cities was ever

consummated.  Lombardo's subsequent unilateral reliance on self-help

by stopping payment of Ms. Zimbalist's salary and expense checks may

have interrupted further discussions of future venues, but Lombardo has

not credibly demonstrated the existence of any oral or written

contractual agreement providing for additional performances of

"Tea at Five" that Lombardo may enforce or upon which Lombardo or its principal may reasonably rely. Subsequent publicity or web comments not directly made by Stephanie Zimbalist are irrelevant and immaterial.

As to Ms. Zimbalist, Lombardo has failed to establish by any persuasive evidence that she colluded in an attempt by Lombardo to mislead and defraud Actors' Equity and the Equity-League Pension Fund by understating her true weekly salary of $7500 in order to reduce her dues obligations. Such collusion would be contrary to Ms. Zimbalist's pecuniary interests, as the savings in dues is far less than the lost pension contributions, and has not been demonstrated by any quantum of evidence that even approaches a preponderance of the evidence. Moreover, Lombardo was less than forthright to Equity about its failure to submit appropriate individual contracts, bond monies, dues and ancillary reports and other documents, as well as dues and pension payments, to Equity in a timely manner.

Equity demonstrated by documentary evidence and sworn testimony that Lombardo made false material statements to Actors' Equity that violated Rule 8(A)(3) and Rule 8(A)(5). In his sworn testimony during the arbitration hearing, Mr. Lombardo admitted committing multiple other breaches of the Equity Rule Book, including stopping payment on salary checks, failure to remit pension contributions and

reports, failure to submit a bond as required, and failure to remit deducted dues in a timely manner within ten days, among other infractions. Lombardo admitted falsely representing to Equity that Ms. Zimbalist agreed to perform "Tea at Five" at the Ordway McKnight Theater in St. Paul, Minnesota for the salary of $577 per week ,and that the dues to be deducted and pension payments to be remitted were properly based on this salary. Lombardo also falsely averred that Ms. Zimbalist conspired with Lombardo to conceal the actual weekly salary of $7500 from Equity.

In the Security Agreement governing the St. Paul production of "Tea at Five" (Union Exhibit 7), Lombardo falsely represented that the total weekly salary for the production was under $4449. These statements and representations to Equity have not been substantiated by Lombardo by competent or persuasive evidence in the record of this arbitration. Therefore, imposing penalties established by the Rule Book for such material breaches based on this misconduct is fully justified.

Lombardo is obligated to pay the aggrieved Equity members "in full for all services rendered plus any sums due the Actor under the terms of this Agreement or the Actor's individual employment contract." As Ms. Zimbalist was not "released from the obligation to work" and performed all of her contractual duties, the measure of her damages for Lombardo's

breaches of Rules (A)(4) and (A)(5) is her unpaid salary, benefits, and ancillary expenses, plus interest.

Mr. Lombardo's testimony that the Confidential Addendum was not the Rider referred to when the box was checked on the front of the Mid-Size Theatre Contract Standard Form, as a different Rider was then being negotiated by the parties, was unable to overcome the more persuasive testimony offered by Ms. Zimbalist, and the thrust of Mr. Lombardo's own testimony, that he understood the Confidential Addendum to be a binding agreement. No other Rider has been introduced by Lombardo as a plausible alternate document to explain the check mark and reference to an attached Rider in the body of the Standard Mid-Size Theatre Contract.

Credible testimony offered at the arbitration hearing established that riders are routinely and frequently added to the Standard Mid-Size Theatre Contract form. A box exists on the front of this form to indicate that a rider has been negotiated. Such riders are especially common for well-known actors such as Ms. Zimbalist in order to provide salary and perquisites far in excess of the minimum union scale for performing a role under the Mid-Size Theatre Agreement without fomenting antipathy from lower paid colleagues. According to the testimony, such addenda often contain confidentiality clauses designed to protect producers from

dissent among other actors who are paid less than the higher-paid actors in a production or who are provided fewer perquisites.

Simply titling a rider as a Confidential Addendum does not signify that Ms. Zimbalist intended to deceive her union by participating in a deceptive practice, as Mr. Lombardo contended in his sworn testimony. Not only would such a practice jeopardize her long-term relationship with Actors Equity, but deceiving Equity in this regard would also result in the loss of substantial pension contributions on her behalf if Equity were led to believe that Ms. Zimbalist was performing this play for only $577 or $600 per week.  Consequently, both Actors' Equity Association and this Arbitrator ultimately concluded that Ms. Zimbalist did not act against her patent self-interest, nor was she complicit in seeking to deceive Actors' Equity by withholding the Confidential Addendum from Equity, in order to reduce her minimal dues deduction at the cost of forfeiting much more valuable pension payments by the Producer.  She testified credibly that she had no basis for knowing that Lombardo had not submitted the Addendum to Equity.

In his testimony, Mr. Lombardo admitted to multiple breaches of the Rule Book set forth in Section 8(A).  These material and significant breaches, including the failure to remit required dues and pension deductions, salary payments, bond payments and documents, and

mandatory weekly reports in a timely manner to Equity members, to

Equity, and to the Equity-League Pension Fund cannot be ignored.

Therefore, Actors' Equity Association properly exercised its discretion

under the Agreements entered into between Mr. Lombardo, The

Lombardo Organization, and Actors' Equity Association to impose

appropriate penalties.

Rule 8(B) provides that:

> Should any Producer be found in an Arbitration procedure to have engaged in an attempt to breach any term of any employment contract, said Producer agrees that such conduct in itself shall be a breach of the Producer's employment agreements with Actors, entitling any such Actors to recover from the Producer, Equity consenting, the actual amount of damages resulting from the breach, or if no basis of calculation exists, a sum equal to two weeks' contractual salary as liquidated damages. The Producer further agrees that, upon such a breach, the Producer's name may be posted on the Defaulting Employers List at Equity.

This language clearly and unambiguously establishes the basis for

penalizing distinct acts by a Producer, such as The Lombardo

Organization, that contravene or evade the requirements of the Equity

Rule Book or other documents governing the producer's relationship with

Actors' Equity or its members.

Equity properly cited multiple sections of various rules in justifying

Equity's contention that Mr. Lombardo and The Lombardo Organization

repeatedly flouted Equity's rules. These infractions have been

established persuasively both by Mr. Lombardo's admissions in his

sworn testimony during the arbitration hearing and by credible testimony submitted by Equity's witnesses. Nevertheless, Equity is not entitled to impose a separate penalty for each separate rationale supporting its conclusion that a violation has occurred or necessarily under each subsection within a particular rule. Although circumstances may arise that justify imposing multiple penalties for violations of different sections of the same rule, the compound penalties imposed by Equity in the instant case must be reduced significantly because redundant penalties have been imposed for the same infractions or elements of improper conduct constituting a single breach.

The evidentiary record demonstrated persuasively that Lombardo violated Rule 1 by failing to pay Stephanie Zimbalist and Christine Catti their full contractual salary and benefits. Mr. Lombardo candidly admitted in his testimony that he caused Ms. Zimbalist's last two paychecks to be stopped in order partially to recoup his investment in the St. Paul production. As Ms. Zimbalist fulfilled her obligations to perform "Tea at Five" for these two weeks, there was no valid justification for stopping payment on her salary checks or her expense reimbursement check in a unilateral attempt to minimize what Mr. Lombardo perceived to have been an unwise or unprofitable investment. Consequently, The Lombardo Organization and Mr. Lombardo, who had personally guaranteed The Lombardo Organization's

obligations to Ms. Zimbalist, owe Ms. Zimbalist two weeks' pay computed at $7,500 per week. Such payment, plus interest, shall be made forthwith. Ms. Zimbalist's agent has waived the payment of its ten percent commission attributed to these two weeks' salary.

Representatives of Actors' Equity testified at the arbitration hearing that The Lombardo Organization failed to convey the two and one-quarter percent Equity dues deducted at the time the checks were originally issued. The deduction of dues without transmitting them to the Union in a timely manner is a serious violation of contract and law. Equity is entitled to immediate payment of both the dues and the contractual penalty for failure to remit dues deductions in a timely manner.

The failure to remit pension contributions in a timely manner, along with the documentation required by the Rule Book, also constitutes a serious breach. Employers may not gain the benefit from deferring mandatory deductions by delaying remittance, thereby implicitly diverting the use of these statutory or contractual deductions for their own use. The evidentiary record demonstrated persuasively that Lombardo failed to remit appropriate pension deductions, equal to 8% of Ms. Zimbalist's full salary as stated in the Confidential Addendum Rider to the Mid-size Theater Agreement, in a timely manner as required by Rule 27.

In addition to the salary that was improperly rescinded, The Lombardo Organization shall pay $1200.--representing eight per-cent of her $15,000. salary-- payable to the Actor's Equity-League Pension Trust Fund, plus interest at the rate of six percent per annum to the date of this Award and nine per cent per annum thereafter until the amount is paid in full.  Such check shall also be sent by Lombardo to Attorney Pordy for transmittal to the Actor's Equity-League Pension Trust Fund.

The Arbitrator has ordered that interest be paid because The Lombardo Organization has improperly withheld for its own use and otherwise failed properly to remit dues payments and/or pension contributions owed to Actors' Equity that Lombardo deducted from Ms. Zimbalist's paychecks that Lombardo was legally and contractually obligated to remit promptly to Actors' Equity Association and to the Equity-League Pension Trust Fund.  Such use of monies for the Producer's own purposes justifies imposing the full contractual penalties established by the Rule Book under which the Lombardo Organization, and Matthew Lombardo as Guarantor, agreed to operate and be bound.

Rule 8(C), cited by the Union as the basis for its imposition of penalties for Lombardo's multiple breaches of contract and violations of the Equity Rule Book, establishes a penalty for breaches of Rule 8(A)(4)

or (5) equal to two weeks salary "if no basis of calculation for damages exists." Thus, The Lombardo Organization, or Matthew Lombardo individually as Guarantor, shall forthwith pay the amount of $15,000, the appropriate measure of liquidated damages specified under the Rule Book where actual damages for a breach cannot be ascertained, plus interest at the rate of six percent per annum from the date of the original checks until the date of this Award and nine percent per annum following the date of this Award until all amounts due and owing pursuant to this Award have been paid.

However, because multiple penalties have been imposed for the same misconduct using alternative rationales, the total aggregate penalties set forth in Equity's December 7, 2006 letter to The Lombardo Organization must be deemed excessive under the unique circumstances of the instant case, and cannot be condoned as wholly reasonable under the governing Agreements. Equity is entitled to penalize each distinct act that violates a standard of conduct set forth in the Rule Book, but cannot pyramid penalties because a particular distinct act of misconduct contravenes multiple rules or multiple sections of the same Rule. This is not to say that repeated instances of non-feasance, breach, or misconduct may not justify imposing and upholding multiple penalties for multiple instances of the same category of breach of the Rule Book or of other binding contractual agreements.

The concealment of the Confidential Addendum upon which the imposition of a $15,000 penalty was properly predicated under Rule 1 is essentially the same conduct for which another $15,000 penalty was imposed under Rule 2. The failure to submit the Addendum and the failure to disclose the terms of the Addendum to Equity do not justify two separate penalties under the Rule Book. Similarly, the negotiation of terms inconsistent with the Standard Mid-size Theatre Contract is essentially the same violation of the Rule Book. Rule 8(A)(4) specifically defines a breach of the Rule Book as "Employment of any Actor under any for of contract other than an Equity form of contract." Consequently, a single $15,000 penalty shall be assessed against Lombardo for this misconduct in breach of the Equity Rule Book.

Equity established that Lombardo failed to comply with the requirement in Rule 14(D) that Equity members be offered Individual Contracts at least three business days before they are required to report for rehearsal by timely offering contracts to Ms. Zimbalist and Ms. Catti; that Lombardo failed to secure a signed Individual Contract from Ms. Zimbalist and Ms. Catti before rehearsals commenced as required by Rule 14(C); and that Lombardo failed to return executed Individual Contracts to Equity in violation of Rule 14 (I). Equity imposed three separate penalties of $18,000 for these violations, computed as the

weekly salaries of both members for the two week run.  A penalty for flouting the procedures and time limits mandated by the Rule Book for offering, securing, and submitting Individual Contracts justifies the imposition of a stringent penalty.  The failure to offer Individual Contracts to Ms. Zimbalist and Ms. Catti incorporates the failure to offer the contracts on time and timely to submit the executed contracts to Equity.  Thus, a penalty in the amount of $18,000 is hereby awarded to Equity.  Equity may elect to direct this penalty either to the Actors' Equity Foundation or to the members or to apportion the penalty as Equity sees fit.

Lombardo admittedly attempted to employ Ms. Zimbalist under a "form of contract other than an Equity form of contract" when Lombardo intentionally withheld the Confidential Addendum Rider and submitted a fraudulently incomplete contract that omitted the Rider referred to by the mark in the box on the front of the Standard Mid-size Theater Contract. This violation justifies a penalty of two weeks salary, as no other basis of calculation of damages for Lombardo's breach of Rules (A)(4) and (A)(5) has been demonstrated persuasively by either party.

Persuasive testimony and documentary evidence established unequivocally that Lombardo failed to provide the requisite bond and supporting documents in accurate amounts and in a timely manner.

These intentional violations fit squarely within the definition of a breach of Rule 8(A)(5), which specifically defines a breach as "Failure to give or deposit security at the time and in the form and amount required by Equity."

Equity assessed a penalty of $15,000 for Lombardo's failure to remit appropriate dues for Ms. Zimbalist based on her full salary. Even if Lombardo's contention that Ms. Zimbalist colluded to deceive Equity of her accurate salary were accepted as accurate, such collusion would not relieve Lombardo of its obligation to remit correct dues deductions and pension contributions and to report such amounts accurately in a timely manner. The two salary checks sent to Ms. Zimbalist through her production company reflect deductions based on her total contractual salary of $7500 per week for each week of her performances in St. Paul. By failing to remit these dues and pension payments to Equity or to the Equity-League Pension Fund, Lombardo committed a material and serious breach of its obligations to Ms. Zimbalist, to Ms. Catti, and to Actors' Equity for which a stringent penalty is fully justified.

Equity imposed three $18,000 penalties in response to Lombardo's failure to submit weekly box office reports in violation of Rule 49(A)(2); failure to remit accurate weekly reports and appropriate pension payments to Equity or to the Equity-League Pension Funds in violation of

Rule 49(A)(1); and to timely submit a production program to Equity in violation of Rule 49(A)(4). These infractions have been demonstrated persuasively by the evidentiary record. At issue is the proper magnitude of penalty to be assessed for these three component Rule Book violations.

Although Lombardo's actions violated several sections of Rule 49 and Rule 63, the essence of the Producer's misconduct is failure to remit required pension contributions, associated reports and documents, and deducted dues amounts within the applicable time limits and in accurate amounts as mandated by the Rule Book. Each untimely or inaccurate report does not necessarily justify imposing a separate penalty of two weeks' wages under the particular facts and circumstances that pertain in the instant case.

As the measure of actual damages for such breaches cannot be ascertained, the contractual standard of two weeks' salary for the adversely affected Equity members, or $18,000 in the instant case, must be sustained. This amount comports fully with Rule 8(B), which establishes liquidated damages equal to two weeks' contractual salary for Ms. Zimbalist and Ms. Catti as liquidated damages for breach of the Rule Book where no other basis exists for calculating the actual amount of damages, but does not specify that a separate penalty may be imposed for each breach that violates multiple rules or multiple sections of a

particular rule. Therefore, the proper remedy for Lombardo's nonfeasance and misconduct of Rule 49 and Rule 63 is a penalty of $18,000, payable to the Actors Equity Foundation, plus dues in the amount of $337.50 that have not yet been remitted, plus interest to Actors' Equity.

To hold otherwise would unduly impair Equity's ability to police its contracts, and would unfairly shift onto the Union from signatory producers, upon whom the obligations fall, the burden of demonstrating compliance with applicable provisions of the Equity Rule Book. Given the far flung theatrical enterprises in which members of Actors' Equity participate and the manifest necessity of assuring complete compliance with the procedural and substantive obligations imposed under the Rule Book by mutual agreement of the various parties to standard Equity contracts, the onus of assuring compliance and honest dealing by producers and others who employ Equity members does not fall exclusively on Equity. A valid presumption that accurate and prompt reporting and prompt payment of monetary obligations will be remitted to Equity underlies the parties' relationships. Material and intentional breaches of such obligations, as have been demonstrated by clear and convincing evidence in the instant case, permit the Union to impose substantial penalties for each action that constitutes a separate breach of the Equity Rule Book and other documents governing the contractual

relationships between Actors' Equity Association, The Lombardo

Organization, and Matthew Lombardo as Guarantor.


The Lombardo Organization has not demonstrated persuasively

that an Equity ruling dated October 30, 2006 disposed of all outstanding

issues between Lombardo and Actors' Equity regarding the St. Paul

production of "Tea at Five."  Lombardo has not substantiated its claim

that Equity knew all of the accurate facts as of this date or that the

ruling relieved Lombardo of its duty to comply with the procedural and

substantive provisions of the Rule Book.  Nothing in the record supports

Lombardo's assertion that the instant arbitration is time-barred based on

an allegation of untimely filing of a Demand for Arbitration with the

American Arbitration Association.  Moreover, Lombardo cannot cite its

alleged collusion to deceive Equity regarding the terms of the

Confidential Addendum to support Lombardo's contention that this

document is not part of the complete contract with Ms. Zimbalist and is

unenforceable in, and irrelevant to, the instant proceeding.


Equity did not review and approve the Confidential Addendum

because Lombardo intentionally and improperly withheld this document

from Equity, thereby depriving Equity of the opportunity to incorporate

the full terms of the employment contract governing Mr. Zimbalist's

St. Paul performances in preliminarily determining Lombardo's obligations under the contract and the Rule Book and evaluating Lombardo's compliance. Furthermore, Lombardo expressly admits that no other Rider was negotiated or memorialized to which the check mark on the Standard Mid-Size Theater Contract could refer. Neither can the distinctions drawn by Lombardo between the format of the 2004 contract between Lombardo and Equity member Kate Mulgrew establishing the terms governing her performances in "Tea at Five" invalidate the contract between Equity and Stephanie Zimbalist for her performances of "Tea at Five" in St. Paul, Minnesota.

Equity has demonstrated by its documentary evidence and sworn testimony that Lombardo owes Christine Catti the amount of $1302, the difference between the weekly salary of $849 declared for Ms. Catti and her actual contractual salary of $1500 per week (Union Exhibit 19) for services rendered in connection with the "Tea at Five" production at the Ordway McKnight Theater in St. Paul. This payment shall also be computed with Christine Catti the amount of $1302.

Therefore, based on the evidence submitted, the Producer, The Lombardo Organization, or Matthew Lombardo as Guarantor, owe Stephanie Zimbalist, Christine Catti, Actors' Equity Association, and the Equity-League Pension Fund monies regarding the production of "Tea at

Five" pursuant to the Mid-Size Theatre Agreement or an individual contract with Stephanie Zimbalist or the Confidential Addendum dated August 31, 2006. More specifically, The Lombardo Organization or Matthew Lombardo as Guarantor shall pay forthwith to Hope Pordy, Esquire on behalf of Stephanie Zimbalist the amount of $15,000 in salary, plus $727 in unreimbursed expenses, less an offset for any amounts previously paid on which payment was actually credited to Ms. Zimbalist's account or the account of her production company, Solstice Productions. A check, payable to Solstice Productions shall be conveyed to Hope Pordy, counsel for Equity for transmittal to Ms. Zimbalist.

Ms. Zimbalist shall be solely responsible for reimbursing Actors' Equity Association for dues in the amount of $337.50, representing the two and one-quarter percent dues rate, plus proportionate interest at the rates of interest set forth above. Ms. Pordy shall compute this payment of dues and interest, and transmit Ms. Zimbalist's check for this amount to Actors' Equity as a prerequisite for releasing the salary payment and interest to Ms. Zimbalist.

Lombardo shall pay Christine Catti the amount of $1302, plus interest as set forth below, and shall pay to Actors' Equity Association the amount of $33,000. In addition, The Lombardo Organization or

Matthew Lombardo as Guarantor shall pay $16,200 to the Equity-League Pension Fund and $18,000 to the Actors' Equity Foundation. All other expenses payable under the Confidential Addendum that have not been paid as of the date of this Award also shall be paid forthwith by The Lombardo Organization, or by Matthew Lombardo individually as Guarantor.

All such payments shall be augmented by interest at the rate of six pre cent per annum from the date such payments were originally due and owing until the date of this Award, and thereafter at the rate of nine per cent per annum until all sums ordered pursuant to this Award have been paid in full.

Equity has asked that The Lombardo Organization be required to pay the full costs of the arbitration because, but for Lombardo's breach of its agreements with Actors' Equity, Ms. Zimbalist, and Ms. Catti, the instant case would not have arisen. However, the instant case concerns more than recoupment of payments Equity, Ms. Zimbalist, and Ms. Catti were owed pursuant to their contracts with The Lombardo Organization. Also at issue was The Lombardo Organization's attempt to reduce its liability for substantial multiple penalties imposed for its misconduct and breaches under the Equity Rule Book.

If the matter had dealt exclusively with making Ms. Zimbalist, Ms. Catti, and Actors' Equity whole for losses incurred as a result of The Lombardo Organization's unwarranted actions, then Equity's request for reimbursement of all its fees and expenses connected with the arbitration would likely have been granted.  However, because Mr. Lombardo was partially successful in reducing the amount of penalty imposed after he exercised his contractual right to appeal Equity's initial internal determination regarding the imposition of penalties by Actors' Equity Association, the adjudication of the instant matter was not predicated solely upon The Lombardo Organization's violations of its contractual and legal obligations to Actors' Equity Association and to its members Stephanie Zimbalist and Christine Catti.  Consequently, the custom of apportioning fees equally between the parties remains appropriate in the instant case.

In the event, however, that either party finds it necessary to undertake further proceedings before this Arbitrator, or elsewhere, to enforce any aspect of this Award, the amounts recovered and the costs of enforcement shall be payable by the party against whom enforcement is successfully sought.

All amounts due and owing to Actors' Equity, to Ms. Zimbalist, and to the Arbitrator shall be paid within ten days after the issuance of this Award.

The Arbitrator's fees and expenses, in the amount of $11,099., shall be considered part of the amounts due and owing pursuant to this Award.  Although the parties may have a contractual agreement with each other to split the costs of arbitration, including the Arbitrator's fees and expenses, both parties ultimately are jointly and severally liable for the entire cost of the arbitration in the event that the other party fails to pay the Arbitrator promptly, in which case the party who pays an additional half share of the Arbitrator's fees and expenses is entitled to contribution from the other party.

The Arbitrator hereby retains jurisdiction to resolve any disputes that may arise regarding the computation, implementation or enforcement of the remedies ordered pursuant to this Award.

January 7, 2008

Daniel F. Brent, Arbitrator

AMERICAN ARBITRATION ASSOCIATION
LABOR ARBITRATION TRIBUNAL

---

In the Matter of the Arbitration Between

THE LOMBARDO ORGANIZATION

and

ACTORS' EQUITY ASSOCIATION

---

AAA Case No.  13 300 02842 06

---

## SUPPLEMENTAL AWARD OF ARBITRATOR

The undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, AWARDS as follows:

On January 7, 2008, the undersigned Arbitrator issued an Award in this matter.  The Award held that The Lombardo Organization and Matthew Lombardo, as Guarantor, owe Stephanie Zimbalist, Christine Catti, Actors' Equity Association, and the Equity League Pension Fund monies regarding the production of "Tea at Five" pursuant to the Mid-Size Theatre Agreement or an individual contract with Stephanie Zimbalist or the Confidential Addendum dated August 31, 2006.

2

The Arbitrator explicitly retained jurisdiction to resolve any disputes that may arise regarding the computation, implementation or enforcement of the remedies ordered pursuant to this Award.  By letter dated January 22, 2008, Hope Pordy, Esq., attorney for Actors Equity Association, requested a clarification of the Award to correct two inadvertent clerical errors.  Her motion is hereby granted.

The Award dated January 7, 2008 is hereby amended to provide that The Lombardo Organization and Matthew Lombardo, as Guarantor, also owe Stephanie Zimbalist the amount of $806.19 for rental car reimbursement that remains unpaid, plus interest computed as set forth in the Award.  This amount shall be paid forthwith.  The Lombardo Organization does not owe Christine Catti any monies pursuant to her employment contract with The Lombardo Organization.  All other aspects of the January 7, 2008 Award of Arbitrator remain in effect and unchanged, and are incorporated as if fully set forth herein.

The Arbitrator hereby retains jurisdiction to resolve any disputes that may arise regarding the computation, implementation or enforcement of the remedies ordered pursuant to the January 7, 2008 Award or this Supplemental Award.

January 22, 2008                    _____

Daniel F. Brent, Arbitrator

State of New Jersey
County of Mercer

    On this 22nd day of January, 2008 before me personally came and appeared Daniel F. Brent, to me known and known to me to be the individual described in the foregoing instrument, and he acknowledged to me that he executed the same.

_____

An Attorney at Law of the
State of New Jersey

# EXHIBIT B

# Actors' Equity Association

### AGREEMENT AND RULES
### GOVERNING EMPLOYMENT
### IN
### MIDSIZE THEATRES

Effective Date: April 24, 2005

Expiration Date: April 29, 2007

**NATIONAL OFFICE**
165 West 46th Street
New York, NY 10036
(212) 869-8530
Fax (212) 719-9815

**Chicago, IL 60603**
Suite 1500
125 South Clark Street
(312) 641-0393 phone
(312) 641-6365 fax

**Los Angeles, CA 90036**
Suite One
5757 Wilshire Boulevard
(323) 634-1750 phone
(323) 634-1777 fax

**San Francisco, CA 94104**
Suite 900
350 Sansome Street
(415) 391-3838 phone
(415) 391-0102 fax

**Orlando, FL 32821**
10319 Orangewood Boulevard
(407) 345-8600 phone
(407) 345-1522 fax

**www.actorsequity.org**

## TABLE OF CONTENTS

1.  ACTOR'S OBLIGATION TO EQUITY ..................................................................... 1
2.  ADDENDUM AND MINIMUM TERMS. ................................................................. 2
3.  AGENTS. ............................................................................................................ 2
4.  ALIENS. ............................................................................................................. 3
5.  ARBITRATION. ................................................................................................... 3
6.  AUDITIONS. ....................................................................................................... 3
7.  BLACKLISTING ................................................................................................... 9
8.  BREACHES ........................................................................................................ 9
9.  CHORUS. .......................................................................................................... 10
10. CLAIMS BY ACTORS. ...................................................................................... 12
11. CLOTHES AND MAKE-UP. ............................................................................... 12
12. COMPANY MEETINGS. ..................................................................................... 15
13. CONTINUOUS EMPLOYMENT. ........................................................................ 15
14. CONTRACTS:  INDIVIDUAL EMPLOYMENT. ................................................... 15
15. DANCE CAPTAIN. ............................................................................................ 16
16. DEFAULTS. ....................................................................................................... 17
17. DEFINITIONS ..................................................................................................... 17
18. DEPUTIES AND REPRESENTATIVES. ............................................................. 19
19. DISCRIMINATION. ............................................................................................. 19
20. DISCRIMINATION FOR UNION ACTIVITY. ....................................................... 20
21. DUTIES OF THE ACTOR. .................................................................................. 20
22. EQUITY SPECIAL PROVISIONS. ...................................................................... 20
23. EXTRAORDINARY RISK.  .................................................................................. 21
24. EXTRAS. ............................................................................................................ 22
25. HOUSING.  ......................................................................................................... 23
26. ILLNESS AND LEAVES OF ABSENCE. ............................................................. 25
27. INSURANCE AND BENEFITS. ........................................................................... 27
28. INTIMIDATION. ................................................................................................... 29
29. JUVENILE ACTORS. .......................................................................................... 29
30. LAWS GOVERNING. .......................................................................................... 29

31. MILITARY SERVICE OF THE ACTOR. ................................................................. 29

32. MONIES IN EXCESS OF REQUIRED MINIMUM. ................................................. 30

33. MORE RUMUNERATIVE EMPLOYMENT. ........................................................... 30

34. MOTION PICTURE AND/OR TELEVISION RIGHTS. ........................................... 31

35. NO STRIKE OR LOCKOUT. ................................................................................. 32

36. NUDITY. ............................................................................................................... 33

37. PER DIEM ............................................................................................................ 34

38. PERFORMANCES. ............................................................................................... 34

39. PERSONAL PROPERTY. ...................................................................................... 36

40. PHOTOGRAPHS. ................................................................................................. 37

41. POTENTIAL WEEKLY BOX OFFICE GROSS AND COMPANY TIERS ............. 39

42. PRODUCTION PROSECUTED. ........................................................................... 39

43. PROGRAMS, PLAYBILLS, BILLING, CHANGES IN THE COMPANY, AND
PUBLIC ANNOUNCEMENTS. ................................................................................. 40

44. PUBLICITY. ......................................................................................................... 43

45. RECORDINGS USED IN A PRODUCTION (SOUND AND VIDEO). ..................... 45

46. REHEARSALS. ..................................................................................................... 46

47. REOPENING OF A PLAY. ..................................................................................... 50

48. REPLACEMENT OF AN ACTOR. ........................................................................ 50

49. REPORTS. ............................................................................................................ 51

50. REST PERIODS AND DAYS OFF. ........................................................................ 52

51. RIGHTS:  CONTINGENT, SUBSIDIARY AND FUTURE PRODUCTIONS. ........... 53

52. SAFE AND SANITARY CONDITIONS OF EMPLOYMENT. ................................. 54

53. SALARIES AND ADDITIONAL COMPENSATION. .............................................. 57

54. SECURITY AND SECURITY AGREEMENTS. ..................................................... 60

55. SET MOVES. ........................................................................................................ 60

56. STAGE FIGHTING/VIOLENCE/STUNTS. ............................................................ 60

57. STAGE MANAGERS AND ASSISTANT STAGE MANAGERS. ............................ 61

58. TELEVISING, FILMING, AND RECORDING. ....................................................... 65

59. TERMINATION AND CLOSING NOTICES. .......................................................... 66

60. TERM OF EMPLOYMENT. ................................................................................... 69

61. TRANSPORTATION AND BAGGAGE. ................................................................. 69

62. UNDERSTUDIES. ................................................................................................. 71

63. UNION SECURITY: DUES AND INITIATION FEES..............................................74

64. VACATIONS. .........................................................................................................75

    INDEX.............................................................................................................77

## AGREEMENT AND RULES GOVERNING EMPLOYMENT
## IN MIDSIZE THEATRES  (hereinafter "Agreement")

### Recognition.

The Producer agrees to recognize Actors' Equity Association (hereinafter called "Equity") as the exclusive bargaining representative of all the Actors (Principals, Chorus, Stage Managers, Assistant Stage Managers, Understudies and Extras) employed by the Producer for the purposes of collective bargaining and the administration of matters within the scope of this Agreement.

### Use of Agreement

(A)  This Agreement may be offered by Equity, at its sole discretion, for use in Midsize Theatres.

(B)  The term "Midsize Theatre" shall mean theatres with a seating capacity of 699 seats or less except those located in the cities of Chicago, New York, San Francisco and the County of Los Angeles.

(C)  Without the express consent of Equity, the Midsize Theatre Agreement may be used only by a Theatre and/or by a Producer or producing organization that has not operated under a Standard Equity Contract in the preceding 12 months.

(D)  Food or beverages may not be served to the audience under any circumstances (this shall not preclude lobby concessions).  It shall be the responsibility of the Producer to enforce this ruling.  If Equity determines that the Producer is permitting violations of this rule, such violations shall subject the Producer to review of this Agreement, and Equity may, at its sole discretion, require the Producer to operate under a different Agreement.

(E)  This Agreement may not be used for touring productions.

(F)  This Agreement may be used to produce a single production and is not a seasonal agreement.

1.  **ACTOR'S OBLIGATION TO EQUITY**

(A) Nothing contained in any employment contract signed by any Actor shall provide for or be construed as a provision to prevent or interfere with a member fulfilling any and all obligations that said Actor owes to Equity.  The Producer shall not request or require any Actor to do any act or thing forbidden by the Constitution and By-laws of Equity, the rules or orders of the Council of Equity, or the orders of its authorized executives but shall require the Actor to do and/or assent to doing all acts required by the foregoing.

(B) The Producer agrees he has notice that:

(1) the Associated Actors and Artistes of America ("the 4-A's") is a voluntary association subject to the constitution, by-laws, rules, regulations and orders of

1

the American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO"), from which it derives its charter;

(2) Equity, deriving its charter from the 4-A's, is in turn subject to the constitution, by-laws, orders, rules, and regulations of the 4-A's and the AFL-CIO; and

(3) the Actor is directly subject to the constitution, by-laws, rules, regulations and orders of the 4-A's.

(C) Contracts of employment shall be subject to all such rules and regulations as specified in (A) and (B) above.

(D) Nothing contained in this Rule shall, however, require the Producer to take any action which is not legally permissible, or permit Equity to change, modify, amend, supersede or impose any conditions or obligations upon the Producer which are not specifically set forth in the Agreement and Rules Governing Employment in Midsize Theatres or in any of the individual agreements made with Actors consistent herewith.

## 2. ADDENDUM AND MINIMUM TERMS.

The Actor and the Producer understand that the rules and regulations set forth herein are minimum provisions and, as such, do not limit an Actor's ability to negotiate for better terms of employment. Such terms, however, must be set forth in a rider to the employment contract and approved by Equity.

## 3. AGENTS.

(A) Franchise Holding. The Producer has notice that if the negotiation for or the obtaining of a contract of employment by the Actor is through any employment agent or personal representative not franchised by Equity or one whose franchise is not in good standing, then the Actor is liable to suspension or other disciplinary action by Equity.

(B) Non-representation by an Agent. Should the Producer contact the Actor directly and agree with the Actor as to the salary and part, the Producer shall not directly or indirectly require the Actor to sign the contract at or through an agent's office. Any such agent so engaged does not represent the Actor and should the Agent make a claim for commission, the Actor will notify the Producer accordingly, and the Producer shall indemnify the Actor and hold the Actor harmless from any such claim.

(C) Commissions/Principal. Commissions on the compensation of a Principal Actor shall be subject to Equity agency regulations. A copy of the current commissions scale and all provisions regarding agents are available upon request from the Equity office.

(D) Commissions/Chorus. Actors engaged under a Chorus contract shall not be permitted to pay commission to any agent except in accordance with the Equity agency regulations.

(E) <u>Agents Acting as Casting Consultants or Packagers</u>.  Any agent who acts as an agent for a Producer, either as a casting consultant or otherwise, with or without fee, does not, if the Actor secures employment through the Agent, represent the Actor in securing said employment and therefore, pursuant to the Agency Regulations, shall not be entitled to a commission from the Actor.  The foregoing also applies in any case in which the agent acts as a packager either on behalf of a Producer, with or without fee, or on his own behalf.  In the event that such agent seeks a commission from an Actor, the Producer shall indemnify the Actor and hold the Actor harmless from any such claim.

## 4. **ALIENS.**

Nonresident aliens may not be employed on this contract.  Equity's decision shall not be subject to arbitration.

## 5. **ARBITRATION.** [See also Rule 10.  CLAIMS BY ACTOR.]

Any controversy arising from the application or interpretation of this Agreement or affecting the relationship between any Actor or Equity and the Producer, including the disputes as to the existence or validity of any employment contract, shall be submitted to arbitration pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association.

(A) Arbitration as provided herein shall be the exclusive remedy for the resolution or adjustment of disputes, including any question as to whether a dispute or issue is arbitrable under the provisions of this Agreement.  Nothing herein shall be construed to give the arbitrator the authority to alter, amend, or modify any of the provisions of this Agreement.  Equity shall determine the site of arbitration, which shall be New York, Chicago, Los Angeles, or San Francisco or such other city as Equity shall designate.

(B) <u>Time Limit</u>.  Should the Producer dispute a ruling by Equity, the Producer shall demand arbitration within four weeks of notice to him of said ruling.  Failure to do so shall constitute agreement with said ruling, and an acknowledgement that Equity may deduct any monies due as a result of said ruling from any security posted with Equity by the Producer.  The Producer further shall replace said amount deducted immediately upon demand by Equity.

(C) <u>Expenses</u>. Equity and the Producer shall share the expense of the arbitration, including the compensation of the arbitrator, equally.

(D) Equity shall act on behalf of the Actor in any arbitration proceedings and no Actor is authorized to commence any arbitration proceeding except with the consent of Equity.

## 6. **AUDITIONS.**

(A) The Producer agrees to hold auditions for principal and chorus performers and interviews for Stage Managers.  The following conditions shall apply:

(1) Among the auditions (or interviews) held for performers, there shall be auditions (or interviews) for Equity performers.

(2) The theatre is under no obligation to hire any person pursuant to any audition or interview procedures including the procedures for Equity performers set forth below.

(3) <u>Agent Calls.</u>  Agent-submitted auditions shall not be permitted prior to the completion of all other auditions.

(B) <u>General Provisions.</u>

    (1) <u>Equal Employment Opportunity.</u>

        (a) <u>Affirmation.</u>

            (i)    The Producer and Equity affirm their commitment to a policy of equal employment opportunities designed to promote the elimination of discrimination and to project a positive model of equal employment and multiethnic diversity within all theatres.  Consistent with the foregoing, it is the intent of the parties that the selection and casting of plays and the hiring of Stage Managers shall be conducted in a manner that provides equal employment opportunities to ethnic minority performers (African-Americans, Hispanic-Americans, Asian/Asian-Pacific Americans, Native Americans), women, senior performers, and performers with disabilities.

            (ii)    The Producer agrees that the casting of all productions shall be conducted in a manner that provides full and fair consideration to ethnic minorities, women, senior performers, and performers with disabilities. Further, active solicitation of ethnic minority performers, women, senior performers, and performers with disabilities shall be evident in all ads, notices, calls, and cast breakdowns to agents and casting directors in order to ensure their participation in the casting process.

            (iii)    In addition, the Producer and Equity shall encourage multiracial, multiethnic productions and the use of a flexible and imaginative casting policy known as "non-traditional casting".  Non-traditional casting is designed to increase employment for ethnic minority performers, women performers, senior performers, and performers with disabilities by the casting of these individuals in roles for which race, gender, age, or the presence or absence of a disability is not absolutely essential to the play or the character's development.

        (b) It is the intent of the Producer and Equity that auditions for all roles shall be held without regard to age, gender, race, color, ethnic origin, creed, impairment, political persuasion or belief, or sexual orientation.

        (c) When announcing auditions for a production, the Producer shall allow sufficient time between the announcement and the audition for those performers who are either visually or hearing impaired to notify the Producer of their intent to audition.  The Producer shall use best efforts to assist or comply with such requests in the following manner:

(i)    For the visually impaired: provide a reader, reader copy, a Braille copy of the script or sides, or an audio cassette of said material if such are not readily available to the performer;

(ii)    For the hearing impaired provide a sign language interpreter.

(2) <u>Casting Authority.</u>  An individual with casting authority (i.e., one who can effectively recommend performers for employment) must be present at all times during auditions/interviews.

(3) <u>Audition Spaces</u>.  All audition spaces should meet the same standards as required for the work place as specified under applicable legal codes and building regulations.  To the best of his ability, the Producer shall insure that audition spaces meet these requirements for all performers, which may include ramps or lifts for the physically impaired.  This clause shall not require the Producer to make immediate changes to the Producer's work area but shall serve as a reminder of the needs of certain members of the community.

(C) <u>Equity Audition or Interview Requirements</u>.

(1) <u>Equity Principal Performer Auditions</u>.  (EPA's)

(a) Equity Principal Auditions (EPAs). Equity Principal Auditions shall be defined as auditions at a scheduled time and designated place at which all Equity Performers shall have equal opportunity to audition for principal roles.

(i)    A full day of Equity Principal Auditions shall consist of no fewer than seven hours.

(ii)    If the production venue is in an Equity Liaison City (as defined by Equity), the Producer shall conduct two full days of Equity Principal Auditions in that Liaison City.

(iii)    If the production venue is within 50 miles of an Equity Liaison City or a city in which Equity maintains an office, Equity may require an additional day of auditions in the venue city.

(iv)    If the production venue is located in a city other than those described in 6(C)(1)(b) or 6(C)(1)(c), one full day of Equity Principal Auditions shall be conducted at the performance venue or other local Equity-approved space.

(v)    When auditions are conducted in an Equity Office City, that city's Equity Principal Audition procedures shall be used.

(vi)    When auditions are conducted elsewhere, they may be conducted on a first-come, first-served basis or by appointment.

(a) If auditions by appointment are used in locations other than Equity Office Cities, appointments shall be made in five-minute intervals.

5

(b) Performers who have not made appointments shall be accommodated at these auditions as time permits.

(c) The Producer shall not invite or call any performer to these appointment auditions except by means of the casting notice described in (E) below.

(2) <u>Equity Chorus Auditions</u>.

(a) <u>Scheduling Equity Performer Chorus Auditions</u>.   Before any Chorus is hired, there shall be chorus auditions open to all performers.   The applicable Equity office shall handle the scheduling of Equity Chorus auditions.  Equity shall receive at least two weeks' notice of such auditions.

(b) Auditions may be held on two separate days: one day for voice and one day for dancing and general qualifications.  If these two days are not consecutive, the Chorus performer shall not be required to report for any purpose on the intervening days.  If the Chorus performer is called for any day, or works on any day after the second audition day, then the Chorus performer shall be paid at the rate of $1/6^{th}$ of the appropriate tier's minimum salary for each day.

(c) For productions in which performers are required to sing, there must be an audition for singers at which performers must be given an opportunity to audition in their primary skill before they may be requested to move or dance. In productions in which performers are required to dance, there must be an audition for dancers at which performers must be given an opportunity to audition in their primary skill before they can be requested to sing.

(d) The Producer shall audition singers (male/female) and dancers (male/female) separately at the first call for Chorus performers.

(e) If the Chorus performer is required to rehearse numbers used in the production, this shall constitute the beginning of the rehearsal period.

(f) Equity shall have the right, in consultation with the Producer, to schedule the auditions so that no more than two Producers hold their first or final auditions on the same day or call the same category (singer or dancer) at the same time.

(g) The Producer shall notify Equity of the time and place of the final audition.

(h) If Equity performers are called for any day, work on any day after the third audition day, or are called for a fourth audition, the performers shall be compensated on the basis of one-sixth minimum salary for each day or part thereof.

(j) The Producer shall not, under any circumstances, halt the progress of a Chorus performer audition for the audition of a Principal performer.

6

(j)There shall be separate changing facilities (not lavatories) for men and women dancers.

(k)Equity reserves the right to approve audition dance surfaces in accordance with Rule 53 (G) -- SAFE AND SANITARY CONDITIONS OF EMPLOYMENT.

(l) Each musical play employing chorus performers shall be required, at least every six months after the first paid public performance, to conduct chorus replacement calls.

(3) <u>Equity Stage Manager Interviews</u>.   The Producer agrees to set aside one half-day to interview Stage Managers.  During these interviews those who have the authority to hire Stage Managers shall be present.  These interviews may be conducted by telephone.

(D) <u>Additional Equity Performer Audition Provisions</u>.

(1) <u>Notice</u>.

<u>(a)</u>.  The Producer shall submit to Equity, through the Equity Region's Auditions department or office, a complete cast breakdown, setting forth a definitive description of each character in the production, and of all stage managerial positions. This notice shall state which roles, if any, will be understudied. The Producer shall indicate the agreed upon time, date and location of the Principal and/or Chorus Audition and the name of the person who will be conducting the audition, for posting on Equity's website, hotline, and in theatrical trade papers. The Producer reserves the right to make changes or substitutions of those who are conducting Principal Auditions, provided that those substituted shall have the authority to set up a subsequent audition and to share in making casting recommendations.

(b)This notice shall also contain the names of the director, stage manager, and in the case of musicals, the musical director and choreographer if they are known at the time the notice is submitted, the dates of the first rehearsal, opening and closing of the production, audition preparation instructions for performers (e.g. "Prepare a brief traditional musical theatre song", "Prepare a brief contemporary comic monologue", "An accompanist will be provided", "Please bring dance clothes", etc) and all necessary information for contacting the Producer including address (with zip code). Equity shall receive all required casting notices no later than two weeks prior to all required Principal and Chorus auditions. If casting information is submitted to personal managers, agents or a breakdown service more than two weeks prior to the auditions, the required casting notice shall be submitted to Equity at that time.

(c) Notices sent to a breakdown service or intended for agents and/or managers shall contain character descriptions identical to those in the Equity Principal Audition notice. If a synopsis or other information regarding the play or author is provided in notices to a breakdown service, agents

and/or managers, identical information shall be included in the Equity Principal Audition notice.

(d) When a role to be cast depicts a person with a specific disability, the Producer agrees to include this information in the casting specifications and, at the same time, to notify Equity of such specifications so that Actors with similar disabilities may be informed and given an opportunity to audition for the role.

(e) The location and time may not be changed within one week of a scheduled Audition without notifying Equity and all trade publications where time permits.

(f) The Producer shall consult Equity with respect to the scheduling of Equity Auditions.

(2) Audition Code.  All auditions scheduled through the Equity office, whether conducted at the Equity office or another location, shall be conducted under the provisions of the Equity Audition Code.

(3) Accompaniment.  The Producer shall provide a piano and an accompanist who can sight-read music for all auditions at which the performer is required to sing and/or dance.

(4) Casting Authority.  All auditions shall be conducted by the director and/or person who equals or supersedes the director in final casting authority. Noncompliance with this provision shall be cause for rescheduling the audition.

(5) Equity Meetings.  Provided that Equity notifies the Producer in advance, the Producer shall not hold Equity performer interviews, calls, or auditions on any day when an official Equity membership meeting is scheduled.

(6) Liability Insurance.  The Producer shall provide liability insurance to cover all Equity performers at Equity performer auditions.

(7) Safe and Sanitary Provisions.  Performers shall not be permitted to audition at any premises that do not comply with the fire laws of the city or state in which the auditions are held.  When auditions are held in studios or theatres, the Producer shall provide:

(a) a room (other than the audition room) which shall have seats and an open space where the performer may wait and/or warm up for the audition;

(b) an audition room, changing room, and/or waiting room that is properly lighted, ventilated, and heated (when necessary) during inclement or cold weather to at least 68° Fahrenheit; and

(c) waiting and/or changing areas where smoking shall not be permitted during Principal or Chorus interviews or auditions; and

(d) ample, cool, pure drinking water and cups where needed at no charge to the performer throughout the audition process; and

(e) separate, clean and functioning lavatories.

(8) Callbacks. Individual production callbacks shall be limited to two per performer. [See Rule 17(C): Definitions—Callback.] A performer shall be compensated at the rate of 1/6th of applicable minimum weekly salary for each callback in excess of two.

## 7. **BLACKLISTING.**

The Producer and Equity pledge to prevent blacklisting. Opposition to blacklisting is not a controversial issue between the Producer and Equity.

For the purpose of this rule, "blacklisting" shall mean the submission of the Producer, directly or indirectly, to individual or group pressure and/or the use of private lists, published or unpublished, of persons not to be employed in theatrical productions for reasons not in any manner related to their theatrical ability.

If it is determined as a result of an Arbitration procedure that a Producer has engaged in blacklisting, the Producer agrees to pay the Actor losing the employment as a result of such act, full contractual salary for the duration of the contemplated engagement, plus a sum equivalent to the full contractual salary of the successor or successors or $1,000.00, whichever is greater.

## 8. **BREACHES**

(A) Breaches.  A breach shall include, but shall not be limited to, the following:

(1) Infraction of any provision contained in the Actor's employment contract;

(2)  Infraction of any Equity rule incorporated into the employment contract;

(3) Any false statement made by the Producer or Actor in connection with the employment contract or the security agreement relating thereto;

(4) Employment of any Actor under any form of contract other than an Equity form of contract; and

(5) Failure to give or deposit security at the time and in the form and amount required by Equity.

(B) Attempted Breach.  No Actor shall agree with a Producer, employment agent, personal representative, or other Actor and no Producer shall agree with any Actor, employment agent, or personal representative, to cause, or agree to permit, any breach of any term of any employment contract.

(1) Should an Actor engage in such conduct, said Actor shall be subject to such disciplinary action as Equity may determine and/or dismissal by the Producer as set forth in this Agreement.

(2) Should any Producer be found in an Arbitration procedure to have engaged in an attempt to breach any term of any employment contract, said Producer agrees that such conduct in itself shall be a breach of the Producer's employment agreements with Actors, entitling any such Actors to recover from the Producer, Equity consenting, the actual amount of damages resulting from the breach, or if no basis of calculation exists, a sum equal to two weeks' contractual salary as liquidated damages.  The Producer further agrees that

upon such a breach, the Producer's name may be posted on the Defaulting Employers List at Equity.

No offset of the earnings acquired by the Actor in any other employment during the period in question shall be allowed to reduce the damages stemming from the Producer's breach.

(3) In the event of a liquidated damages award stemming from an Actor's participation in a Producer's breach, any award granted shall be payable to the Actors' Equity Foundation.

(C) Remedies.

(1) Except as otherwise expressly provided in this Agreement, disputes hereunder shall be subject to the Arbitration provisions. Equity may not make final determination of breaches by the Producer except with respect to violations of (A)(4) and (A)(5) above. As to (A)(4), Equity may intervene, without penalty, and require the Actor to perform or rehearse or not perform or not rehearse until said infraction is remedied. As to (A)(5), the Producer shall have two business days to remedy said infraction after which Equity may intervene without penalty and require the Actor to perform and rehearse or not perform or not rehearse until such infraction is remedied.

(2) In the event of default or breach by the Producer under the provisions of (A)(4) or (A)(5), and with Equity's consent, the Actor shall be released from the obligation to work and may terminate employment if the Actor should so desire. The Producer shall pay the Actor in full for all services rendered plus any other sums due the Actor under the terms of this Agreement or the Actor's individual employment contract. If no basis of calculation for damages exists, the Producer shall pay the Actor a sum equal to two weeks of the Actor's contractual salary.

9. **CHORUS.**

(A) Parts Breakdown. As soon as available, the Producer shall furnish to Equity the script of a new musical or new adaptation of a musical production with casting breakdowns of principal parts and an indication of the number of principal and chorus Actors to be used.

Equity will then respond with its breakdown of Principal and Chorus roles. Where differences exist, Equity's determination shall hold for contract filing. Final determination shall be made when the production is frozen and contracts shall be changed to reflect this determination. Equity retains final authority in role determination.

(B) Chorus Contracts.

(1) Equity Chorus Contracts. Any Actor performing as Chorus shall be signed to a Chorus contract. The determination of what constitutes Chorus work shall be made by Equity.

(2) Number of Equity Chorus Contracts During Run.  The number of Chorus Actors employed as of the first paid public performance must be retained for the entire run of the production.

(C) Dance Captains.  [See Rule 15 DANCE CAPTAINS.]

(D) Swings.  In all productions that perform five weeks or more and have a Chorus, a Full Swing (a non-performing Chorus Actor who Swings all or fewer than all Chorus Actors in Chorus numbers in the production) of each gender must be employed from the first day of rehearsal.

(1) Full Swing. A Full Swing (i.e. a non-performing Chorus Actor who swings all or fewer than all Chorus Actors participating in Chorus numbers in the production) i shall receive not less than 5% of the applicable tier's minimum salary/week in addition to the Actor's weekly contractual salary:

(2) Partial Swing.  If a Chorus Actor is designated to swing a Chorus number in a production and is not hired solely as a full Swing (see above), said Actor shall receive not less than 2% of the applicable tier's minimum salary/week for each such number assigned in addition to the Actor's weekly contractual salary.

(E) Chorus Playing a Part.

(1) Chorus Playing a Part.  If a Chorus Actor is assigned to play a part, execute a choreographic sequence, or sing a song which was performed by a Principal Actor in the original production or which is individual in its character, the Chorus Actor shall receive no less than 4% of the applicable tier's minimum salary/week for each such assignment in addition to the Chorus Actor's weekly contractual salary.

(2) If a Chorus Actor is assigned to perform a specialty, play a part, speak lines, or do a solo which is incidental to the production or which was assigned to a Chorus Actor in the original production, the Actor shall receive no less than 2.5% of the applicable tier's minimum salary/week for each such assignment in addition to the Actor's weekly contractual salary.

(F) Chorus Understudying.

(1) Chorus Understudying Principal.  If a Chorus Actor understudies a Principal role, the Actor must be paid no less than 4% of the applicable tier's minimum salary/week in addition to the Chorus Actor's weekly contractual salary for each Understudy assignment.

(2) Chorus Understudying Chorus Playing a Part.  If a Chorus Actor understudies another Chorus Actor who is functioning under (E)) above, the Chorus Actor shall be paid no less than 2% of the applicable tier's minimum salary/week in addition to the Chorus Actor's weekly contractual salary for each such assignment.

(3) Emergency Understudies.  [See also Rule 62 (F ) UNDERSTUDIES.]

(4) Payment for Performance.  [See Rule 62 (D) UNDERSTUDIES.]

10. **CLAIMS BY ACTORS.** [See also Rule 5 ARBITRATION.]

(A) <u>Waiver or Release Not Permissible</u>. In the event that any claim by an Actor is urged under this Agreement by reason of breach thereof, no evidence of receipt of any waiver, release, adjustment, compromise, or settlement by the Actor is of any validity whatsoever, unless Equity consents in writing thereto. Further, the Producer will not seek or solicit any such receipt, waiver, release, or adjustment as evidence in any, Arbitration, or court proceeding unless Equity specifically consents in writing. In no case shall claims of Actors under employment contracts be handled or urged by agents, attorneys, or other representatives of Actors unless Equity consents in writing.

(B) <u>Time Limit in Lodging</u>. Should the Actor deem that there is any claim against the Producer under the Actor's contract, the Actor shall present that claim to Equity or to the Producer within four weeks of the occurrence of the claim or when the Actor first became aware of the claim, whichever is later. In the event that notification of a claim is delayed, Equity or an arbitrator may consider the sufficiency of the reason for that delay and proceed accordingly.

11. **CLOTHES AND MAKE-UP.**

(A) <u>Clothing</u>. The Producer except as herein provided shall supply all clothes, except for conventional underwear. In no event shall a Producer require the Actor to purchase any clothes for the production. All clothing required in the production shall be sanitary and free of materials, paints, and/or adhesives that are toxic or hazardous. The Actor may agree to use such conventional morning, afternoon, and/or evening clothes in the production as the Actor may use for everyday wear. The Producer must pay the Actor a rental fee for such wardrobe in accordance with (B)(2) below.

(B) <u>Rental of</u>.

(1) The terms of the rental shall be stated in a rider to the Actor's contract and shall not be less than, but may be more than, the terms provided in Equity's Weekly Clothing Rental Schedule. The Producer must pay any rental approved by Equity to the Actor weekly in a separate check, along with the Actor's salary.

(2) <u>Weekly Clothing Rental Schedule:</u> In those instances in which the Producer requests and the Actor agrees to furnish the Actor's own clothing for any production, the Actor shall be paid no less than the following weekly rates for the items listed:

| Item | Rate |
|---|---|
| Topcoat | $5.00 |
| Overcoat | 5.00 |
| Raincoat | 5.00 |
| Suit Jacket | 5.00 |
| Blouse | 2.00 |
| Dress | 5.00 |
| Ensemble (Shirt, Tie, Suit, Shoes, Hat, etc.) | 30.00 |
| Jeans | 2.00 |
| Shirt | 2.50 |

| | |
|---|---|
| Skirt | 5.00 |
| Shoes (street) | 8.00 |
| Shoes (dance – Professional jazz shoes, character shoes, tap shoes, pointe shoes, dance boots) | 10.00 |
| Shorts | 2.00 |
| Slacks | 5.00 |
| Suit | 20.00 |
| Sweater | 3.00 |
| Tie | 1.00 |
| Hat | 2.00 |
| Boots | 10.00 |
| Evening Gown | 15.00 |
| Slip/Bra | 2.00 |
| Nightgown | 2.00 |
| Bathing Suit | 2.00 |
| Miscellaneous (Purse, Briefcase) | 1.00 |

(C) <u>Cleaning and Upkeep</u>. All clothing worn by the Actor for use in the production, whether furnished by the Producer or not, shall be cleaned at least once every two weeks unless conditions dictate a shorter interval; such interval/condition shall be determined by the Stage Manager and the Deputy. Any residue from the cleaning process must be removed from garments prior to their issuance/return to the Actor. "Skin parts" of clothing (<u>e.g.</u>, stockings, shirts, undergarments, bodysuits, dress shields, bathing suits, and slips) shall be laundered at the Producer's expense after each use. After they have been laundered, skin parts must be thoroughly rinsed and dried. In addition, the Producer agrees to have any wardrobe item furnished by the Actor cleaned at the close of the engagement. A bona fide professional cleaning establishment shall do such cleaning.

(D) <u>Costumes for Understudies and Swings</u>. Swings and Understudies must be assigned properly fitted shoes and skin parts for their sole and exclusive use in performance.

A Swing or Understudy shall be provided with a properly fitted costume whenever the Swing or Understudy is required to perform. Any costume worn by another Actor shall be cleaned prior to its use by a Swing or Understudy and again prior to its further use by any other Actor, including the Actor to whom it is regularly assigned. However, if a Swing or Understudy who does not have a full set of costumes is required to appear, costumes worn by said Swing or Understudy must be cleaned not later than the first business day on which no matinee performance occurs following the Swing or Understudy's appearance.

Understudies and Swings shall be advised by contract rider at the time their original employment contracts are executed whether or not the Producer will provide said Actors with their own set of costumes. It is understood that there is no requirement for individual costumes for Understudies.

(E) <u>Make-up</u>. The Producer shall provide all make-up except ordinary and conventional make-up, which shall be furnished by the Actor. If the Actor is

13

required to use body make-up, the Producer shall furnish clean cloth towels for removal of such make-up.

(F) <u>Hairpiece</u>. When the Actor is required to wear a hairpiece at the Producer's request, the Producer shall be responsible for the cost of procuring and maintaining said hairpiece. Should the Actor and Producer agree in writing to use the Actor's personal hairpiece, then a rental fee of no less than $15.00 per week shall be paid to the Actor. The cleaning and upkeep of this hairpiece shall be the Producer's responsibility.

(G) <u>Change of Hair Color</u>. The Actor may not be required to change the hair color unless the Actor agrees in writing. If the Actor agrees, the theatre shall pay the expense of changing and maintaining the color during the run of the engagement and restoring the original color at the close of the engagement.

(H) <u>Change of Hair Style</u>. The Actor may not be required to cut or change hairstyle in any way or to shave his head or his beard unless the Actor agrees in writing. If the Actor agrees, the theatre shall pay the original expenses associated with the styling and upkeep of said hairstyle. The Actor may not be required to grow a beard or let his hair grow unless the Actor agrees in writing.

(I) <u>Knee Pads and Protective Clothing</u>. Prior to any activity that requires kneepads, elbow pads, and/or protective clothing, the Producer shall furnish new and properly fitted (<u>i.e.</u>, small, medium, or large) protective items for the exclusive use of the Actor for all rehearsals and performances. Such protective clothing shall be replaced when necessary.

(J) <u>Chorus:  Additional Provisions</u>. The Producer shall furnish Actors engaged on Chorus contracts with all hats, costumes (period or modern), wigs, beards, hairpieces, tights, hose, stockings, T-shirts and any undergarments required by the Producer for use in the production. Clean, dry skin parts must be provided for each performance.

(K) <u>Shoes</u>.

   (1) <u>General</u>. The Producer shall provide all footwear, which shall be clean, sanitary, properly fitted, and in good repair. Any footwear used for dancing shall be new. Professional dance shoes are not required for normal ballroom dancing or minimally choreographed movements.

   (2) <u>Dance Shoes</u>. The Producer shall provide properly fitted professional dance shoes for all members of the Company who are required to dance. Dance shoes may represent the period of a production or the nature of a specific character (<u>e.g.</u>, sneakers in *West Side Story* or athletic shoes in *Damn Yankees*) and must conform to the appropriate style of the movement. All footwear shall be of suitable construction for dancing when used for theatre dance movement. The Producer shall provide professional dance shoes at least one week prior to dress rehearsal. The Producer shall furnish pointe shoes with ribbons for all rehearsals and performances requiring pointe shoes. The Producer shall furnish at least one pair of pointe shoes for each member of the Company called upon to dance in pointe shoes. New pointe shoes shall be

provided sufficiently in advance of their use to allow the Actor adequate time to break in the shoes. Shoes for dancing shall be rubbered, braced, repaired, and/or replaced whenever necessary.

12. **COMPANY MEETINGS.**

No meetings shall be held to vote on working conditions, concessions, or waivers without the consent of Equity, except as provided in Rule 47(A)(6)—REHEARSALS, Rule 41(A)(3)(e)—PHOTOGRAPHS. [See also Rule 14(F)—CONTRACTS: INDIVIDUAL EMPLOYMENT.]

13. **CONTINUOUS EMPLOYMENT.**

Continuous employment is the essence of all employment contracts, and all calculations of sums due or benefits accruing to the Actor shall be computed on the basis of consecutive rehearsals and consecutive employment.

14. **CONTRACTS: INDIVIDUAL EMPLOYMENT.**

(A) Equity Contracts. Individual employment contracts and riders (as applicable) shall only be valid and binding on Equity-printed contract forms.

(B) Determination of Classification. Equity has the sole right to determine whether an individual is correctly classified as an Actor, Stage Manager, Assistant Stage Manager, Chorus, Understudy, or Extra, and the Producer agrees that Equity's determination shall be final and is not subject to arbitration.

(C) Effective Date. Both parties must sign contracts between the Producer and the Actor before the Actor begins rehearsals.

(D) Signing of. All Contracts must be presented to the Actor no less than three business days before the Actor is to report for rehearsal.

(E) Term Contracts. A Term Contract for a period of no less than three months and no more than six months can be negotiated at no less than $150.00 above the applicable tier's minimum. The Term Contract increment shall be paid in addition to all other required increments.

(F) Equity-Approved Concessions. Prior to contract signing, the Producer shall inform the Actor, in writing and as part of the contract, of all concessions and/or waivers granted to the Producer by Equity. The Actor has neither the right nor the power to waive any of the minimum conditions set forth in the employment contract or Equity rules without the written consent of Equity.

(G) Job Assignments. A Principal Actor may be assigned no more than four job assignments (excluding bit parts) in a production. Job assignments may include performing parts, understudying parts, or performing as a non-required Assistant Stage Manager but exclude any assignments for which the Actor is receiving an additional increment.

(H) Changes, Errors, and Alterations.

(1) Unless all riders, changes, alterations, waivers, or substitutions made prior to, at, or after the time of contract signing have been consented to by Equity in

15

writing, such riders, changes, alterations, waivers, substitutions, or any part thereof, are void at the option of the Actor, Equity consenting. It shall be the duty of the Producer, not the Actor, to submit proposed changes, etc. to Equity for its written approval by a duly authorized representative.

(2) The Producer agrees that all blanks (e.g., opening date, name of part, salary, etc.) must be written in before contract signing or delivery. Any deletions, additions, or corrections must be initialed by both the Actor and the Producer.

(I) Quadruplicate Copy. Within three business days after the Producer and the Actor receive the signed contract, each shall mail to Equity a signed copy of the employment contract including any riders or attachments.

If the Producer fails to file said copy within the specified time, the Actor may terminate employment without notice, providing the Actor has filed the Actor's copy of the contract within the specified time and has obtained Equity's consent. If the Actor terminates the contract, the Producer shall pay the Actor the amount to which the Actor may be entitled under this Agreement.

(J) Hiring "As Cast". All roles, parts, and/or functions shall be specified in the Actor's contract except as follows:

A Principal Actor in a non-musical may agree to appear in the production in "Multiple Parts". The parts assigned and performed one week after the first paid public performance shall be deemed the Actor's assigned role for that production and may not be changed or added to without a written agreement.

(K) First Rehearsal Date. Should any contract be signed more than two months in advance of the projected starting date, such date may be listed as "on or about" with a three-day grace period on either side of the date. The Producer shall notify the Actor and Equity at least two months prior to the rehearsal date as to the exact starting date of the Actor's contract. If the Producer fails to so notify the Actor and Equity, payments to the Actor start on the earliest of the grace period dates.

15. **DANCE CAPTAIN**.   [See also Rule 43 (A) Free Program)

(A) In all productions utilizing musical staging or choreography, there shall be a Dance Captain assigned no later than the first day of rehearsal.

(B) A Dance Captain shall receive no less than 15% of the applicable tier's minimum salary/week in addition to his weekly contractual salary, commencing with the first day of rehearsal. Provision for payment shall be included in a rider to the Dance Captain's contract. An Actor engaged solely as a Dance Captain shall be paid no less than the minimum salary for an Actor plus any other increments due.

(C) The Dance Captain's rehearsal hours shall not exceed the maximum number of hours as provided in Rule 47 (B) and (C) REHEARSALS without incurring overtime. All provisions for breaks, rest periods (including overnight rest) as provided in Rule 51 REST PERIODS AND DAYS OFF shall apply.

(D) The Stage Manager shall not serve as Dance Captain.

16

(E) The Dance Captain shall be listed on the Cast Page.

16. **DEFAULTS.**

Any Producer engaging any Actor represents that the Producer is not in default under any agreement with Equity at the time of such engagement, and that no contract has been entered into between said Producer and Equity, or any Actor, in which any breach remains unsettled or unliquidated. For the purpose of this paragraph, the subject matter of a dispute currently in any phase of Arbitration or for which notice of Arbitration has been given shall not be deemed an "unsettled" or "unliquidated" breach.

No Actor shall work or be required by any Producer to work (without the consent of Equity) for any person, partnership, corporation, enterprise, or group which has failed to abide by any Arbitration award or, where permitted herein, any final determination of Equity, or which through failure to meet past obligations to Equity or Actors has been placed on Equity's Defaulting Employers List. No Actor shall work or be required by any Producer to work (without the consent of Equity) for anyone who is a general partner, associate producer, corporate director or officer, or active stockholder of a defaulting Producer.

Should a Producer remain in default for non-payment of salaries or other monies due an Actor or Actors for a period of longer than one year, the Producer agrees that 5% interest, compounded annually, beginning one year after the default and ending when the claim is paid shall be added to and be payable as part of said claim.

17. **DEFINITIONS.**

(A) <u>Actor</u>. The term "Actor" shall refer to and include all persons who are signed to Equity contracts, including those engaged as Principals, Chorus, Stage Managers, Assistant Stage Managers, Understudies, or Extras.

(1) <u>Principal Actor</u>. "Principal Actor" shall include Actors other than those engaged as Chorus or Stage Managers. A Principal Actor may not be assigned Chorus functions.

(2)<u>Chorus</u>. A "Chorus Actor" shall include Actors engaged under a Chorus contract and/or Actors actually performing Chorus work, as may be determined by Equity.

(3)<u>Stage Manager</u>. A "Stage Manager" is any person engaged under contract as a Stage Manager or an Assistant Stage Manager.

(B) <u>Actor's Designated Call</u>. The "Actor's designated call" shall refer to the actual scheduled daily call of the Actor as posted by the Producer.

(C)<u>Callback</u>. A "callback" is an interview or audition to which an Actor has been specifically called by the Producer or Producer's representative (including, but not limited to, the artistic director and individual production's director) for a second, third, fourth, etc. screening after having completed one initial interview or audition for the specific production to which the callback pertains.

(D) <u>Chorus</u>. [Rule 17 (A): Definitions—Actor.]

17

(E) <u>Contemplated Closing Date</u>. The "contemplated closing date" is the date listed on the face of the Actor's contract that identifies either when the production is scheduled to close or when the Actor's and Producer's mutual obligations shall cease. The date is "contemplated" because, with proper notice, the Producer could close the production sooner. A production that does not have a known ending date at the time of contract signing shall list "Open" as the contemplated closing date.

(F) <u>Day Off</u>. A "day off" is 24 hours in addition to the regular rest period required at the end of each working day.

(G) <u>Designated Tech Week</u>. The "designated tech week" is the workweek stipulated on the face of the Actor's contract in which the Company may rehearse the extended hours indicated in the rehearsal rules section of the Agreement. Each production may have one designated tech week. The designated tech week may, but need not, be concurrent with the Opening Week.

(H) <u>Extraordinary Risk</u>. [See also Rule 24 EXTRA ORDINARY RISK.] Extraordinary Risks include but are not limited to, performing acrobatic feats; suspension from trapezes or wires or like contrivances; the use of and/or exposure to smoke, mobile scenery, excessive heights, unsecured and/or unprotected heights, weapons, fire, or pyrotechnic devices; the taking of dangerous leaps, falls, throws, catches, knee drops, or slides; participating in potentially dangerous choreography; choreography requiring the Actor to execute movements which depart from the accepted techniques of movement and support as used in contemporary theatre dance, (<u>i.e.</u>, classical ballet, modern, modern jazz, or ethnic); or performing on sets which are potentially dangerous.

(I) <u>Fight Captain</u>. The "Fight Captain" is the individual assigned responsibility for maintaining stage fights/stunts, either with or without weapons, as safely as possible. The Fight Captain shall have authority to require changes in the production elements of the fight/stunt or the actual routine of the fight/stunt action when such may be essential for the safety of the performers.

(J) <u>Final Curtain</u>. "Final Curtain" shall be defined as the last curtain down at which point the Actors are released from the stage or, if notes, a photo call, or other work takes place after said point, the end of said work.

(K) <u>Midsize Theatre</u>. "Midsize Theatre" shall mean theatres with a seating capacity of 699 seats or less except those located in the cities of Chicago, New York, San Francisco and the County of Los Angeles. [See also Use of Agreement}.

(L) <u>Musical Production</u>. For the purpose of this Agreement, a "musical" is defined as a production that has, as an integral and major part of its thematic nature, the use of singing and/or dancing (<u>e.g.</u>, NO, NO NANETTE, a musical comedy, SMOKEY JOE'S CAFE, a musical revue, STUDENT PRINCE, a light opera, CONTACT, a dance musical).

(M) <u>Opening.</u> The "Opening" is the first paid public performance.

(N) <u>Opening Week</u>. "Opening Week" is the workweek, which contains the first paid public performance.

(O)Part and Role.  A "part" shall mean each character, specialty, or function for which the Actor is responsible.  The Role is the sum of the parts for which the Actor is responsible.

(P) Per Diem.  [See also Rule 37--PER DIEM.]  Per Diem.  Per Diem is a fixed allowance to cover living expenses for out-of-town Actors (i.e. those Actors whose primary residence as listed with Equity is more than 50 miles from the theatre).

(Q)Potential Weekly Box Office.  [See Rule 41–Potential Weekly Box Office and Company Tiers.]

(R)Principal.  [Rule 16 (A): DEFINITIONS—Actor.]

(T)  Producer.  The term "Producer" shall mean the individual (or individuals, corporations, or other legal entities) who signs contracts of employment or, for the rendering of services, is the individual who has signed the Security Agreement as such.

(U) Production Contract.  Wherever "Production Contract" is used in these rules, it shall be understood to refer to the current "Agreement and Rules Governing Employment Under the Equity/League Production Contract".  Where the phrase "Production Minimum" or "Standard Production Minimum" is used, it shall be understood to refer to the applicable minimum salary in the current "Agreement and Rules Governing Employment Under the Equity/League Production Contract".

 (V) Stage Manager.  [See (A) Above: DEFINITIONS – Actor.]

(W) Tiers.  [See Rule 41 – POTENTIAL WEEKLY BOX OFFICE AND COMPANY TIERS and Rule 53 -- SALARIES AND ADDITIONAL COMPENSATION.]

(X) Workweek.  A "workweek" is seven consecutive days, spanning Monday through Sunday.  No other workweek shall be used for computing days off, pay periods, etc.

18. **DEPUTIES AND REPRESENTATIVES.**

Each Company shall elect a Deputy.  Deputies shall have the duty and obligation to report to Equity the total weekly hours worked, any overtime, and/or any violations of the rules.

There shall be a Deputy for Principal Actors and whenever a Chorus is employed, there shall be a Deputy (or Deputies) for Chorus Singers and Chorus Dancers.

Duly authorized representatives of Equity shall have free access to the stage and to all Actors at all times.

19. **DISCRIMINATION.**

(A) There shall be no discrimination against any Actor or applicant for a part in a production on the basis of race, color, creed, gender, ethnic origin, sexual orientation, age, impairment, or political persuasion or belief.  Unless satisfactorily resolved between Equity and the Producer, a claimed violation of this section shall be submitted to arbitration.  In the event the arbitrator determines that discrimination has been practiced, the Arbitrator shall have the authority to direct reinstatement or employment, as the case may be, and/or assess such monetary damages as, in the

Arbitrator's opinion, will make the Actor or applicant whole for such financial loss that the Actor may have suffered by reason of said discrimination.

(B) The Producer and Equity agree that there shall be no discrimination on the basis of race, color, creed, gender, ethnic origin, sexual orientation, age, impairment, or political persuasion or belief practiced against any Actor or any patron in the admission or seating of individuals in theatres or other places of performance. Any determination of discrimination shall be made by Equity who shall immediately notify the Producer. Actors shall not be permitted to perform in any theatre or other place of performance where such discrimination exists.

20. **DISCRIMINATION FOR UNION ACTIVITY.**

Producer shall not dismiss or otherwise penalize any Actor for fulfilling the Actor's duties or obligations as a Deputy or as an Equity member or as an Actor. [See Rule 59(E)(2)-- TERMINATION AND CLOSING NOTICES and Rule 8--BREACHES BY THE PRODUCER AND/OR ACTOR.]

21. **DUTIES OF THE ACTOR.**

(A) Duties.

(1) The Actor shall abide by all rules and regulations of Equity and not alter, omit, or change them in any way.

(2) Within three days after entering into any employment contract, the Actor shall file with Equity a signed copy of that contract, including any riders or attachments.

(3) The Actor shall be prompt at all calls and shall appear at the theatre no later than the Actor's designated call.

(4) The Actor shall perform services as directed and as sustained by the Stage Manager and shall conform to the language of the script.

(5) The Actor shall pay strict regard to make-up and dress.

(6) The Actor shall properly care for and check his costumes and props.

(7) The Actor shall respect the physical property of the production and the theatre.

(8) The Actor shall abide by all reasonable rules and regulations of the Producer that are not in conflict with this Agreement or Equity rules.

(9) The Actor shall not appear at rehearsals or performances under the influence of alcohol or any controlled substance.

(B) Infractions. Infractions of the above-listed rules shall subject the Actor to disciplinary proceedings in accordance with this Agreement and the Constitution and By-laws of Actors' Equity Association, where applicable.

22. **EQUITY SPECIAL PROVISIONS.**

(A) Representation. Equity may represent the Actors in any dispute that may arise with the Producer and in any matters arising under any Equity employment

agreement. When any act, request, or consent of any such Actor is provided for in said agreement, the request, consent, or approval of Equity shall, for all purposes, be deemed the consent, request, approval or act of the Actors.

(B) Meetings: Privilege of Actors to Attend. There shall be no rehearsals, performances, auditions, or call-backs (except in cases of dress rehearsals or rehearsals on the day of the first paid public performance) at any time when a regularly scheduled meeting of Equity is being held in within 50 miles of where the Actor is rehearsing or performing. Time off for this purpose shall not be counted as a part of that day's rehearsal.

(C) Special Power to Act for Actor.

(1) Whenever it is provided in any employment contract that any act or thing may be done by an Actor either at the option of, with the consent of, or at the request of Equity, or on the demand of or with the consent of such Actor, then Equity (representing the Actor) has and is given the authority to act for and in place of the Actor and to assert the Actor's position or make the Actor's request or demand as the case may be, with all of the power and authority of the Actor himself/herself, without liability to itself.

(2) In all cases where, by virtue of any employment contract, the consent or approval of Equity is required, Equity has and reserves full discretionary power in giving its consent to change, modify, or limit rights of any Actor under this contract, said action to be taken on behalf of Equity, in writing, by either the President or Executive Director, or one of the executives. .

(D) Oral and Written Interpretations. Oral or telephone rulings made by Equity representatives are not binding upon Equity or, without its consent, upon its members. Written confirmation of these rulings shall be forwarded to the Producer upon request.

Written rulings or interpretations of the employment contract or this Agreement must be either approved or given by the President, the Executive Director, or one of the executives  and shall be binding upon Equity only when said persons act within the powers delegated to them by the Council of Actors' Equity Association.

(E) Council Powers. Should there be any conflict between any rules or any basis for more than one interpretation as to the meaning of any of the rules, Equity has the right to determine the correct interpretation or resolve the conflict, and its decision shall be binding upon Equity and its members.

23. **EXTRAORDINARY RISK**.  [See also Rule 17(L) DEFINITIONS - Extraordinary Risk.]

(A) Inherently Dangerous Conditions are Prohibited. No Actor shall be required to perform any feat or act that places the Actor in imminent danger or is inherently dangerous, nor shall any Actor be required to perform in a costume or upon a set that is inherently dangerous.

(B) Determination. Equity reserves the right to determine an Extraordinary Risk and shall notify the Producer in writing that such a risk exists. Upon such notification,

the Producer may request an immediate meeting with Equity to occur within two days of the request. The Producer agrees to abide by Equity's final determination as to whether Extraordinary Risk exists.

(C) Agreed to at Time of Contract Signing. An Actor who agrees to perform an act of "Extraordinary Risk" must agree to do so in a rider to the Actor's contract. Said rider shall specify whether additional compensation shall be paid for the Extraordinary Risk and, if so, in what amount. Any payments shall begin with the first day of rehearsal or the time when the act becomes an Extraordinary Risk, whichever proves to be the initial period of risk. If a Producer challenges Equity's determination of an Extraordinary Risk, payments shall be delayed until a final determination is made and all payments shall be retroactive.

(D) Determined Subsequent to Contract Signing. No Actor shall be required to perform an act of Extraordinary Risk as a condition of employment when determination of such risk has been made after the contract has been signed.

(1) If the Actor involved agrees to perform the Extraordinary Risk, a rider to the Actor's contract must be executed and a copy filed with Equity. Said rider shall specify whether additional compensation shall be paid to the Actor for performing the Extraordinary Risk and, if so, in what amount. Any payments shall be retroactive to the first day of rehearsal or the time when the act became an Extraordinary Risk.

(2) If the Actor involved does not agree to perform the Extraordinary Risk, the Producer shall modify the activity involved to eliminate such Extraordinary Risk.

24. **EXTRAS.**

(A) Function and Definition. The function of an extra is to provide atmosphere and background only. An extra may not be identified as a definite character, either singly or within a group, and may not be required to change make-up. An extra may, however, make two costume changes. An extra may not be rehearsed more than two weeks before the first paid public performance, may not speak except in omnes, may not sing (except with the consent of Equity in relation to a particular play), dance, or understudy.

(B) Audition. When a Producer determines to conduct auditions for Extras, such auditions shall be conducted consistent with the provisions of Rule 6 AUDITIONS, provided however, that there shall be no required minimum number of audition days, and performers may be screened for general type during the scheduled audition.

(C) Salary and Other Conditions of Employment.

(1) Rehearsal and minimum performance salary shall be no less than ½ Actor's minimum salary. The Producer shall contribute, on behalf of each Extra, to the Equity-League Pension and Health Funds, as provided in Rule 28 (B)(2), (C)(1) and (D).

(2) Extras shall be signed on a Standard Form Contract which shall provide the following:

(a) a one week guarantee of salary from the date of opening of the play; and

(b) a requirement of one-week notice for termination of contracts.

25. **HOUSING**.  [See also Rule 37 PER DIEM]

Housing, including room taxes and utilities shall be provided by the Producer at no cost to the out-of-town Actor.  The securing of housing and transportation shall not be the responsibility of the Stage Managerial Staff.

(A) Requirements.  The Actor shall be provided a furnished private room and is to be offered a choice of at least two air-conditioned living accommodations.  Such accommodations shall include bedding, bed linens, and towels and, where a kitchen is included, cooking and eating utensils shall be furnished.  The Producer shall warrant and guarantee all housing shall be clean, sanitary, and reputable.

(1) Not Acceptable.  YMCA's and/or YWCA's, university or college dormitories or rooms in private homes are not acceptable choices.

(2) Definition/Private.  A "private" room is defined as:

(a) One which can be locked from both the inside and outside (i.e. a private hotel room or individual apartment); or

(b) A room within an apartment or suite with a door which can be secured (closed or locked) to ensure privacy, without restricting the access of any other Actor sharing the premises to the bath, kitchen and/or living room.

(3) Hotel.  If the Actor is housed in a hotel, the hotel must have an AAA rating of two diamonds or greater.

(4) Kitchen Facilities.  Housing for Actors in residence 15 days or more shall have access to cooking facilities.  Cooking facilities shall mean a kitchen area with a refrigerator, stove with oven and a kitchen sink.

(5) Telephone.  The Producer shall provide private, individual local non-toll telephone service in the Actor's housing at no cost to the Actor, with the following exceptions:

(a) When the Actor is housed in a hotel, Theatre shall reimburse Actor for the expense of four local, non-toll calls per day;

(b) When the Actor is housed in a multi-bedroom unit the Producer shall provide access to phones with free local, non-toll service for each unit.

(6) Theatre Owned Housing.  The Actor may not be required to live on the theatre premises, or in theatre-owned and/or Producer-owned premises as a condition of employment.  Equity has the right to inspect "on premises" living quarters.

If the Producer owns or leases living accommodations, Producer may offer these to the Actor provided these accommodations have been approved by Equity.  If the Actor agrees to accept these accommodations, the Actor may do so in the form of a rider to the Actor's contract.

(C)  The Producer shall provide a portal (hook-up) for Internet access.  Where possible, this shall be a phone jack in the Actor's housing.  Otherwise, the Producer will provide such access at the theatre during hours when the Actor is not in rehearsal or performance.

(B)  Accessible Accommodations.    The Producer will ensure that there are accessible accommodations when an Actor with a disability is employed.

(C)  Selection of Choice.  If the Producer transmits a list of Equity approved housing to the Actor at least 10 days prior to the Actor's arrival at the theatre, the Producer may require the Actor to notify the Producer of the Actor's choice within four days after receipt of written notice from the Producer that such prompt choice is required. Once the Actor has selected a room from this list and has notified the Producer or Producer's representative of Actor's choice, Actor must accept such choice on arrival or make Actor's own housing arrangements.

(D)  Family and Pets.  The Producer is obligated to secure living accommodations for the Actor and is not responsible for securing accommodations for the Actor's family or pets.  However, the Producer will make best efforts to locate and reserve suitable living accommodations for the Actor and his children, provided the Actor advises the Producer of his intention to bring children at the time that he accepts the offer of employment.  The Theatre shall provide, if requested, current information on accommodations, if any, which accept pets. Such best efforts do not obligate the Producer to any additional costs incurred to house the Actors family or pets.

(E)  Local Transportation.    The Producer, at Producer's expense, shall furnish round-trip transportation to the Actor for all performances and/or rehearsals under the following conditions:

(1) No available public transportation.

(2) No suitable living accommodations within one-half mile of the theatre by normal transportation routes.

(3) In all cases where no suitable shopping and/or public dining facilities are available where the Actor can obtain three meals a day during normal meal hours, seven days a week, within one-half mile of the Actor's lodgings and/or theatre by normal transportation routes, the Producer shall provide round-trip transportation to such dining facilities daily and to an area of diversified shopping including a bona fide supermarket twice a week (if shopping is further than one-half mile or if there is no pedestrian way between shopping and housing).

(4) If housing and/or restaurants are more than one-quarter mile from the theatre, the Producer will furnish transportation for Actors who are physically disabled or 65 years of age and over, and for all Actors in the event of inclement weather or in the event that the Actors are required to use unlighted roadways after dark.

(5) Local transportation may be furnished in a "Company Car" or a "Cast Car" (and they may be the same vehicle) but each car shall be properly insured, operated by a properly licensed driver, and each Actor shall be provided with

24

Actor's own seat facing forward in the car.  The car shall be in good repair with functioning heating and ventilating facilities and shall be equipped with modern safety devices.  It is further agreed that such "company" and/or "cast" car will be covered by $500,000/ $l,000,000 liability insurance.

(6) Transportation shall be furnished in such manner that the Actor will arrive at the theatre one-half hour prior to the beginning of each performance, and promptly for each rehearsal and shall be available to return the Actor to Actor's living quarters no later than one-half hour after each performance and promptly after each rehearsal.

(7) Public transportation shall not mean public conveyance for private hire, such as taxis.

(8) It shall be the Producer's obligation and responsibility to either to have the Actor met on Actor's arrival in the town, or instruct Actor in advance where to go on arrival.

(F) <u>Security Measures</u>.  Where possible, in addition to tumbler locks, there shall be a dead bolt lock on all exterior doors of the Actor's quarters.  Neither the Actor's room number, address or phone number shall be given out by the theatre's business or box office, except to an authorized Equity representative, unless authorized to do so by the Actor.  The Producer shall promptly relay phone calls of an emergency nature to the Actor.  Emergency phone numbers will be posted on the official Equity Callboard.

26. <u>**ILLNESS AND LEAVES OF ABSENCE.**</u>

(A) <u>Illness:</u>

(1) <u>Standard Contract</u>.  If the Actor cannot perform due to illness, injury (except for an injury or illness covered by worker's compensation), or any other valid reason, then the Actor shall not be entitled to any salary for the time during which said services shall not be rendered, except as provided in (B) below.  Should the foregoing condition (except for an illness or injury covered by worker's compensation) continue for a period of 16 performances or more or for any 24 performances within a period of 48 performances and the Actor has not requested and received a Disability Leave under the provisions of paragraph (C) below, the Actor may terminate the contract effective immediately or the Producer may terminate the contract upon one week's notice and in either case, the Producer shall pay for all services to date.  [See also Rule 46(A)(11)--REHEARSALS.]

(2) <u>Term Contract</u>.  If the Actor cannot perform due to illness, injury (except for an injury or illness covered by worker's compensation), or any other valid reason, then the Actor shall not be entitled to any salary for the time during which said services shall not be rendered, except as provided in (C) below.  If during such illness an Actor other than an Understudy plays the part and the original Actor has not requested and received Disability Leave under the provisions of paragraph (C) below, the original Actor shall give two weeks' notice of the date of Actor's return to the cast together with a doctor's certificate

25

certifying Actor's ability to act on that date.    Should the illness of the Actor continue or should it appear that it should necessarily continue for 10 days or more, Equity, at the request of the Producer, shall have full power to modify or terminate the Actor's contract on such terms as it may consider just if it shall be satisfied that it will be necessary for the Producer to employ a successor under a Term Contract.

(B) Sick and/or Bereavement Leave.  Each Actor shall be entitled to one working day of paid sick and/or bereavement leave during the first four weeks of employment and for each four weeks or part thereof thereafter.  There shall be no limit as to the amount of leave an Actor may accumulate.  In the event an Actor has accumulated such leave, the Actor shall be paid for each absence up to the amount of the Actor's accumulated time for illness and up to three days for each bereavement leave.  In the case of bereavement leave, additional days may be granted by the Producer for which the Actor will not be paid.  In the case of illness, if an Actor still needs time and has exhausted his accumulated sick leave, the Actor may use any accumulated vacation pay/days due under this Agreement, provided the Producer agrees to this in writing with a copy to Equity.  In both instances the Producer may require reasonable proof of illness or need for bereavement leave. [See also Rule 46(A)(11)--REHEARSALS.]

(C) Disability and Disability Leave.  If an Actor becomes disabled during the course of employment in the production and is able to perform the Actor's role to the satisfaction of the Producer and/or the Producer's representative, the Producer shall make appropriate adjustments with respect to costumes, staging, and other related matters for said disabled Actor.  An Actor who becomes disabled during the course of employment in the production and is unable to perform satisfactorily the Actor's role shall be eligible for Disability Leave in accordance with the following provisions:

(1) An Actor who is unable to work may request an unpaid leave of absence for a period of up to 12 months.

(2) An acceptable medical certificate indicating the time necessary for the leave must support such request.

(3) The Actor shall be eligible to request only one such leave for any single medical condition within any three-year period.

(4) The Producer shall use best efforts to ensure that the duration of the leave relates to the nature of the disability.  However, in order to accommodate the needs of the production, the Producer may require that the leave be at least three months in length.

(5) An Actor on approved leave must notify the Producer at least one month prior to the expiration of the leave of the Actor's intention to return to work as scheduled or to resign.

(6) When a disability leave is requested, Equity will advise the Actor about sick leave benefits, health benefits, medical coverage, and, if applicable, the procedures for direct payment.

26

(7) Prior to an Actor's return from a leave, the Actor will be required to establish that the Actor is able to meet the artistic and physical requirements of the production. In addition, at the Producer's option, the Actor may be required to submit to an appropriate examination by the Producer's medical representative at the Producer's expense. The Actor, at the Actor's option, may seek a second opinion at the Actor's expense.

(8) The Actor's salary upon return to the production shall not be less than the Actor's salary when the leave began and shall reflect any increases required by this Agreement during the leave.

(9) An Actor on a Term Contract shall be eligible to request a leave under this provision only if at least nine weeks remain on the Actor's contract on the first day of disability. If the Actor is eligible and elects to take a disability leave, the Actor will complete the remaining term of the contract upon return to the production.

(10) Temporary Replacement Actors may be hired under "Replacement Contracts" for periods up to the full term of the leave. The Replacement Actor may be employed for the designated term on a standard or Term Contract. Under no circumstances will the Producer be required to employ both Actors simultaneously. Such Replacements will not be eligible for disability leave under the terms of this provision.

(11) During the term of disability, the Actor shall not be entitled to any salary for the time during which services are not rendered. Upon the Actor's return to the production, the Actor shall give no more than three days of free rehearsals.

27. **INSURANCE AND BENEFITS.**

(A) <u>Social Security and Unemployment Insurance</u>. It is understood and agreed that the Actor is entitled to the benefit of all federal and state laws relating to social security and unemployment insurance, and during the term of the Actor's contract, the Producer shall pay any and all taxes or payments required from employers under the provisions of said laws. In the event the services of the Actor are not subject to the compulsory provisions of the federal social security laws or the unemployment compensation (insurance) laws of the state in which the theatre is located, the Producer agrees to elect to cover the Actor and pay contributions on the earnings of the Actor under the elective provisions of the unemployment compensation (insurance) laws of the state in which the theatre is located. In the event the Producer is not eligible to elect to come under the state unemployment compensation (insurance) laws, then the Producer agrees to elect to come under the unemployment compensation (insurance) laws of the state in which the Producer has his principal place of business, the state of the Actor's residence, or the state in which the contract of employment was entered.

(1) <u>Filing Reports</u>. The Producer agrees to execute and file the necessary forms required by the unemployment compensation laws under which the Producer has elected to cover the Actor and shall notify the Actor of the election.

(2) <u>Verification of</u>.    The Producer agrees to furnish the Producer's unemployment registration number to the Actor and to Equity as soon as such number is assigned.  Further, the Producer shall execute the form now called the "Producer's Statement and Questionnaire" at the time of executing the Producer's Agreement.

(B) <u>Worker's Compensation</u>.    The Producer shall obtain and maintain worker's compensation insurance coverage for all Actors, including Stage Managers, Assistant Stage Managers, Chorus Actors, Understudies, and Extras in the Producer's employ.  The Producer shall submit appropriate documentation to Equity upon request.

(1) <u>Report of Accidents</u>.  Within 24 hours of each occurrence, the Actor shall report all accidents and injuries to the Stage Manager (who shall inform Equity) and the Producer or the Producer's representative.

(2) <u>Supplemental Worker's Compensation Plan</u>.  The Producer shall  contribute up to $4.00 per week per Actor to provide for a Supplemental Worker's Compensation Plan.  This rate is subject to change on the anniversary date of this Agreement.  This is in addition to the contribution amount specified in (C)(1) below.

(C) <u>Hospitalization and Medical Insurance</u>.

(1) <u>Premiums</u>.  The Producer agrees to pay to the Equity-League Health Trust Fund the amount established by the actuarial firm employed by the Fund's Trustees for each Actor in each workweek that the Actor is engaged under contract.  These rates do not include payments to the Supplemental Worker's Compensation Plan. [See (B)(2) above.]  Payments shall commence with the Actor's first day of employment, including rehearsals, and no pro-ration of the health payment shall be allowed in a partial week.   This rate is subject to change on the anniversary date of this Agreement.

(2) <u>Health Trust Fund</u>.   The Producer further agrees to be bound by the Agreement and Declaration of Trust establishing the aforesaid Health Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto that may be adopted by its Trustees during the term of this Agreement.

(D) **Pension Fund**.  The Producer hereby agrees to become a contributor to the Equity-League Pension Trust Fund.  The Producer further agrees to abide by and adopt all applicable provisions of said Equity-League agreement relating to the Pension Fund as a part of this Agreement and will execute all necessary documents required to become a contributor of the Equity-League Pension Fund in an amount equal to 8% of each Actor's weekly salary (as defined by applicable federal law) including both rehearsal and performance pay.

(E) **401(k) PLAN DEFERRAL.**  The Actor shall have the option to contribute to the Equity-League 401(k) Plan. The Producer agrees to make salary deferrals, as directed by the Actor, and remit these deferals to the Plan. No contributions shall be required of the Producer. The Producer further agrees to be bound by the

Agreement and Declaration of Trust establishing the Equity-League 401(k) Plan, including all its rules and regulations and any and all amendments and modifications thereto that may be adopted by its Trustees during the term of this Agreement.

28. **INTIMIDATION.**

Neither the Producer, nor any personnel under the Producer's supervision or control, shall intentionally intimidate, harass or humiliate any Actor at any time, including, but not limited to, all communications to Actors in connection with artistic notes. However, it is understood that there is no intent to interfere with the original Director's or original Choreographer's ability to critique Actors in connection with artistic notes.

29. **JUVENILE ACTORS.**

The following special provisions shall apply to Actors under 16 years of age:

(A) A Juvenile Actor may not be called to understudy or brush-up rehearsals that would intrude on the Actor's normal school day more than once per calendar week.

(B) Producer shall provide a responsible person to supervise Juvenile Actors during the rehearsal period and, after the first public performance, from the half-hour call until a responsible parent or guardian calls for the Juvenile Actor(s) after curtain down.

(C) If tutoring is required, when the Juvenile Actor(s) are rehearsing and/or performing, all such required tutoring must be held during the permitted rehearsal hours.

(D) Dressing Rooms. Producer shall use best efforts to provide separate dressing rooms for male and female Juveniles that shall be separate from the adult dressing rooms.

(E) Working Papers. The Juvenile's working papers must be filed with the applicable city authorities (copy to Equity) by the Juvenile's first day of rehearsal.

(F) The foregoing shall apply until the Juvenile Actor reaches the age of 16.

30. **LAWS GOVERNING.**

(A) All contracts of employment shall be subject to, construed by, and all the rights of the parties thereto shall be determined by the laws of the State of New York.

(B) If any provision of this Agreement should be held invalid or unlawful by any tribunal of competent jurisdiction, the remaining provisions shall not be affected thereby but shall remain severally valid, binding, and in full force and effect.

31. **MILITARY SERVICE OF THE ACTOR.**

If the Actor is called to report for military service, the Actor may terminate the contract by giving the Producer as much notice as the circumstances will permit.

32. **MONIES IN EXCESS OF REQUIRED MINIMUM.**

Any monies paid directly to the Actor in excess of contractually-required minimums, such as money for housing, baby sitting, local transportation, shall also be subject to Equity Working Dues deductions and Pension contributions.

33. **MORE REMUNERATIVE EMPLOYMENT.**

More remunerative employment ("MRE") may be exercised only when it involves employment in the entertainment industry. It may not be used to seek employment under any circumstances. [See (D) below.] The Producer shall not be required to pay the Actor for time the Actor misses due to more remunerative employment.

(A) <u>13-Day Blackout Period</u>. In each production, no Actor shall be able to exercise the provisions of more remunerative employment during the 13 consecutive calendar days stipulated by the Producer on the face of the Actor's contract. Said 13 consecutive calendar days shall include at least a portion of the designated tech week or the workweek containing the first paid public performance.

(B) <u>MRE Notification</u>   Should the Actor engaged under contract be offered More Remunerative Employment, the following shall apply:

(1) <u>No More Than Two Days' Employment</u>. Should the Actor engaged under contract be offered more remunerative employment of no more than two days in the entertainment industry, the Actor shall be free to accept such employment upon written notice to the Producer and Equity. This written notice must be received by the Producer or the Producer's duly authorized representative as soon as the Actor knows of said employment but no later than 11:00 AM. on the day prior to the first rehearsal or performance to be missed. In no event, however, may notice be less than 24 hours prior to the Actor's first absence from rehearsal or performance. If proper notice is not given within the above-specified time, the Producer is not obligated to release the Actor. [See (C) below.]

(2) <u>Up to One Week of Employment</u>. Should the Actor engaged under contract be offered more remunerative employment of at least three days but not more than seven days in the entertainment industry, the Actor shall be free to accept such employment upon 72 hours' written notice to the Producer and to Equity. If said employment should extend beyond seven days, the Producer may terminate the Actor's contract upon written notice to the Actor and Equity with no further financial obligation by the Producer to the Actor. If proper notice is not given within the above-specified time, the Producer is not obligated to release the Actor. [See (C) below.]

(3) <u>Long-Term Employment (8 to 14 Days)</u>. Should the Actor engaged under contract be offered more remunerative employment of more than seven days but less than 15 days in the entertainment industry, the Actor shall be free to accept such employment upon seven days' written notice to the Producer and Equity. Upon receipt of said notice, the Producer may terminate the Actor's contract by giving a seven-day written termination notice to the Actor and Equity. If said employment should extend beyond 14 days, the Producer may

terminate the Actor's contract of employment upon written notice to the Actor and Equity with no further financial obligation by the Producer to the Actor.

(C) Violation.  Should an Actor improperly absent himself/herself from rehearsals or performances, violate any of the provisions of this rule, or fail to abide by the conditions set forth in the Equity MRE Notification Form, the Actor may be subject to:

(1) Immediate dismissal by the Producer without further financial obligation by the Producer to the Actor;

(2) The Arbitration provisions of this Agreement;

(3) Disciplinary proceedings in accordance with the Constitution and By-laws of Actors' Equity Association.

(D) Buy-Out Option.

(1) During the Term of the Contract.  The Actor may agree in a written rider to the Actor's contract not to apply the provisions of more remunerative employment during the term of the contract provided that the Producer pays the Actor no less than $100.00 per week in addition to the Actor's negotiated salary, plus any other required compensation (e.g., additional duty payments, clothing rental, Understudy payments, etc.).

(2) Extended Blackout Period.  The Actor may agree to extend the 13-day blackout period stipulated on the face of the Actor's contract by an additional six consecutive days.  The dates of the extended blackout period shall be stipulated in a written rider to the Actor's contract, and the Producer shall pay the Actor no less than a single payment of $100.00 for this extended blackout period in addition to the Actor's contractual salary plus any other required compensation (e.g., additional duties payments, clothing rental, Understudy payments, etc.).

34. **MOTION PICTURE AND/OR TELEVISION RIGHTS.**

(A) Equity Motion Picture and/or Television Rights Agreement.  If the Producer either directly or indirectly owns or participates in the motion picture and/or television rights of a production, the Producer shall agree to sign the Equity Motion Picture and/or Television Rights Agreement prior to the signing of any individual employment contract.

(B) Producer's Representation.  The following clause appears in all contracts of employment.  "The Producer warrants and represents that:

(1) The Producer (has) or (has not) an interest and/or right in the play presently entitled (name of play);

(2) The play named above is an original play and the production herein is the first production in the United States in which Actors are employed, and;

(3) The Producer, or person or persons holding or participating in the motion picture and/or television rights, has signed the Equity Motion Picture and/or Television Rights Agreement agreeing to its terms."

31

(4) The Producer and the Actor agree and recognize that the inclusion of the above-referenced Producer's representation in each Actor's contract of employment is offered as a material inducement to the Actor to sign the contract.   In the event the motion picture and/or television rights are subsequently sold, the Producer agrees that the first monies received from said sale or other disposition of these rights, excluding the first $1,000.00 received or disbursed by the Producer, shall be used to reimburse all Actors engaged under this Agreement who originally appeared, Stage Managed, or Understudied at the first paid public performance hereunder, in an amount equal to no less four weeks' salary at the applicable minimum which prevailed at the time of the production.   Any reimbursement under this provision, however, shall not exceed 25% of the total monies received or disbursed by the Producer from said sale.  The obligation herein is for the benefit of Equity and the Actors and shall survive the termination of this Agreement for a period not to exceed two years from the closing of the production.

35. **NO STRIKE OR LOCKOUT.**

(A) Notwithstanding any other provisions contained in this Agreement to the contrary, no Actor shall be subject to discharge, discipline, or replacement by the Producer: (1) for refusal to cross a picket line or enter upon the picketed premises if employees of the Producer other than those covered by this Agreement are on strike or are picketing the Producer; or (2) for refusal to cross a picket line or enter upon the premises of an employer other than the Producer if the employees of such employer are engaged in a strike ratified by a representative of such employees, which such employer is required by law to recognize.  Provided, however, that in either instance, such strike or picketing must enjoy the sanction of and be ratified by the relevant parent national or international union and provided further that the Council of Equity endorses and supports the strike or picketing and directs its members to honor such picket line or strike and further provided that the strike or picketing is not in violation of law.

(B) The Producers shall not lock out any of the Actors and neither the Actors nor Equity will call, sanction, or participate in a strike during the period of the Agreement between Equity and the Producer except as provided above.  In no event shall any Actor be required to perform, or to enter the theatre for such purpose, if such performance or entrance would endanger the Actor's safety.

(C) Should a strike by the Actors occur during the period of the Agreement, Equity will be deemed not to have violated the terms of this Rule if Equity refrains from assisting, encouraging, or condoning and in good faith takes every reasonable means to terminate the strike at once and in addition thereto, promptly declares publicly that the strike is unauthorized and directs the Actors to cease such conduct.

(D) The provisions of this Rule shall not be deemed to effect the express rights of Equity or the Actor under Rule 8, BREACHES; Rule 15, DEFAULTS; Rule 31, MILITARY SERVICE; or Rule 43, PRODUCTION PROSECUTED.

36. **NUDITY.**

(A) Interviews/Auditions.

Actual sex acts shall not be permitted under any circumstances.

(1) Nudity shall not be permitted at Principal interviews.

(2) Nudity at auditions (Principal and/or Chorus) shall not be permitted without the express written consent of Equity and shall be subject to the following guidelines:

(a) The Actor shall not disrobe in whole or in part until after the Actor has been auditioned as a Principal Actor or Chorus singer and/or Chorus dancer;

(b) The Stage Manager or an official Equity representative is present; and

(3) The direct professional and artistic supervisory capacity of all persons present (i.e. Producer, director, choreographer) must be attested to by the Producer in writing to Equity.

If the Producer breaches any of the above provisions, the Producer shall be assessed damages of one week's applicable minimum salary or one week's minimum production contract salary, whichever is higher, for each violation of any of the provisions set forth above for each actor involved.

(B) Rehearsal/Performance.

Actual sex acts during rehearsal or performance shall not be permitted.

(1) The Actor shall not appear nude or perform acts of a sexual nature in the course of a stage presentation unless the Actor has been advised and gives written consent at the time of contract signing. The script shall be submitted to the Actor for review prior to contract signing if the Actor so requests. After the contract has been signed, upon the request of the Producer and with the permission of Equity, the Actor may agree to appear nude or perform acts of a sexual nature upon the signing of an additional rider.

(2) The Actor shall not pose for nude photographs nor appear nude for any motion picture filming, videotaping, or other forms of visual recording without the Actor's prior written consent.

(3) Photographs in which any Actor appears nude or performs an act of a sexual nature shall not be used in any way without the prior written consent of each Actor appearing in the photograph (or copy of the photograph) on a fully executed Equity Nude Photograph/Video Release Form. The Actor's written consent must also appear on a copy of the photograph release. Such request to utilize the photograph must specify the specific use for the photograph. The signed, released photograph and release form shall be filed with Equity. The Producer and the Actor shall keep duplicate records.

Prior to the release or use of any film, videotape, videocassette, or any electronic or mechanical reproduction in which any Actor appears nude, each

33

Actor appearing in the scene shall be given an opportunity to view the film or tape. Use or release shall not be permitted without the prior written consent of each Actor participating in a scene in which any Actor appears nude or performs acts of a sexual nature on a fully executed Equity Nude Photograph/Video Release Form. The Producer shall file with Equity a copy of the fully executed release form for each Actor.

An authorized Equity representative shall be present at all such photographing, filming, or videotaping and shall be given the opportunity to view the photographs, etc. prior to their use or release.

(4) While nude the Actor shall not mix with the audience or leave the stage, backstage, or performance area. The Producer shall take all necessary measures to ensure that no member of the audience will be permitted to enter the stage, performance area, or backstage while any Actor is nude.

(5) Artists' renderings of nude Actors shall not be permitted.

If the producer breaches any of the above provisions, the Producer shall be assessed damages of one week's contractual salary or production contract minimum, whichever is higher, for each violation of any of the provisions set forth above for each actor involved.

All of the above provisions shall not preclude the Actor or Equity from instituting any civil or criminal action in addition to the damages set out in this rule.

37. **PER DIEM**. [See also Rule 26 HOUSING.]

(A) <u>Per Diem</u>. When kitchen facilities, as outlined in Rule 25 (A)(4) HOUSING are provided, the Actor shall receive a per diem of no less than $35.00 per day. When kitchen facilities are not required and are not provided, the Actor shall receive a per diem of no less than $50.00 per day. Any additional negotiated per diem payments must be stated in a rider to the Actor's contract and shall be subject to Pension contributions and Equity Working Dues deductions.

(B) <u>Monies In Excess Of Required Minimum Per Diem</u>. Any monies paid directly to the Actor in excess of contractually required minimum Per Diem, such as money for housing, baby-sitting, local transportation, etc., shall be subject to Equity Working Dues deductions and Pension contributions.

38. **PERFORMANCES.**

(A) <u>Number of Performances</u>.

(1) There shall be no more than eight performances in six consecutive days.

(2) There shall be no more than two performances on any one day, or more than five performances in any three consecutive days.

(3) A Day Off must be given immediately following two consecutive two-performance days. [See also Rule 50 REST PERIODS AND DAYS OFF.]

(4) If, for the purpose of computing the theatre's potential box office, the Producer establishes a regular performance schedule of fewer than eight performances per week, said number of performances shall be considered the

maximum number of weekly performances for that theatre. All computations for pro rata payments shall be based on said number of performances. In addition any performances beyond said number shall be deemed extra performances and payable as per Rule (B)(5) below.

(B) <u>General Rules</u>.

(1) <u>Length</u>. A performance shall not last longer than 3 1/2 hours, inclusive of the Actor's designated call and intermissions.

(2) <u>Matinee</u>. There shall be no more than two matinees in any workweek. The curtain time for such matinees shall not be earlier than 1:00 PM. A matinee may not be scheduled for the day following the designated day off unless the company receives two consecutive full days off immediately preceding the matinee.

(3) <u>Curtain Down</u>. Except for twi-nighters (see below), the final curtain for the day shall not occur later than 12:00 midnight.

(4) <u>Twi-night Performances</u>. Twi-night performances shall have at least one hour between performances, inclusive of the Actor's designated call, and shall not start earlier than 4:00 p.m. nor end later than 1:00 a.m. If the rest period between performances is less than two hours, inclusive of the Actor's designated call, see Rule 50(A)(2)--REST PERIODS AND DAYS OFF for additional stipulations.

(5) <u>Extra Performances</u>. If when an extra performance is added, the weekly total of performances will be eight or fewer, extra performances shall be compensated at no less than 1½ times the pro rata performance rate of the Actor's contractual salary for each such extra performance. An extra performance that is a ninth performance shall be compensated at no less than two times the pro rata performance rate of the Actor's contractual salary. The Producer must secure the permission of Equity before scheduling a tenth performance in any workweek. Such additional performance, if permitted, shall be subject to the terms and conditions as determined by Equity. No other additional performances shall be permitted. The Company must be given at least a one-week notice of the Producer's intention to give an extra performance; this notice shall be posted on the theatre's callboard. An extra performance may not be scheduled on the Actor's day off.

If a scheduled extra performance is canceled with less than two weeks' notice to the Actor, the Actor shall receive any extra performance pay that would have been due.

(6) <u>Schedule Changes</u>. Except for extra performances as outlined in (B)(5) above, the Producer may change the performance schedule by giving no less than two weeks' written notice to Equity and the Actor.

(7) <u>Holidays</u>.

(a) <u>Performance On.</u>

35

(i)    The Actor shall receive, in addition to the Actor's weekly contractual salary, no less than $1/6^{th}$ of contractual salary for each performance scheduled on Christmas Day.

(ii)    The Producer further agrees that without a four-week notice at the time of contract signing and again at each subsequent contract anniversary, the Actor shall not be required to rehearse and/or perform on Christmas Eve, Christmas Day, New Year's Day, and/or Thanksgiving Day.

(b) Schedule Change.

(i)    For the purposes of this provision, a holiday week is one which contains any of the following: New Year's Eve, New Year's Day, Good Friday, Easter, Passover, Independence Day, Rosh Hashanah, Yom Kippur, Thanksgiving, Christmas Eve, or Christmas Day.

(ii)    The Producer may shift up to two holiday performances occurring within the same holiday week into other performance weeks of the same production. In any holiday week where a performance shift occurs, the Actor shall have a designated day off in addition to the holiday day off. The Actor shall be notified of any holiday performance shifts at the time of contract signing and again at each subsequent contract anniversary by way of a Performance Schedule Rider to the Actor's contract.

(iii)    Not more than one such "shifted" performance may be added to the performance schedule in any one week, and not more than eight days may elapse between days off, except by written permission of Equity. A "shifted" performance may not be added to a week in which an extra performance is already scheduled.

(8) The Producer shall be limited to three such holiday performance shifts within a contract year.

(C) Rest Periods and Days Off. [See Rule 50--REST PERIODS AND DAYS OFF.]

39. **PERSONAL PROPERTY.**

(A) Dressing Room. The Producer agrees to restrict public access to the Actor's dressing room and to provide facilities for safekeeping the Actor's daily and incidental street clothing, coats, overcoats, shoes, and/or makeup not used in rehearsals or performances while said articles are in the theatre or other rehearsal and/or performance space. The Producer agrees to inform all Actors of the necessity for using such facilities by posting a written notice on the callboard. The Producer may limit the use of such facilities to those above-listed items or to items that can be adequately protected (the Producer may not, for example, be able to provide a safekeeping facility for an Actor's bicycle or personal stereo). The Actor's signature on this notice shall be deemed proper notification to the Actor of the existence of these facilities.

(B) <u>Personal Valuables</u>.  The Producer shall be liable for the loss of and/or damages to the Actor's personal valuables (for example, jewelry, watches, and/or cash), subject to the liability limits indicated below, if the valuables have been given to the Producer or the Producer's agent for safekeeping.  All such valuables shall be collected prior to the beginning of rehearsals or at half-hour and returned upon the request of the Actor at the end of the Actor's call.  Upon mutual consent, the Producer may designate the Stage Manager for collection and return of said valuables.  The Producer, however, shall retain all liability for their collection and return.

(C) <u>Actor's Property Used in Production</u>.  When the Actor agrees to utilize the Actor's personal property in a production, the Producer shall be liable for the full loss and/or damage to such property and shall not be subject to the limitations in (D) below.

(D) <u>Limited Liability</u>.  Provided the Actor follows the procedures outlined in (A) and (B) above, the Producer shall be liable for the loss of or damage to the Actor's personal property.  Such liability shall be limited to: $10,000.00 for the Actor's personal effects and/or clothing; $3,000.00 on the Actor's furs, coats, and overcoats; and $3,000.00 for the Actor's jewelry, watches, and radio.  The Producer shall not, however, be liable for any loss or damage to the Actor's property while said property is under the sole and exclusive control and supervision of the Actor.

40. **PHOTOGRAPHS.**

Photographs of the Company and the production may be taken for the purposes of publicizing and advertising the production.  [See Rule 40(E) below.]

(A) <u>Photo Calls</u>.

(1) <u>Before the Rehearsal Period.</u>  The Actor shall not be available for any photo calls prior to contract signing.  Once the contract has been signed, photo calls may be scheduled when the Actor's availability permits, and the Actor shall be compensated at no less than the applicable tier's overtime rate for the time spent for such calls, however in no case less than two hours.  These photo calls may be combined with costume calls.  A Stage Manager shall be present at all photo calls and shall be paid the applicable overtime rate even if said call falls within the Stage Manager's pre-pro week.

(2) <u>During the Rehearsal Period</u>.  For photo calls taken during authorized rehearsal hours, no additional compensation shall be required.  Photo calls taken outside authorized rehearsal hours shall be limited to two calls for which the Actor shall receive payment at the applicable tier's overtime rate.   [See (B) below.]

(3) <u>After the First Paid Public Performance.</u>

(a) There shall be no more than two two-hour calls in the first three months after opening.

(b) There shall be no more than two two-hour calls between the fourth and the twelfth months of the production.

(c) There shall be no more than two one-hour calls after the production has run one year or longer.

(d) A one-hour call shall be allowed whenever there is a permanent cast replacement.

(e) All photo calls shall be held immediately after a performance except by the unanimous secret ballot vote of those Actors involved in said photo call. Photo calls may not be held on a two-performance day.

(f) Should such calls exceed the hours stated above, overtime shall be paid at the applicable tier's overtime rate.

(B) <u>Notice</u>. There shall be at least a 24-hour written notice for all photo calls. Notice of the call shall be posted on the Company callboard.

(C) <u>Credit</u>. In all cases under the control of the Producer, the Actor's name shall be properly credited in publicity whenever and wherever the photographs are used. If the Actor does not receive proper credit in photographs or publicity and such error is not corrected within one week of receipt of written notice by the Producer or the Producer's representative, the Producer shall pay the Actor 1/6th of the Actor's contractual salary for each week the error remains uncorrected. Said penalties shall be subject to the Arbitration procedures of this Agreement.

(D) <u>Permanent Replacement</u>. In the event of a permanent replacement of an Actor, said Actor's name and/or likeness shall be removed when feasible from wherever displayed, including all advertising, and display media under the Producer's control. Such removal shall be made prior to the first paid public performance of the Actor's successor.

(E) <u>Subsequent Use</u>. Photographs from the production cannot be used for subsequent productions without the permission of Equity and under such terms and conditions, as Equity shall require.

(F) <u>Use with Commercial Product or Service</u>. The Producer must obtain the Actor's prior written authorization before the Actor's picture may be used as part of or in conjunction with a commercial product or service and said authorization must specify the commercial product or service involved.

If the Actor consents to the use of the Actor's picture, the Actor shall be paid not less than $150.00 for said use. A Rider stipulating the specific commercial product, the photograph(s) to be utilized, the agreed upon compensation and the duration of the permission shall be executed between the Producer and the Actor and filed with Equity. Actors called to a photo call for this purpose, whether said call is at the theatre or elsewhere, shall be paid no less than $150.00 per hour for each hour or part thereof for said call.

(G) <u>Nudity</u>. [See Rule 36--NUDITY.]

(H) <u>TV or Radio Commercials</u>. [See Rule 44(C)--PUBLICITY.]

(I) <u>Websites.</u> [See Rule 44 (D) PUBLICITY.]

41. **POTENTIAL WEEKLY BOX OFFICE GROSS AND COMPANY TIERS** [See also Rule 53 – SALARIES AND ADDITIONAL COMPENSATION.]

(A) Potential Weekly Box Office Gross.  A theatre's potential weekly box office gross (hereinafter "potential weekly gross") shall be computed as follows: seating capacity multiplied by full-face ticket price(s) multiplied by the number of performances in a workweek.

(B) Change in Seating Capacity, Ticket Prices, or Number of Performances.  If the Producer alters the gross income by increasing the number of seats and/or increasing ticket prices and/or increasing the number of performances, Equity shall retain the right to re-compute the potential weekly gross utilizing the more current information in order to determine whether a tier reclassification is warranted.  If warranted, Equity shall reclassify the theatre accordingly.  Any increase in compensation due the Actor based on such change(s) shall be effective as of the date of such change(s).  Under no circumstances may the seating be increased beyond 699.

(C) Certified Accounting.  The Producer agrees that figures submitted to Equity in order to determine the potential weekly gross shall be supported by certified auditors' statements when available or, if unavailable, by box office statements certified by the Producer.

(D) Potential Box Office Chart:

| Tier 1 | $     0          -  $   89,649.99 |
| --- | --- |
| Tier 2 | $   89,650.00  -  $ 101,709.99 |
| Tier 3 | $ 101,710.00  -  $ 113,774.99 |
| Tier 4 | $ 114,775.00  -  $ 125,834.99 |
| Tier 5 | $ 125,835.00  -  $ 137,914.99 |
| Tier 6 | $137,915.00 + |

42. **PRODUCTION PROSECUTED.**

Should the production or performances of a production in which the Actor is engaged be complained of as being in violation of any statute, ordinance, or law of the United States or any state or municipality, and should a claim or charge, either civil or criminal, be made against the Actor arising out of employment in such production, the Producer shall defend the Actor at the Producer's own expense or pay any and all reasonable charges made or incurred by the Actor in the Actor's defense and indemnify the Actor against any loss or damage which the Actor may suffer arising out of employment in the production.  This rule does not apply to acts other than those in the course of employment unless directed by the Producer or the Producer's representative.

It is specifically agreed and understood between the Actor and the Producer that the language, business, and costuming of the play are under the control and direction of the Producer and the author who, according to custom, can at any time erase or amend the scenes and lines, and that, consequently, the Actor has no certain way of knowing

during rehearsals whether the play in its final presentation is susceptible to being considered immoral or indecent. The Producer, therefore, represents to the Actor that the play as produced shall not violate any law or give offense which is punishable by any law and expressly agrees that should the Producer or the author be arrested or summoned on such charges, the Actor may terminate the engagement with Equity's consent. Upon such termination the Producer shall pay to the Actor all sums due under this Agreement plus one week's salary as compensation for the termination of the engagement without notice, but in no event shall the Actor receive less than a total of two weeks' salary.

This rule shall not apply to any case or any set of conditions where its enforcement would be illegal or against public policy. In the case of an arrest due to the nature of the play or its production, the Producer shall furnish bail for the Actor; in the event the Producer fails to do so, or for any breach of this rule, the Producer shall pay to the Actor (Equity consenting) the sum of $2,000.00. After an arrest, the Actor may demand a suspension of performance pending a determination; this suspension shall not terminate or otherwise affect the terms of this Agreement unless Equity shall otherwise order.

43. **PROGRAMS, PLAYBILLS, BILLING, CHANGES IN THE COMPANY, AND PUBLIC ANNOUNCEMENTS**.

(A) Free Program. A free program shall be offered to every patron prior to that patron's arrival at his seat. The program shall contain a list of all Actors in the production together with their roles or functions. The program shall contain biographical material for each Actor and Stage Manager (including Understudies and Assistant Stage Managers). The Dance Captain shall be listed on the cast page.

(1) Biographical Material. The Actor and Stage Manager shall submit all biographical material and pictures for programs at the time required by the Producer, providing the Actor has no less than 48 hours notice. In doing so, the Actor shall indicate the preferred cuts if program space requires editing. The Actor shall have the right of approval of biographical material for the program and souvenir program; said approval shall be in writing and not unreasonably withheld. The Producer and the Actor agree to use best efforts to limit all biographies in the program to biographical data and professional credits. Biographical material not responded to within 48 hours of its submission to the Actor shall be considered to be approved. If the Actor does not return biographical material within this time frame, the Actor shall have waived his right of approval of such material as required herein.

(2) There shall also be biographical material about Equity, supplied by the union.

(3) Understudies. If an Actor is engaged as an Understudy or Swing, the Actor's name and the role understudied shall be listed in the program. This shall also apply when more than one Actor understudies the same role.

40

(4) <u>Equity Designation</u>. The following wording shall appear on the cast page in the program: "This theatre operates under an agreement with Actors' Equity Association, the Union of Professional Actors and Stage Managers."

(5) <u>Errors and/or Omissions</u>. In the event that there are errors or omissions in the printed cast listing or biographical material in the Playbill and/or program, the Producer shall agree that, upon receipt of written notice of an omission and/or error, the Producer shall place in the Playbill and/or program a mimeographed or printed slip correcting the omission and/or error within 24 hours (including at least one business day). The Producer will also correct the omission and/or error in the next printing of the Playbill and/or program, provided such written notice is given at least 24 hours prior to the press deadline.

(6) If any provision of this section is violated, correction must be made within 24 hours of receipt of written notice.

(B) <u>Billing</u>.

(1)  <u>House Boards</u>  The names of all Actors employed in the production shall be listed in alphabetical order in letters no less than ½ inch in height. Such house boards shall be entitled "The Company". Stage Managers, Understudies, and Swings may be listed separately. Such house board shall be placed prominently outside the theatre, if possible, or inside the lobby where it is visible at all times. The Producer shall have 24 hours, from receipt of written notice to correct any errors or omissions in the House Board.

(2) <u>Rider</u>. All terms and conditions pertaining to the billing of the Actor shall be specific. If the billing is contingent on the billing of any other Actor, such contingency shall be clearly set forth in a rider and attached to the Actor's contract of employment. The Producer has seven days from receipt of written notice to correct any billing requirements as specified in the Actor's rider.

(3) <u>When an Actor Leaves a Production</u>. When an Actor leaves a production, the Actor's name and/or likeness (in photographs portraying three Actors or less) shall be removed from all public relations and press materials and from all promotional, visual displays, and advertising materials under the control of the Producer. [See also Rule 40--PHOTOGRAPHS.] All printed materials containing the name of the Actor shall be changed to reflect the most recent casting information before any use of the material subsequent to the Actor's leaving is made. Written notice shall be made to the media to correct the information if the Actor's name appears regularly in printed information on the production. This ruling shall not be enforced against posters that are displayed in spots for which the Producer has paid no rent, commonly known as sniping.

(C) <u>Changes in the Company</u>. When an Understudy takes the place of an Actor whose part listed in the program is a specifically identifiable character or where such an Actor is replaced by another, such changes in the company shall be made known in any two of the following three ways:

(1) A separate printed slip publicizing the change(s) in the company shall be inserted into the house program distributed to the audience;

(2) An oral announcement shall be made from the stage or via the house sound system before the beginning of the performance;

(3) A sign with the change(s) in the company shall be posted conspicuously and prominently at the entrance(s) of the theatre where tickets of admission are sold or collected.

(D)  Public Announcements/Warnings.

(1) Aisles.  If the aisles are used by the Actors for entrances and/or exits, an oral announcement to that effect shall be made from the stage or via the house sound system before the beginning of the performance and in one of the two following ways:

(a) A printed notice shall appear in the program;

(b) A sign shall be posted conspicuously and prominently at the entrance(s) of the theatre.

(2) Cameras, Videotape Recorders, Audio Recorders.  Use of cameras, videotape recorders, audio recorders, and/or any other type of recording device during a performance is strictly prohibited.  To ensure compliance with this rule, the Producer shall do two of the following:

(a) Post prominently in the lobby an international sign (a camera with a slash or "X" mark) or a sign utilizing the language in (2)(b) below;

(b) Have a pre-performance announcement utilizing the following language: "The use of cameras, videotape recorders, or audio recorders by members of the audience during the course of this production is strictly prohibited";

(c) Have a printed notice in the program utilizing the language in (2)(b) above.

(3) Strobe Lights.  Use of strobe lights during a production must be accompanied by a sign in the lobby warning the audience of the use of strobe lights during the production.

(4) Gunshot(s).  The occurrence of gunshot(s) during a production must be accompanied by a sign in the lobby warning the audience of the use of gunshot(s) during the production.

(5) Electronic Devices.  An announcement will be made instructing patrons to turn off all beepers, cell phones, alarm watches and other electronic devices.

(E) Remedies.  If a violation of any of the above clauses is not remedied within the time period allotted from the receipt of written notice, monetary damages may be assessed against the Producer on behalf of each Actor, in an amount not to exceed 1/7th of the Actor's weekly contractual salary per day of infraction.

42

44. **PUBLICITY.** [See also Rule 58 – TELEVISING, FILMING, AND RECORDING.]

(A) Personal Appearances and Interviews.  Any personal appearances or interviews required or arranged by the Producer shall be for the purpose of publicity for the specific production for which the Actor is contracted.

(1) Except as specified herein, Equity sets no limit on the number and length of personal appearances or newspaper, radio, and/or TV interviews arranged by the Producer.  An Actor may not be required to be available for personal appearances and/or interviews except within the allowable rehearsal and/or performance hours.  Any personal appearances/interviews falling outside the allowable rehearsal and/or performance hours shall be with the Actor's consent and at the Actor's convenience, and the Actor shall have the right to limit the number and time devoted to such appearances and/or interviews.

An Actor may not be requested to be available on the day off or on a two-performance day except with the written permission of Equity and under such terms and conditions as specified by Equity.  An Actor must be given no less than a 48-hour notice of all personal appearances and/or interviews.  Any time taken for personal appearances or newspaper, radio, and/or TV interviews (including transportation to and from the appearance/interview site) may not infringe upon the 12-hour overnight rest period without incurring overtime.

(2) Performance Required.

(a) For Television and Radio.  When an Actor is required by the Producer or the Producer's representative to perform at a personal appearance and when that personal appearance comes under the jurisdiction of AFTRA, the Producer and Actor agree to meet all the requirements of AFTRA.   When a Stage Manager is required to do any work at a personal appearance that comes under the jurisdiction of AFTRA, the Stage Manager shall be paid no less than the applicable AFTRA minimum for a Principal (on camera).

(b) Live Appearances.  The Actor shall be paid at the rate of no less than the applicable tier's overtime rate for a two-hour minimum call, for performing at a live publicity appearance.  Travel time is to be included in computing the time of the call.  The Stage Manager shall be in attendance at all such live appearances and shall be compensated as specified above.

(3) Transportation Expenses.  The Producer shall not require the Actor to incur expenses in connection with personal appearances and/or interviews initiated or required by the Producer.   The Producer shall provide round-trip transportation for all interviews and personal appearances arranged by the Producer or reimburse the Actor for such costs.  The Producer shall reimburse the Actor for all reasonable personal expenses incurred in connection with the personal appearances and/or interviews arranged by the Producer or the Producer's representative.

(B) Filming or Taping for News and Community Affairs Telecasts.   [See also Rule 58 TELEVISING, FILMING, AND RECORDING.]  Equity shall permit the filming or taping of a play during its regularly scheduled rehearsal or performance hours for

43

the purpose of transmitting said coverage on television news or community affairs programs, provided the following conditions are observed:

(1) The Producer shall use best efforts to ensure that the artistic integrity of the production is not disturbed by the presence of filming or taping crews;

(2) At least 24 hours' advance notice of filming or taping at a rehearsal shall be given to the Actors. For taping at a regularly scheduled performance, as much notice as possible shall be given, but in no case shall the Actors be notified later than the half-hour call for said performance;

(3) Material reproduced under the terms of this provision shall not exceed 30 minutes without the written consent of Equity. The Deputy shall file a report with Equity giving the time utilized for the filming and/or taping;

(4) No more than three minutes of any rehearsal or performance (which may not depict an entire scene or musical number) shall be shown on the television news or community affairs broadcast without the permission of Equity;

(5) No payment shall be required provided no payments are made to any other personnel employed in the production;

(6) The Stage Manager and a representative of the Producer shall be required at every filming or taping of the production;

(7) The Producer shall provide a copy of this provision to all film or tape crews and television stations. For any violation of this rule, other than violations of unauthorized subsequent use of the film or tape, the Producer shall be liable for a penalty subject to the Arbitration procedures contained within this Agreement. Such procedures shall not preclude any right in law or equity, civil or criminal, which arises under a breach of this rule which the Actor or Equity has against the Producer or any third party;

(8) Subject to permission from Equity, footage which has been produced in compliance with the above terms, may be reused on certain local network and major market programs identified by Equity and the Producer in addition to news or community affairs broadcasts, to illustrate reviews and feature stories about the current productions, theatres, and personalities associated with them, provided that such reuse shall be in accordance with the appropriate AFTRA Code; and

(9) The Producer shall ensure that Actors, who appear in such segments mentioned in (B)(8) above, shall be compensated at no less than the AFTRA minimum in effect and that such reuse is controlled by an agreement between the television producer and AFTRA.

(C) TV or Radio Spot Commercials. Equity will permit the Actor to make TV or radio spot commercials of one minute or less duration to promote the theatre or production, provided the Actor is signed to the applicable SAG or AFTRA contract and paid no less than that contract's minimum. If a TV commercial is made from still photographs of persons in the cast, each Actor contained within the photograph,

whether recognizable or not, shall receive no less than the applicable SAG or AFTRA minimum.

When a Stage Manager and/or Dance Captain is required to do any work in connection with a TV or radio commercial, they shall be paid no less than the applicable SAG or AFTRA minimum for a Principal (on camera).

(D) <u>Web sites</u>. Up to three minutes of rehearsal and/or performance footage (of which no continuous sequence shall exceed 30 seconds) may be used, without additional compensation on the theatre's website.

> (1) Neither merchandise promotion nor ticket sale information shall be presented on the same "page" as the Reproduction but may be presented on a separate "page". However, the "page" containing the Reproduction may indicate how to get to the "page" which does have information about merchandise or tickets. It is also understood that there may be no promotion of any other product(s) on the "page" where the Reproduction will be seen. If voice-over or other live actor work performance is required, in addition to the performance footage, the applicable AFTRA/SAG Agreements shall apply to such voice-over or other work.

(E) Use of footage for any purpose other than specified above is strictly prohibited. For any violation under this Rule, the Actor shall be paid no less than two week's contractual salary in addition to any AFTRA/SAG amounts that may be due.

45. <u>**RECORDINGS USED IN A PRODUCTION (SOUND AND VIDEO).**</u>

There shall be no use of recordings or mechanical or electronic reproduction of voice to supply dialogue, singing, chanting, or any business that might be performed by a live Actor, unless the Producer has first obtained the written consent and permission of Equity and complied with all such terms and conditions as Equity may prescribe.

(A) The consent of Equity shall not be required, however, for a Principal Actor to record a portion of the role in which the Actor performs live on stage for use in the production, provided the recording is used only during the period in which the Actor is employed and with the Actor's consent and is made during the regular rehearsal hours.

If the Producer wishes to sign an Actor who is not in the cast of the production for which the recording is being made to an Equity contract to make a recording, the Producer may do so by signing the Actor to a two-week contract at the applicable tier for each 26 weeks' use of the tape. The Producer may hire an Actor at the AFTRA non-broadcast, off-camera daily rate provided no more than 60 seconds of such recorded material is used in the production for each such Actor.

(B) <u>Ensemble Recordings</u>. An Actor engaged to record material which is ensemble in nature (i.e. unrecognizable) for use in the production may do so provided that Actor is originally contracted for the duty or contracted by rider to participate in such recording and further provided that the Actor is compensated upon leaving the production at no less than one week's minimum salary if the recording is used in the production after the Actor's termination. Such recordings may only be made with

the written permission of Equity and under such additional terms and conditions as determined by Equity.

(C) Any recording so produced may be used for that one production only.

46. **REHEARSALS.**

(A) General Rules.  Beginning with the first day of rehearsal, the Producer agrees to pay the Actor no less than the minimum salary for the appropriate Tier as specified in Rule 54 (C) MINIMUM SALARIES.  Should the rehearsal period exceed six weeks, the Actor shall be paid full contractual salary for each week of continuing rehearsal.

(1) Notice to Equity.  The Producer must notify Equity of the date, hour, and place of the first rehearsal and/or read-through as provided in (A)(7) below at least five days in advance of said rehearsal.

(2) Equity Business.  One half-hour, exclusive of the rehearsal call, shall be set aside on one of the first three days of rehearsal (or at any other time mutually agreed to by the Producer and Equity), to allow the Company to conduct Equity business, including the election of an Equity Deputy.  It shall not be counted as part of the rehearsal period.  It shall be exclusive, however, of time devoted to paperwork, including the signing of the contracts, the filling out of W-4 forms, pension/welfare cards, and the conducting of any other business by the Producer.

(3) Beginning of.  Rehearsals shall begin on the date when the Actor is first called to report to the theatre or other location as designated by the Producer, except as provided for in (A)(7) below.

(4) Continuous.  It is agreed that the rehearsal period shall be continuous from the date of the first rehearsal to the date of the first paid public performance of the production as stated on the face of the contract of employment.

(5) Rehearsal Schedule.  For rehearsals prior to the first paid public performance, there shall be a 12-hour notice of the rehearsal call.

(6) Breaks .  During the rehearsal period, there shall be a recess of 1½ hours after a period of not more than five consecutive hours of rehearsal.

The 1½-hour break may be shortened to one hour by unanimous consent of the Actors taken by secret ballot vote.  Said reduction of the 1½-hour break shall reduce the Actor's span of the workday by one half-hour.

There shall be an additional break of five minutes within each 60 minutes of rehearsal.  If a five-minute break is not given at the end of 55 minutes, a ten-minute break must be provided at the end of 80 minutes, except during a run-through and/or dress rehearsal, when the break must be given no later than the end of the scene or act.

Due to the nature of Stage Managerial duties, it is not always possible for the Stage Manager and/or Assistant Stage Manager to take the required breaks at

the same time as the Actors.  A violation of the Stage Manager's or Assistant Stage Manager's break period(s) shall be paid for at the overtime rate.  [See Rule 53(H)--SALARIES AND ADDITIONAL COMPENSATION.]

(7) <u>A Read-Through Prior to First Rehearsal</u>.  If the Producer chooses to start with a read-through of the play, in whole or in part, to or by the whole Company or a part thereof, said read-through shall begin and be considered a part of the rehearsal period.  The Producer may schedule a read-through prior to the first rehearsal, however, under the following conditions:

(a) The Actor agrees in a rider to the Actor's contract to attend such a read-through;

(b) The Producer agrees that such a read-through is not a condition of employment;

(c) A Stage Manager is present at this read-through;

(d) There  may be a maximum call of four hours for the read-through; and

(e) The Producer agrees to pay an Actor whose contract is not in effect on the date of the read-through at the rate of no less than one-sixth of rehearsal salary.  This payment shall be subject to Pension contribution and Equity Working Dues deduction.

(8) <u>Overtime Computation</u>.  [See Rule 53(H)--SALARIES AND ADDITIONAL COMPENSATION.]

(9) <u>Costume Calls</u>.

(a) <u>Prior to Rehearsals</u>.  The Actor shall not be available for any costume calls prior to the signing of the Actor's contract.  Once the contract has been signed, the Actor shall be available for one costume-measuring call prior to the rehearsal period at a mutually convenient time and location and shall be compensated for said call at the rate of the applicable overtime rate per hour or part thereof, but in no case less than two hours.  Travel time shall be included in computing the time of the call.  If mutually agreed to in a rider to the Actor's contract, one costume-measuring call may be allowed during the reading call, as stipulated in (A)(7) above, with no additional compensation.

(b) <u>During Rehearsals</u>.  Two costume calls, each of up to two hours in duration, shall be permitted in addition to the rehearsal period, provided that the hours for the costume calls and rehearsals shall be consecutive and fall within the prescribed maximum workweek hours.  If these calls take place on a 10 out of 12 or 9 out of 11 hour rehearsal day, the overtime rate shall be paid for any costume call time actually used.

(10) <u>Technical Rehearsals</u>.  Actors shall not be required to perform in front of an audience until they have had a technical rehearsal on the stage set.  Such technical rehearsal shall include, but shall not be limited to, rehearsal on the set with such props, lighting effects, mechanical or pyrotechnical devices, weapons,

and costumes necessary for the production.    Understudies shall not be governed by this rule but by Rule 63(C)--UNDERSTUDIES.

(11) <u>Absence From</u>.

(a) After an Actor has expended the Actor's available sick leave and continues to absent himself from rehearsal for an additional seven days due to illness and/or a non-work-related injury, the Producer may terminate the Actor's contract at the end of said seven days without further obligation to that Actor by paying the Actor for any rehearsal to date (including sick time) plus two week's contractual salary.

(b) Equity may, in its discretion, upon appeal by the Producer, reduce this period.

(12) <u>Rehearsals Discontinued or Play Abandoned</u>.    If a production is abandoned before or during rehearsals, the Producer shall pay the Actor a sum equal to two weeks' salary plus all rehearsal pay due to date.

(13) <u>Holidays</u>.    Except for replacement rehearsals, there shall be at least four weeks' notice, or notice at the time of contract signing, of the Producer's intent to schedule rehearsals on Thanksgiving, Christmas Eve, Christmas Day, or New Year's Day. [See also Rule 38(B)(7)--PERFORMANCES.]

(B)  <u>Rehearsal Rules</u>.

(1) <u>Before the Workweek Containing the First Paid Public Performance.</u>    The following weekly and daily limits shall apply:

| | | |
|---|---|---|
| Weekly rehearsal hours | = | 42 hours per week per Actor |
| Daily rehearsal hours | = | 7 out of 8½ consecutive hours per day |
| Days off | = | 1 day per week |

(2) <u>During the Designated Tech Week</u>.    The following weekly and daily limits shall apply:

| | | |
|---|---|---|
| Weekly reh/perf hours | = | 45 hours per week per Actor |
| Non-performance days | = | 10 out of 12 consecutive hours on one day |
| | | 7 out of 8½ consecutive hours on the other days |
| Combined reh/perf days | = | 5 hours of rehearsal per day |
| Two-performance days | = | No rehearsal permitted |
| Days off | = | 1 day off |

Not more than two hours or less than one and one-half hours may elapse between the end of the Actor's first call and the beginning of the Actor's second call of the day.

(3) <u>During the Workweek Containing the First Paid Public Performance</u>.    The total number of hours allowed for rehearsal and performance shall be 42 unless the theatre designates this week as tech week, in which case 45 hours shall be permitted.    Rehearsals scheduled on a one-performance day shall be limited to five hours in duration.    The span of time between the end of a rehearsal and the beginning of the performance (curtain up) shall not be more than two hours.    No

rehearsal may be scheduled on a two-performance day.  Rehearsal on a non-performance day shall be governed by the rule for rehearsal prior to the first paid public performance.  [See also Rule 50(B)(3)—REST PERIODS AND DAYS OFF.]

(4) After the Workweek Containing the First Paid Public Performance.  See (C) below.

(5) Overtime Rates.  Rehearsal and/or performance calls that exceed the daily or weekly limits described above shall be compensated at the appropriate overtime rate as stipulated in Rule 54(H)--SALARIES AND ADDITIONAL COMPENSATION.

(C) Rehearsals After the Workweek Containing the First Paid Public Performance.

(1) Brush-up, Replacement, Put-in, Understudy.

(a) During the weeks following the week containing the first paid public performance, rehearsals may be scheduled up to eight hours per week.

(b)  Except for brush-up, replacement, put-in, or understudy rehearsals, any rehearsal held under the provisions of Rehearsal After the Workweek Containing the First Paid Public Performance shall be compensated at no less than the applicable tier's overtime rate. If such rehearsal is for the purpose of rehearsing new material, the Producer shall not require the Stage Manager, Dance Captain, and/or Fight Captain to conduct such rehearsals.  Rehearsals for the replacement of crew and/or musicians may be held within the regular rehearsal hours without additional compensation.

(2) Scheduling.  Rehearsals scheduled on a one-performance day shall be limited to five hours in duration.  The span of time between the end of a rehearsal and the beginning of the performance (curtain up) shall not be more than two hours.  No rehearsal may be scheduled on a two-performance day.  Rehearsal on a non-performance day shall be governed by the rehearsal rules for weeks prior to the first paid public performance, except that rehearsal hours may not exceed the weekly limits prescribed in (1) above without the payment of overtime.  Rehearsal may not be scheduled on the day after the day off except for a put-in rehearsal of no more than three hours that is necessitated by illness, MRE or major cast replacement.

(3) Notice.

(a) Rehearsals.  The Actor shall receive no less than one week's notice of such rehearsals, except for put-in rehearsals due to illness of an Actor, more remunerative employment of an Actor, or other emergencies, in which case the Producer will provide as much notice as circumstances will permit.

(b) Note Sessions.  Note Sessions may be scheduled with no less than 12 hours' notice to the Actor.  Note Sessions shall be scheduled contiguous with the Actor's designated performance call.  They may not be scheduled on a two-performance day.  Time utilized for Note Sessions shall be

calculated in no less than half-hour increments and shall be deducted from allowable rehearsal hours.

(4) Inviolability of Designated Performance Call.  After the Actor's designated performance call time, the Actor may not be called to rehearse (except for fight/stunt rehearsal required by Rule 57(C—STAGE FIGHTING/ VIOLENCE/ STUNTS), accept script changes, or accept notes, except in an emergency, and no persons except those connected with the production and/or theatre personnel will be permitted in the dressing rooms.

(5) Rehearsal Time Utilized.  If the Actor is called for a rehearsal that is designated to be of a specific call time and duration, the Actor shall be credited with the total hours of the call regardless of whether the Actor is kept for the entire time period.

## 47. REOPENING OF A PLAY.

A play, once closed, shall not be reopened for rehearsal or performance within eight weeks of the date of its closing under any Equity contract without the written consent of Equity and under such terms as stipulated by Equity..

## 48. REPLACEMENT OF AN ACTOR.

(A) Permanent Replacement.  Every Actor whose employment terminates during the production must be replaced by another Actor so that the number of Equity contracts will not be diminished.

The Actor's Replacement shall be contracted and called for a minimum of three days of rehearsal.  For each such day, the Replacement Actor shall receive a payment of 1/6th of rehearsal salary.  The Replacement Actor's rehearsal hours shall be governed by the  "Rehearsal Before the Workweek Containing the First Paid Public Performance". [See Rule 46 (B)(1).]

The above rehearsal/payment requirement shall be waived for an Actor who is returning to play a role that the Actor has played in that production within the previous three months, provided Equity is notified in writing of the consent of both the returning Actor and the production's Stage Manager.

(B) Temporary Replacement.  An Actor may be signed to a one-week contract to replace an Actor who is out of the production due to illness, vacation, more remunerative employment, previous commitment, or if only one week remains of the run of that production.  The one-week guarantee must be stated on the face of the Actor's contract.  [See also Rule 62--UNDERSTUDIES.]

(C) Alternating with Understudy or Replacement.

(1) Without the Actor's Consent.  Unless Equity shall otherwise order, the theatre shall not require the Actor to alternate with an Understudy or a successor, and if replaced by either without the Actor's consent, the Actor may not thereafter be required (unless Equity otherwise orders) to act again in the part or report to the theatre for that purpose.  Payments, however, shall continue to be made to the Actor according to the terms of his contract.

(2) <u>With the Actor's Consent</u>.

(a) An Actor may agree in a rider to his contract to alternate performances with another Actor. Notice that more than one Actor is performing a role must be stated in the program and the Actor performing must be properly identified. If such notice is not included in the printed program, any change of the Company must be announced in accordance with this Agreement.

(b) By mutual agreement with the Producer, the Actor may consent to withdraw from one or more performances for the express purpose of permitting the Understudy to perform. Such agreement cannot be a condition of employment. If such agreement is reached, a rider specifying the terms of such withdrawal shall be filed with Equity. The Actor shall not, however, suffer any loss of salary by reason of such withdrawal.

(D) <u>Replacement or Termination Due to Actor's Inability to Perform</u>. Should the Producer replace or terminate an Actor for inability to perform due to intoxication, controlled substance abuse, physical abuse of persons, theft of property, or similar cause, the Producer shall notify the Actor and Equity, in writing, of such action and the reasons therefore within 24 hours. In the instance of a temporary replacement, the provisions of (C)(1) above shall not apply and the Actor may be required to perform thereafter at the Producer's discretion. Should the Actor's replacement or termination be determined to be without just cause by an arbitrator or by other mutually agreeable means, the Actor shall be paid full salary for any performance not played as a result of the Producer's action and if the Actor was terminated, the Actor shall return to perform under his contract when notified to do so by the Producer. In such cases, payment for missed performances must be made prior to the Actor resuming to perform under the Actor's contract, and pending the determination, the Actor need not report to the theatre.

(E) <u>Re-engagement of an Actor</u>. Should a Producer dismiss or give an Actor notice of termination, the Producer shall not re-engage the Actor for the same part at a lesser salary than the Actor received at the time of termination.

49. **REPORTS.**

(A) <u>Reports Required</u>. All Producers are required to submit to Equity or the Equity-League Pension and Health Trust Funds, as applicable, the following reports:

(1) <u>Weekly Report</u>. A Weekly Report (on a form provided and/or approved by Equity) along with the appropriate payments shall be submitted to Equity or the Equity-League Pension and Health Trust Funds, as applicable, by the Friday of the week immediately following the end of the workweek that said statement covers. The Weekly Report includes the following:

(a) <u>Pension Report</u>: Computes the Producer's weekly pension contribution;

(b) <u>Health Report</u>: Computes the Producer's weekly health insurance contribution;

(c) <u>Membership Department Report ( Equity Working Dues)</u>: Computes the Actor's Working  Dues obligation to Equity; and

(d) <u>Contracts Department Report</u>: Lists all Actors employed by the theatre.

(2) <u>Box Office</u>. A weekly Box Office Statement (on a form approved by Equity) showing total attendance, gross receipts, unsold tickets, and the average face value of tickets shall be submitted every two weeks.

(3) <u>Understudies</u>. Complete understudy assignments, listing the name of the understudy and part(s) understudied, must be forwarded to Equity no later than the end of the second workweek of rehearsals.

(4) <u>Program</u>. A copy of the production program must be sent to Equity as soon as it is printed. Any changes in the program during the run of the production (including printed inserts correcting errors or omissions) must also be sent to Equity.

(B) <u>Failure to File</u>.

(1) <u>Equity Reports</u>.

(a) <u>Late Filing Penalty</u>. If the above-listed reports and payments are not received by Equity in accordance with the time requirements therein prescribed, the Producer or the Producer's designated representative shall be orally notified by Equity. If the reports are not received within 5 working days of the oral notification, effective immediately, a fine of $25.00 will be assessed for each week of failure to file the reports.

(b) <u>Failure to File as Breach</u>. Moreover, failure to file the Weekly Reports as described in (A)(1) above shall constitute a breach of this Agreement, entitling Equity, among other things and without any limitation, to refuse to release the balance of the security deposited with Equity until the above requirements are satisfactorily met.

(2) <u>Equity-League Pension and Health Reports</u>. Failure to file these reports shall be subject to the rules of the Equity-League Pension and Health Trust Funds.

(C) <u>W-2 Forms</u>. W-2 forms must be furnished to the Actor according to IRS regulations.

50. **<u>REST PERIODS AND DAYS OFF</u>.**

(A) <u>Rest Periods</u>.

(1) <u>Overnight</u>.

(a) <u>Actors</u>. There shall be no less than a 12-hour rest period between the end of employment on one day and the beginning of employment on the next day.

(b) <u>Stage Managers</u>. The rest period between the end of employment on one day and the beginning of employment on the next day shall be no less than 11 hours.

(c) <u>Penalty for Violation</u>.  Any invasion of the required overnight rest period as stated above shall be compensated at no less than 1½ times the applicable tier's overtime rate for each hour or part thereof of such invasion.

(2) <u>Between Performances</u>.  There shall be a minimum of one and one-half hours between curtain down and curtain up.  Should there be less than two hours between performances from curtain down to curtain up, the Producer, at the Producer's option and expense, shall either provide the Actor with a hot meal or pay the Actor $15.00.  [See also Rule 38(B)(4)--PERFORMANCES.]

(3) <u>Rehearsal Breaks</u>.  [See Rule 46(A)(6)--REHEARSALS.]

(4) <u>Stage Managerial Staff</u>.  Due to the nature of Stage Managerial duties, it is not always possible for the Stage Manager and/or Assistant Stage Manager to take the required breaks at the same time as the Actors.  A violation of the Stage Manager's or Assistant Stage Manager's break period(s) shall be paid for at the applicable overtime rate.    [See Rule 53(H)--SALARIES AND ADDITIONAL COMPENSATION.]

(B) <u>Days Off</u>.

(1) <u>Definition</u>.  The term "day off" shall mean 24 hours in addition to the regular rest period required at the end of each working day.

(2) <u>Specified on Face of Contract</u>.  The day(s) off shall be stipulated on the face of the Actor's contract.

(3) <u>Required Number of Days Off</u>.  The Actor shall be entitled to one day off in each workweek.

(4) <u>Change of Day Off</u>.  The day off may be changed with no less than a two-week written notice to the Actor and Equity.

(5) <u>Period Between Days Off</u>.  No more than eight consecutive days may elapse between days off except by written permission of Equity. This provision shall not abrogate the Producer's responsibility to provide a day off in each workweek.  A Day Off must be given immediately following two consecutive two-performance days.

51. <u>**RIGHTS:  CONTINGENT, SUBSIDIARY AND FUTURE PRODUCTIONS**</u>.

(A) <u>Contingent and Subsidiary Rights</u>.  Should an Equity Showcase, Los Angeles 99-Seat Theatre Plan, or Bay Area Project Policy production be produced under this Agreement within 24 months of its last performance as a Showcase, Los Angeles 99-Seat Theatre Plan, or Bay Area Project Policy production, all Actors engaged in that previous production must receive a bona fide offer to perform the same role or function(s) for which they were engaged in that production.  If a bona fide offer is not made, the Actor shall be compensated in the amount of three weeks' minimum salary under the applicable tier of this Agreement.  If more than one such production has been produced within that 24 month period, the Producer shall be responsible only to the Company of the first such production.  This provision is not applicable when the subsequent production under this Agreement is not the first standard Equity contract presentation of the play within 24 months of the last performance of

the Showcase or other such production, provided the intervening contract presentation has satisfied the applicable conversion rights clause.

(B) Rights in Future Productions. If the Producer (or any management group or enterprise, corporate or otherwise, which the Producer controls or directs) takes a play produced under this Agreement into any theatre operating under an Off-Broadway or Production Contract within 24 months of the close of the production being produced under the provisions of this Agreement, and the Producer has a financial interest in the play, then the Producer shall offer any Actor who was engaged for said play under this Agreement and who performed and/or functioned as an Actor in the first paid public performance and who performed the role and/or functioned as an Actor for at least 30 performances or the length of run thereof, an opportunity to continue in the same role or function for which the Actor was originally engaged for that production for no less than four weeks of employment under the new contract, notwithstanding minimum guarantees of employment to the contrary which might appear in the higher contract to which the Actor is signed. The Producer agrees to pay any Actor not so offered the identical role or function a sum not less than three weeks' salary at the prevailing minimums of the higher contract.

These provisions shall also apply to a production for which the Producer has received enhancement monies from the first class rights holder.

52. **SAFE AND SANITARY CONDITIONS OF EMPLOYMENT.**

The Producer agrees to provide the Actor with a safe and sanitary place of employment.

(A) Dressing Rooms.

(1) Separate dressing rooms for male and female Actors shall be provided. Where possible there shall be separate dressing rooms or areas for children 13 years of age and under. All dressing rooms shall be clean and sanitary.

(2) After the designated performance call, no persons except those connected with the production will be permitted in the dressing rooms.

(3) Dressing rooms (except quick-change booths) shall be of a permanent type and shall not be only under canvas.

(4) Adequate table space for each Actor shall be allocated to all members of the Company, including Understudies and Swings, for make-up and dressing purposes.

(5) Smoking shall not be permitted in the dressing rooms. It shall be the responsibility of the Producer to post NO SMOKING signs in the dressing rooms. If the Producer designates a smoking area, it shall be easily accessible to the Actors, away from the non-smoking Actors and the view of the audience. Any designated smoking area shall comply with the rules of the municipality in which the theatre is located.

(6) All exterior dressing room windows and doors shall have screens whenever fire regulations permit.

(7) All dressing rooms shall be equipped with air conditioning systems, in good working condition to ensure proper ventilation and the circulation of fresh cool air.

(8) The indoor temperature of the dressing room(s) shall not fall below 65° or rise above 85° Fahrenheit. If the temperature falls below or rises above these limits and the Producer fails to take steps within 24 hours to maintain the proper temperature, with Equity's consent, the Actor shall not be required to remain in the theatre.

(9) Alleys and roads leading to stage doors of theatres shall be accessible and properly lighted.

(10) Dressing room entrances and windows shall be properly masked from the view of the audience to ensure the Actors' privacy.

(11) Dressing room areas shall be thoroughly cleaned when necessary, but at least once per week.

(B) Lavatory and Toilet Facilities.

(1) Adequate, separate sanitary facilities shall be provided for male and female Actors. Toilets and lavatories shall be clean and sanitary and shall be provided with toilet paper, soap, and paper towels. Toilets and lavatories shall be separate from those provided for the audience.

(2) Sinks with hot and cold running water shall be available in, or reasonably convenient to, the dressing rooms and shall be provided with hand and face soap and paper towels. "Reasonably convenient to" shall mean within the same building and in the dressing room area.

(3) In all theatres where the Actor is required to use body make-up, there shall be showers with hot and cold running water.

(4) Any walkway between the dressing rooms and toilet facilities shall be masked from the view of the audience.

(C) Rehearsal Space. The indoor temperature shall not fall below 65° nor rise above 85° Fahrenheit. If the temperature falls below or rises above these limits and the Producer fails to take steps within 24 hours to maintain the proper temperature, with Equity's consent, the Actor shall not be required to remain in the rehearsal space.

(D) Stage Manager's Booth. Any booth or room, separate from the stage area, from which the Stage Manager must call cues must be safe, equipped for air circulation, heating and air conditioning, and have safe access and proper lighting.

(E) Aisles Ramped. In arena theatres there shall be no rise between the runway and the stage. A ramp or other leveling device must be provided.

(F) <u>Guide Lights</u>.

(1) All ramps, stairways, entrances and exits, crossover areas, or off-stage passageways that may be affected by blackouts shall be illuminated with guide lights, luminous tape, or luminous paint.

(2) In arena theatres, there shall be two guide lights or luminous tape placed on the edge of the stage and one on each side of every ramp leading to the stage. In addition, there shall be a guide light or luminous tape on each side of the aisle adjacent to the first rows of seats of every aisle at eight-foot intervals. There shall be a warning light or luminous tape at eye-level on both sides of every pole located in an aisle, and on any obstruction in an aisle that Equity shall deem to be injurious or unsafe. There shall be side rails on any ramp adjacent to any pit and level guide lights on stage along the edge of any pit.

(3) Aisles shall be maintained in a firm and even condition and, if not constructed of a hard surface such as concrete, asphalt, or macadam; such aisles must be covered and the coverings must be secure.

(G) <u>Dance Surfaces</u>. Actors shall not be permitted to audition, rehearse, and/or perform a dance or dance movements on concrete or marble floors or any other surfaces which Equity shall deem to be injurious or unsafe, or on wood or any other substance laid directly over such similar surfaces which do not provide air space of at least 1 5/8th inches between the concrete, marble, or similar supporting surface. Warm-up areas shall conform to the above dancing surface specifications.

(H) <u>Cots</u>. The Producer shall provide a cot for all rehearsals and performances, which shall be accessible to any Actor at all times. This cot shall not be in a dressing room but shall be easily available to the entire Company. The Producer may, in lieu of the above, provide a cot in each dressing room.

(I) <u>First Aid Kits</u>. First aid kits stocked with adequate supplies shall be available and easily accessible at all times.

(J) <u>Intercom System</u>. An intercom system between the stage area and the dressing rooms shall be installed in all theatres in which Equity deems that the dialogue from the stage is not clearly audible in the dressing rooms.

(K) <u>Drinking Water</u>. Ample, pure, cool drinking water shall be provided wherever the Actor is required to rehearse or perform.

(L) <u>Hazardous Materials</u>.

(1) <u>Make-up</u>. Whenever the Producer provides make-up, hair coloring, wigs, or other material, they shall be free of toxic or hazardous chemicals. Unless such material is unavailable, hypoallergenic products shall be utilized. Aerosol products shall not be provided for use by Actors.

(2) <u>Sets, Props, and Costumes</u>. Sets, props, and costumes shall be constructed in such a manner that there shall be no toxic or hazardous residue that might be inhaled, absorbed, or ingested.

(3) <u>Use and Storage of Toxic or Hazardous Materials</u>.  Toxic or hazardous materials, including solvents, aerosols, adhesives, cleaning agents, paints, dyes, and pyrotechnic effects, if stored in the theatre, shall not be stored on stage or in or near dressing rooms.  If volatile materials are used in the theatre, forced-air exhaust shall be provided and such materials shall be confined to rooms not occupied by the Actor.  Smoking shall be strictly prohibited during the use of such materials.

(4) <u>Lasers</u>.  Laser lighting effects will be maintained and operated by licensed personnel in such manner as to avoid injury to the Actor.

(5) <u>Smoke and Haze</u>.  The Producer agrees to use only dry ice, liquid nitrogen, or substances listed in, and in accordance with, the specific limits set forth in EQUIPMENT-BASED GUIDELINES FOR THE USE OF THEATRICAL SMOKE AND HAZE prepared by ENVIRON International Corporation, dated May 14, 2001 and as may be amended by Environ and Mount Sinai Hospital and approved by the Equity-League Pension and Health Trustees.

(6) <u>Raked Stages</u>.  Raked stages are prohibited under this agreement.

(M)<u>Telephone</u>.  A telephone reasonably accessible to the Stage Manager shall be available for production and emergency purposes.

(N)<u>Fire Safety</u>.  Fire extinguishers shall be mandatory in the dressing rooms, backstage areas, and the Stage Manager's booth.  Escape procedures shall be posted on the callboard and, if possible, fire drills shall occur.

(O)<u>Inspection and Compliance</u>.  The Producer agrees that Equity's representative shall have the right to inspect the theatre to determine whether the Producer has complied with the safe and sanitary requirements.  Any deficiencies shall be reported in writing to Equity and the representative shall furnish the Producer with a copy of such report.

Upon receipt of such report, Equity may notify the Producer in writing that the Producer must correct the deficiencies.  Unless the Producer corrects the deficiencies noted or gives Equity assurances satisfactory to it that such deficiencies will be promptly corrected, Equity's Council or its executives may certify the theatre as unauthorized for rehearsal, performances, or both, as the Council or its executives may determine.

Upon such certification and until correction of the deficiencies or the giving of assurances satisfactory to Equity that they will be corrected within a reasonable time, Equity may either require the Actors to refrain from rehearsing and/or performing in the theatre, or require the Producer to pay the sum of $1,000.00 per week to the Actors' Equity Foundation for each week in which the infraction continues.

53. **SALARIES AND ADDITIONAL COMPENSATION.**

(A) <u>General Rules: Salaries</u>.

(1) <u>Salaries Paid</u>.  All salaries must be paid to the Actor on the day prior to the last banking day of each workweek.  [See (2) below.]  When paid, the Actor

57

must be issued a stub or other record of gross salary, itemized additions (e.g., overtime), and itemized deductions (e.g., dues deductions, taxes, and Social Security).

(2) Checks.  The Producer may pay salaries by check only if facilities are made immediately available for cashing said checks at the box office, a reputable currency exchange, a bank, or other nearby financial institution.

In any event, no check or draft, either of the Producer or a third party, given to or received by the Actor in payment of any sum due under the Actor's employment contract shall operate to minimize or affect the Actor's claim for salary or other compensation under his contract.

(3) Actual Salary.  The actual agreed-upon salary of the Actor shall be stated in the contract.  A new contract or rider will be issued and signed whenever the Actor's salary is increased as the result of negotiation.

(B) Minimum Weekly Salaries for Actors, Stage Managers, Assistant Stage Managers, and Full Understudies.  [See also Rule 41 – Potential Weekly Box Office and Company Tiers.]

(C) Minimum Weekly Salaries.

|        | Actor or US | ASM    | SM      |
|--------|-------------|--------|---------|
| Tier 1 | $498        | $559   | $622    |
| Tier 2 | $577        | $648   | $720    |
| Tier 3 | $656        | $736   | $819    |
| Tier 4 | $733        | $804   | $917    |
| Tier 5 | $812        | $914   | $1015   |
| Tier 6 | $890        | $1,001 | $1,112  |

**Each year, on the anniversary of the agreement, the salaries shall be increased by the cost of living (January of the current year over January of the prior year) and the Minimum Weekly Salaries shall be adjusted accordingly.  All minimum salaries shall be rounded to the nearest dollar.**

(D) Buy-Out Option.  [See Rule 33(E)--MORE REMUNERATIVE EMPLOYMENT.]

(E) Additional Compensation.

(1) Additional Duties.  Additional work is defined as playing additional parts, understudying, or mutually agreeing to other related work not specified in the Principal Actor's contract at the time of its original signing.  The Actor shall not be required to do any additional work without mutual agreement and additional compensation, which shall be stated in a rider to the Actor's contract and which shall be no less than the minimums stipulated below:

(a) Playing an additional part: 3½% of the applicable tier's minimum salary/week per part.

(b) <u>Understudying</u> an additional part: 3½% of the applicable tier's minimum salary/week for the first part and 1½% of the applicable tier's minimum salary/week for each additional part thereafter.

(2) <u>Dance Captain.</u> [See Rule 15 DANCE CAPTAIN.]

(3) <u>Fight Captain.</u> [See Rule 56 (C) STAGE/ FIGHTING/ VIOLENCE/STUNTS.]

(4) <u>Chorus Playing a Part.</u> [See Rule 9 (E)(1) and (E)(2)- CHORUS.]

(5) <u>Chorus Understudying.</u> [See Rule 9 (F) (1), (F)(2) and (F)(3) CHORUS.]

(6) <u>Swing.</u> [See Rule 9 (D) (1) and (2) CHORUS.]

(F) <u>Per Diem.</u> [See Rule 37--PER DIEM.]

(G) <u>Long-Term Salary Adjustment (LOTSA).</u>  Any Actor whose salary is not 10% above the then-current weekly minimum salary shall receive a salary increase of not less than 5% on the Actor's 53rd, 105th, 157th, etc. week of continuous employment.

(H) <u>Overtime Rates.</u>  Overtime rates will increase annually at the same percentage as the minimum salary and the increased rates.  The increase shall be adjusted to the nearest 25 cents.

(1) <u>Overtime Rates, First 10 Hours.</u>  Overtime rates for the first 10 hours in any workweek shall be compensated at the following rates:

Tier 1:  $17.75/hour or part thereof or $10.25/half hour or part thereof
Tier 2:  $20.50/hour or part thereof or $12.25/half hour or part thereof
Tier 3:  $23.50/hour or part thereof or $13.25/half hour or part thereof
Tier 4:  $26.25/hour or part thereof or $14.75/half hour or part thereof
Tier 5:  $29.00/hour or part thereof or $16.00/half hour or part thereof
Tier 6:  $31.75/hour or part thereof or $17.50/half hour or part thereof

(2) <u>Overtime Rates, Second 10 Hours.</u>  Overtime rates for the second 10 hours of overtime in any workweek shall be compensated at the following rates:

Tier 1:  $23.75/hour or part thereof
Tier 2:  $27.50/hour or part thereof
Tier 3:  $31.25/hour or part thereof
Tier 4:  $35.00/hour or part thereof
Tier 5:  $38.75/hour or part thereof
Tier 6:  $42.50 hour or part thereof

(3) <u>Overtime Rates, More Than 20 Hours.</u>  Overtime that exceeds 20 hours in a workweek requires prior approval from Equity.

(4) <u>Limitations.</u>  Should the same time period be subject to more than one violation requiring overtime payment (<u>e.g.</u>, rest period violation, span of day violation, etc.), overtime compensation shall be paid on no more than two categories of the violation.

(5) <u>Use of Overtime Rates.</u>  Use of the hourly or half-hourly rate shall be determined by the Producer, however the rates may not be combined.

54. <u>SECURITY AND SECURITY AGREEMENTS.</u>

The provisions of any and all agreements relating to security deposited or agreed to be deposited with Equity covering any employment under this Agreement and/or any contracts of employment are hereby adopted and made a part of this Agreement and/or said employment contracts as though fully set forth herein.  This includes agreements on forms now called "Producer's Agreement," "Security Agreement," and "Producer's Statement."  It is the essence of this Agreement and all contracts of employment that the Producer shall file and maintain with Equity satisfactory security as required by Equity's existing Security Agreement and Rules and the contract prior to the contracting of any Actors.

55. <u>SET MOVES</u>.

(A) An Actor in character may, consistent with that character, set, or move scenery or props.

(B) An Actor out of character may set or move scenery or props only in scenes in which the Actor enters or exits.

(C) Set or prop moves which are inherently hazardous due to location on stage, weight of the set piece or prop, construction, pyrotechnic or electrical effects, proximity to machinery or simultaneous movement of other scenery or effects, shall not be undertaken by the Actor without the express consent of Equity.

56. <u>STAGE FIGHTING/VIOLENCE/STUNTS.</u>

The following regulations shall be followed whenever a production requires physical violence, with or without weapons, and/or potentially dangerous choreographed movement such as falls, throws, or tumbling:

(A) The Actor shall agree in a rider at the time of contract signing to participate in stage fighting/violence/stunts.  When an Actor has already signed the contract, the Actor may still agree to participate in stage fighting/violence/stunts provided that the Actor executes a rider to that effect and has no less than three days to consider the terms of that rider.

(B) If the Producer does not employ a fight/stunt director/choreographer for the duration of the production and the production has actors who participate in stage fighting/violence/stunts, a qualified Fight Captain shall be assigned by agreement with the Producer and the fight/stunt director/choreographer during the first week of rehearsal and paid from the beginning of that week.  Equity shall be notified of said assignment within one week.

A Fight Captain shall be deemed "qualified" when through experience and/or training, the Actor has proven ability to perform and supervise the maintenance of safe theatrical fighting/violence/stunts.

(C) A Fight Captain shall receive no less than 10% of the applicable tier's minimum salary/week in addition to his weekly contractual salary, commencing with the first

week of rehearsal. Provision for payment shall be included in a rider to the Fight Captain's contract.

(D) All Actors who participate in stage fighting/violence/stunts shall run through the routine before each performance. When a Fight Captain is employed such run-through shall be under the Fight Captain's supervision. Any exception to the rule shall be at the express discretion of the fight/stunt director/choreographer or the Fight Captain. Such run-throughs shall not be deducted from regular rehearsal hours.

(E) Understudies and Replacements shall be coached by the fight/stunt director/choreographer or Fight Captain. Performing members of the Company shall rehearse stage fighting/violence/stunts with Understudies and Replacements during regular rehearsal hours under the direction of the fight/stunt director/choreographer or Fight Captain at least once prior to the Understudy or Replacement's performance in any role.

(E) Proper first-aid information and equipment (including ice packs) shall be made available at any rehearsal or performance site where stage fighting/violence/stunts occurs.

(F) The fight/stunt director/choreographer and/or Fight Captain shall consult with all other artistic personnel prior to the first rehearsal in order to achieve the optimum degree of safety.

(G) Firearms. It is essential that appropriate firearms rehearsals are held to ensure the Actors' safety. Utilizing a form provided by Equity (found in both the Stage Manager and Producer kits), the Stage Manager shall confirm that such rehearsals have and will continue to take place during the duration of the production. [See also Rule 43(D)(4)--PROGRAMS.]

57. **STAGE MANAGERS AND ASSISTANT STAGE MANAGERS.**

(A) Clarification of Definition. The words "Stage Manager", "Assistant Stage Manager", "members of the Stage Managerial staff", and/or "Actor" in any of the rules of this Agreement have been inserted for added emphasis and/or clarification. The failure of those words to appear in any rule is not meant to imply that the rule does not cover those categories of employment. Stage Managers and Assistant Stage Managers are covered by all rules in this Agreement except where specifically stated otherwise. [See also Rule 17 DEFINITIONS.]

(B) Required.

(1) Stage Manager. There shall be at least one Stage Manager for each production. In order to maintain a high level of professionalism in the production as well as necessary backstage safety and discipline for the efficient running of the production, the Producer shall hire a Stage Manager who has been employed previously as a stage manager.

(2) Assistant Stage Manager. There shall be at least one Assistant Stage Manager for each production.

(C) <u>Pre-Production Week</u>.  The Stage Manager shall be engaged and the Stage Manager's contractual salary shall commence no later than one week prior to the first day of rehearsal.  The ASM's employment shall commence no later than the date of the first rehearsal for the Actors; however the ASM will be called to work with the Stage Manager, using the provisions of (E) (3) below, for at least one day during the Stage Manager's pre-production week.

(D) <u>Acting/Understudying</u>.    Stage Managers and the required Assistant Stage Manager shall not be permitted to act or to understudy.

(E) <u>Contract</u>.

> (1) <u>Continuous Employment</u>.  No Stage Manager or Assistant Stage Manager shall be required to do any work of any kind without an individual contract executed after security has been properly posted with Equity, and until said Stage Manager or Assistant Stage Manager has received instructions from the Producer as to the duties.  Stage Managers shall be employed continuously, commencing with the date specified on the individual contract, which may not be later than one week prior to the first rehearsal date for the Actors.
>
> (2) <u>Counted Work</u>.  Whenever a Stage Manager or Assistant Stage Manager does work related to the production (such as attending meetings, doing administrative work, scheduling and contacting cast, crew, and liaisons), said work shall be regarded as part of the workweek.
>
> (3) <u>Work Prior to the Commencement of Contractual Employment</u>.    The Producer agrees that the Stage Manager and/or Assistant Stage Manager shall receive compensation for any work done in preparation for the production and/or any auditions held for same that occur prior to the beginning of the Actor's contract.  The above rule of continuous employment shall be waived for such work, which shall be performed and compensated for as follows:
>
>> (a) The call for the Stage Manager and/or Assistant Stage Manager shall not be less than four consecutive hours; and
>>
>> (b) Payment shall be made at the overtime rate for the appropriate tier for each hour or part thereof worked.  This payment shall be subject to Pension contributions and Equity Working  Dues deductions and will require the Producer to file a separate Weekly Report.

(F) <u>Primary Responsibility</u>.   Either the Stage Manager or the Assistant Stage Manager shall be present at all rehearsals and performances.  An Assistant Stage Manager shall be the individual who is assigned to assist the Stage Manager(s) on the production.  An Assistant Stage Manager may not be assigned the primary responsibility for a production.

(G) <u>Work Area.</u>  The Producer shall provide the Stage Manager, during his normal working hours, with access to a work area with adequate desk space and customary business equipment, including, but not limited to, telephone, computer and printer, copy machine, fax machine and answering machine.

(H) Stage Managers' Booth.   The Stage Managers' booth shall have:

(1) Adequate table space for the Stage Manager's use; an adequate seat; adequate lighting; and, to the extend possible, an unobstructed view of the stag. (If the view is substantially obstructed, a video monitor shall be provided.)

(2) The Stage Manager's booth shall also have an audio monitor from the stage and a communication and/or paging system in working order between the booth and the dressing rooms.

(3) All obstructions, (i.e., pipes, conduit, ducts, beams, any other protrusions extending into the booth) must be clearly marked and securely fastened.   All electrical devices must be properly shielded.

(4) Access-ways must have adequate lighting and adequate handrails.   Treads on stairways and/or permanent ladders shall be maintained in safe condition.

(5) The Producer agrees to provide adequate secure, lockable space for the Stage Managers' belongings.

(6) The Stage Managers' booth must be properly heated in cold weather and shall be properly air conditioned in warm weather as necessary.   Heating and air conditioning systems shall be properly maintained.

(7)  The Stage Managers' booth shall be maintained and kept in a clean and sanitary conditions ( See Rule 53(O) Safe and Sanitary Inspection.

(I)  Working Conditions for Stage Management.   It is agreed that the Stage Manager's function is a full-time one.  The Stage Manager shall not be required to function in areas that impinge upon the primary duties as a Stage Manager.

(1) A Stage Manager signed to an Equity contract is obligated to perform at least the following duties for the production to which the Stage Manage is engaged, and by performing them is hereby defined as the Stage Manager. The Stage Manager shall:

(a) Be responsible for the calling and/or coordinating of all rehearsals and note sessions whether before or after opening;

(b) Be responsible for assembling and maintaining the prompt book, which is the property of the Producer and is defined as the accurate playing text and stage business, together with cue sheets, plots, daily records, etc., as are necessary for the actual technical and artistic operation of the production;

(c) Work with the director and coordinate and communicate with the heads of all other departments during rehearsal and after opening;

(d) Schedule rehearsal and outside calls in accordance with Equity's regulations;

(e) Assume active responsibility for the form and discipline of rehearsal and performance and be the executive instrument in the technical running of each performance;

63

(f) Maintain the artistic intentions of the director and the Producer after opening to the best of the Stage Manager's ability, which shall include giving notes, calling brush-up rehearsals of the cast when necessary, and preparing understudies, replacements, and extras when and if the director and/or the Producer declines this prerogative;

(g) Keep such records as are necessary to advise the Producer and/or the Producer's representative on matters of attendance, time, or other matters relating to the Actors and/or the Producer;

(h) Maintain discipline as provided in the provisions of this Agreement;

(i) Notify the Producer or the Producer's representative if the safe and sanitary provisions of this Agreement are not being maintained; and

(j) Implement provisions designated by the Producer for the security of personal property and notify the Producer or the Producer's representative when security provisions for Actors' valuables are not available/operable.

(2) The following duties are not Stage Managerial duties and Stage Managers or Assistant Stage Managers  shall not be required to perform them:

(a)  Design, build, hang, transport, operate, shift, run, shop for, or maintain lights, sound, scenery, props, video, animals or wardrobe, etc.;

(b)  Arrange living accommodations;

(c)  Order or distribute food for any members of the production;

(d)  Transport the cast or be responsible for any aspect of transportation or the maintenance of any vehicle; and

(e)  Be responsible for any aspect of laundry or dry cleaning

(f)  Set up the Stage Manager  tech tables for technical rehearsals.

However, for additional compensation, the Producer and the Stage Managers or Assistant Stage Managers may agree to those duties in an agreement separate from the Equity contract that shall be discussed, issued, and signed subsequent to the signing of the Equity contract.  The Equity contract shall not be contingent upon the signing of said separate agreement, which shall neither be attached nor ridered to the Equity contract.

(3) The following activities are prohibited, and Stage Managers or Assistant Stage Managers shall not accept responsibility for:

(a) Having contracts or riders signed or initialed or performing any other function which normally comes under the duties of the general or company manager (which is not to preclude delivery of contracts and/or riders in a sealed envelope addressed to the individual Actor);

(b) Signing the closing notice of the Company or the individual termination notice of an Actor (which is not to preclude posting of all closing and other pertinent Company notices);

(c) Doing the payroll or distributing payments (including, but not limited to, salary and per diem) except when such payments are delivered in a sealed envelope addressed to the individual Actor; or

(d) Doing building maintenance, janitorial, house management or custodial work, including securing or locking any part of the theatre or backstage areas;

(e) Supervising juvenile actors;

(I)  Owning or Operating a Motor Vehicle.  It shall not be a condition of employment that any Stage Managers or Assistant Stage Managers own or operate a motor vehicle.

(J) Workweek.  All rules for the Actor pertaining to rehearsals, performances, overtime, breaks, and rest periods shall also be applicable to Stage Managers and Assistant Stage Managers, except where expressly stated otherwise.  The workweek for Stage Managers and Assistant Stage Managers shall be limited to six hours per week beyond the hours permitted for the Actors.  Hours worked in excess of the six additional hours per week must be approved in advance by the Producer or the Producer's designated representative and shall be compensated at the appropriate tier's overtime rate.  In cases of emergency and instances when the Producer or the Producer's designated representative is not available, post approval shall not be unreasonably denied.

(K) Tech Week.  During the designated tech week of the production Stage Managers and Assistant Stage Managers shall be paid 2/8ths of contractual salary in addition to contractual salary.  The workweek limitations specified in (I) above shall not apply during tech week.

58. **TELEVISING, FILMING, AND RECORDING.** [See also Rule 44.  PUBLICITY]

(A)  Application and Liability.  Except as provided below, televising, broadcasting, visual and/or sound recording, motion picture filming, videotaping, and/or other means of reproduction in whole or in part shall require that the Producer apply to Equity for terms and permission at least 30 days in advance of said activity.  This rule shall also apply to any reproduction made within a period of 16 weeks following the final performance of the production.

(B) Access to the Production.  The Producer agrees that the Producer is responsible for access by media personnel to the production including rehearsals and performances and for all filmed or recorded versions or excerpts of the production.

(C)  Filming or Taping for News and Community Affairs Telecasts.  [See Rule 44 (B) 4– PUBLICITY.]

(D) TV or Radio Spot Commercials.  [See Rule 44(C)--PUBLICITY.]

(E) Cast Album.  Notwithstanding (A) above, cast albums may be made under the provisions of the Original Cast Album Rider.  The Producer agrees that the Stage Manager and any Actor who sings or verbalizes in any number in the production, shall be employed on the appropriate AFTRA contract for the recording of said

album and shall receive at least one week's Equity contractual salary or the prevailing Production Contract Minimum, whichever is higher, for each day or part thereof so employed. The cast album shall accord credit to each Actor appearing in the production at the time the recording is made, whether or not the Actor performs on the recording. The following terms and conditions shall apply:

(1) The Producer shall give Equity not less than 72 hours' notice (inclusive of at least two business days) prior to such recording;

(2) If, during the recording of a cast album, one or more singers who are not members of the Equity cast are engaged, then Actors engaged as Swings or Understudies assigned to singing parts, if any, who are not engaged to record the cast album shall share equally in an amount equal to the average weekly contractual salary of said Swings and Understudies multiplied by the number of employment days of such supplementary singers; and

(3) For cast album recordings only, there shall be at least a 10-hour rest period between an evening performance and a morning recording call. There shall be a break of 1½ hours (one hour if a meal is provided) between the recording session and rehearsals or performances scheduled under this Agreement. Recording sessions may not be scheduled on two-performance days. Application of this rule may not reduce breaks or rest periods required by the AFTRA contract.

(F) Websites. [See Rule 44(D)-PUBLICITY.]

59. **TERMINATION AND CLOSING NOTICES.**

(A) Written. It is the essence of all employment contracts that all notices, Company and individual, must be made in writing. Copies of all notices must be filed with or mailed to Equity immediately by the party (Actor or Producer) giving notice.

(B) Serving of. All notices to the Producer must be in writing and may be given to the Producer personally, the company manager, or other designated representative of the Producer. No Actor or Stage Manager may be the designated representative. Notice to the Actor must be in writing and given to the Actor personally, unless the Producer has obtained the address of the Actor as registered with Equity, in which case unless otherwise provided under the rehearsal provisions, it may be given by mail or telegram. All communications that refer to the Company in general shall be posted on the callboard.

(C) Before Rehearsal. Before the beginning of rehearsals, standard contracts may be terminated as follows:

(1) By the Actor. An Actor may give written notice to the Producer at any time prior to three weeks before the reporting date on the face of the contract. During the three weeks prior to the reporting date, said Actor may terminate the contract by paying one week's contractual salary to the Producer. Said payment, in the form of a certified check, cashier's check, or money order, must accompany the termination notice in order for such notice to be effective.

(2) <u>By Producer</u>.  The Producer may terminate the Actor's contract any time prior to the reporting date on the face of the contract by giving written notice to the Actor and paying the Actor a sum equal to one week's contractual salary multiplied by the number of weeks of employment guaranteed in the contract, but in no case less than two weeks' contractual salary.  Said payment must accompany the termination notice in order for such notice to be effective.

(D) <u>During Rehearsal</u>.  During rehearsals, standard contracts may be terminated as follows:

(1) <u>By the Actor</u>.  During rehearsals the Actor may not terminate the contract; however, during the rehearsal period, the Actor may give the Producer written notice of the Actor's intention to terminate the contract.  The effective date of said notice shall be no earlier than two weeks after the first paid public performance.

(2) <u>By the Producer</u>.  The Producer may terminate the Actor's contract any time prior to the first paid public performance by giving written notice to the Actor and paying the Actor for all rehearsal to date plus a sum equal to one week's contractual salary multiplied by the number of weeks of employment guaranteed in the contract, but in no case less than two weeks' contractual salary.  Said payment must accompany the termination notice in order for such notice to be effective and is in addition to any amount owed to the Actor for work done to date.

(E) <u>Individual Termination After the First Paid Public Performance</u>.  After the first paid public performance, standard contracts may be terminated as follows:

(1) <u>Two Weeks' Notice</u>.  Either party may terminate the contract on or after the date of the first paid public performance of the production by giving the other party two weeks' written notice.  Once the just cause provisions [see (E)(2) below] are in effect, however, the Producer may only terminate the Actor's contract for just cause.  The just cause provision is in effect three weeks after the individual Actor's first performance.

(2) <u>Just Cause</u>.  Except for the provisions of (E)(1) above or in the case of a Stage Manager temporarily replacing another Stage Manager on pregnancy leave, no Actor may be terminated except for "just cause".

(a) Where it is alleged that the actor is not performing as required, notice of termination may be served only if the following procedures have been observed:

(i)    The Actor must have received prior written warning alleging failures to perform as required which warning must also be served upon Equity;

(ii)    Such written warning may be in the form of "notes" which are reduced to writing;

(iii)    The written warning (which may be or include "notes") shall be over the signature of the Producer, Director, Choreographer, Musical Director, or other person with authority to terminate employment.

(b) The notice of termination may not be served unless the Producer, Director, Choreographer, Musical Director, or other person with authority to terminate employment has seen the Actor in performance (in the case of understudies, in rehearsal or performance of the part(s) understudied within one week prior to the date of the notice of termination.

(c) If requested by the Actor in writing, the Producer must furnish the reasons for dismissal to the Actor and Equity in writing within two weeks of such request.  Equity may then investigate the basis for the discharge.  If Equity desires to challenge the discharge, the matter shall be submitted to Arbitration.

In the event just cause is not found, the arbitrator's award shall be limited to monetary damages, which shall not exceed 15 weeks' contractual salary.

(F) <u>Company Closing Notice</u>.  The Producer may close the company upon a one-week written notice or upon payment of one week's contractual salary in lieu thereof, provided the Producer has paid the Actor for all services rendered to date, but in no event shall the Actor be paid less than two weeks' salary.  [See also Rule 60--TERM OF EMPLOYMENT.]  The theatre shall post this closing notice before the curtain up of the last performance of the week preceding the closing week.

(G) <u>Extension of Engagement – Standard Contract.</u>  The Producer may state a contemplated closing date on the face of the contract.  This shall not be considered a guarantee.  Should the Producer extend the playing weeks beyond the contemplated closing date, the Actor, at the Actor's option upon announcement of said extension, may terminate his contract upon written notice, said termination to coincide with the contemplated closing date as stated on the contract.  Written notice under the above conditions may be less than two weeks.  Should the Actor agree to remain for the extension of the engagement, a written agreement so stating shall be executed and a copy filed with Equity,

(H) <u>Effect of Company Notice</u>.  When an entire Company is closed in accordance with (F) above, such closing notice shall supersede any individual termination notice then outstanding.

(I)  <u>Payment When the Actor Is Not Allowed to Work Out Notice</u>.  If the Actor is not allowed or required to work out any notice properly given under the terms of this Agreement, the Actor shall be paid all amounts due immediately upon the giving of notice and may accept other employment.

(J)  <u>Rights After Giving Notice When the Actor Secures a New Engagement</u>.  Should either party give the other any notice permitted under this Agreement which terminates the Actor's contract of employment at any future date, and should the Actor have a new engagement, the Actor shall be permitted to attend rehearsals under the new engagement that do not conflict with the Actor's rehearsals and/or performances under the Actor's then-existing contract.

(K) <u>Pregnancy</u>.   A Stage Manager and/or Assistant Stage Manager shall not be terminated because of pregnancy during the term of the   contract.   The Stage Manager and/or Assistant Stage Manager shall remain on contract without pay or accrual of benefits during such leave.  Said leave shall continue until she is ready to return to work but may not exceed 180 days without the written consent of the Producer.  The Stage Manager and/or Assistant Stage Manager must give the Producer the same amount of notice of her intent to return as the notice of termination contained in the Replacement Stage Manager's or Assistant Stage Manager's contract.

(L) <u>Actor's Inability to Perform</u>.  [See Rule 48(D)--REPLACEMENT OF AN ACTOR.]

(M) <u>Term Contracts</u>.  Notwithstanding (C), (D), and (E) above, Term Contracts may only be terminated in accordance with the following:

(1) <u>Notice of closing</u>.  The Producer shall give to all Actors signed to Term Contracts one week's individual notice in writing of the closing of the production and Company or pay one week's salary in lieu thereof.

(2) <u>Termination</u>.   Term Contracts, except as they may be terminated in accordance with Rule 47(A)(11)--REHEARSALS, or Rule 27(A)(2)—ILLNESS AND LEAVES OF ABSENCE, terminate on the date stipulated in the individual contract of employment without notice, provided that a Principal Actor engaged under a Term Contract may agree to continue with the Producer after the expiration of the period of employment contracted for, without entering into a new contract, but from and after the expiration, Actor shall be deemed to be employed under all the terms and conditions of the standard contract.

## 60. **TERM OF EMPLOYMENT.**

The Producer guarantees the Actor a minimum of two consecutive performance weeks of employment, in addition to any rehearsal time, except as provided in Rule 49--REPLACEMENT OF AN ACTOR.

## 61. **TRANSPORTATION AND BAGGAGE.**

(A) <u>Responsibility for</u>.  The Producer, at the Producer's own expense, shall transport the Actor by a direct and expedient mode whenever the Actor is required to travel. Any Actor employed originally from a point outside of the area in which the theatre is located shall be provided return transportation to the same place at the termination of employment with the theatre whenever that occurs.

(B) <u>Manner and Route</u>.  The Actor shall travel by such routes as the Producer may direct, except as otherwise agreed in writing between the Actor and the Producer. In no event shall any agreement provide for a payment to the Actor of a sum less than the cost of applicable public transportation from the place of residence to the theatre and return.

Should the Producer fail to specify the manner and route of transportation, the Actor may choose the mode of transportation and shall be reimbursed in an amount at least equal to the fare of a direct and expedient mode of transportation, including

transportation of the Actor to the theatre or lodgings in the community of the theatre's location.

(C) Tickets or Cash Equivalent.   The Producer shall furnish the Actor with the necessary transportation tickets or their cash equivalent at least three days in advance of departure and return.

If, in any emergency, it should become impossible for the Producer to comply with the above conditions, the Producer shall reimburse the Actor in an amount equal to the actual sum spent by the Actor for transportation.   In no instance may the Producer take advantage of reduced round-trip fares unless tickets or their cash equivalent are delivered to the Actor three days in advance of departure.

(D) Previous Consecutive Engagement.   When the Actor has been playing in a previous consecutive engagement, all tickets or their cash equivalent covering transportation from one theatre to another shall be furnished by the Producer at which the Actor has his next engagement at least three days prior to leaving for said engagement.

Should the Producer fail to send these tickets or monies, the Producer of the theatre at which the Actor is currently engaged may furnish the Actor with the full cost of transportation to the next engagement, or the Producer shall provide the Actor with return transportation to the Actor's place of residence.

The Producer of the theatre at which the Actor is last employed shall be responsible for returning the Actor to the Actor's residence.

(E) Rail Transportation.   Day coach transportation is limited to 10 hours daily.   If the train schedule requires transportation in excess of 10 hours or after 10:00 p.m., transportation shall include individual sleeping accommodations, which shall be no less than a roomette.

(F) Air Travel.   The Actor shall not be compelled to travel by air without the Actor's consent.   Air travel must be on certified, scheduled, commercial airlines and, unless the only air service available does not permit, shall include no more than one stop.   Unless the Actor requests otherwise, these flights shall take place between the hours of 8:00 AM and 8:00 PM and shall be less than six hours duration with meals provided at the Producer's expense.   The Producer may require the Actor to board a flight that is scheduled to depart between the hours of 8:01 PM and 7:59 AM if the Actor is provided with a first-class seat.   If the Actor consents to travel by air, the Producer agrees to reimburse the Actor for the premium cost of air travel insurance up to the amount of $100,000 purchased by the Actor.   Air travel on non-scheduled or private airlines will not be permitted.

The Producer may utilize special fares provided the above-listed conditions are met and the Actor is assigned a seat identical to seats provided to full-fare coach passengers, receives the same meal service, and generally receives the same degree of service provided to full-fare coach passengers.

If a delay en route in air travel occurs, all expenses usually paid or furnished the traveler under first-class air travel and not paid the Actor by the airlines shall be reimbursed to the Actor by the Producer.

(G) Automobile Travel.  In the event the Actor uses the Actor's own car or rides with another Actor in lieu of other transportation at the beginning and/or end of the Actor's engagement, the Actor shall receive in cash a sum equivalent to the cost of a 14-day advance coach airline ticket or the current federal governmental auto travel reimbursement rate, whichever is less.

(H) Bus Transportation.  Bus travel shall be by public carrier duly licensed to carry passengers by interstate or intrastate commission (regularly scheduled).  Such travel shall be between the hours of 8:00 AM. and 8:00 PM and shall not exceed 10 hours.  Buses shall be air-conditioned and provide for the maximum comfort of the Actor.

(I) Baggage.  The method of shipment shall be determined by the Producer and specified in the contract.

(1) The Producer shall pay for the transportation of the Actor's baggage and/or personal effects up to 400 pounds for each Actor.

(2) At the start of an engagement where employment is anticipated for 26 weeks or more, the baggage allowance shall be 500 pounds for each Actor.

(3) At the end of the engagement, the Produce shall pay to ship not more than an additional 100 pounds over the weight at the start of the engagement.

(4) The Actor shall be responsible for transporting his personal hand baggage to and from the station or airport in the Actor's city of residence.  The Actor shall take the most reasonable and expeditious mode of transportation and the Producer shall reimburse the Actor for the actual cost each way as set forth and itemized on a form that shall be provided by Equity for this purpose.

(J) Local Transportation.  [See Rule 26(E)--HOUSING.]

## 62. UNDERSTUDIES.

(A) Requirement.  Each part shall be covered by an understudy except for "bit" parts.

(B) Assignment.  Understudies must be available to perform by the first paid public performance.  Complete understudy assignments must be forwarded to Equity no later than the end of the second week of rehearsal.

(1)  A Full Understudy may understudy no more than three Principal roles.

(2) An Actor performing in the production may understudy no more than two Principal roles.

(C) Performance.  No Understudy shall be required to perform until the following conditions are met:

(1) One week has elapsed since the Actor was engaged or assigned.  In the case of an Understudy who is also performing in the production, this shall be extended to two weeks;

(2) The Actor has had the script and music, if applicable, for at least one week. In the case of an Understudy who is also performing in the production, this shall be extended to two weeks; and

(3) The Actor has had at least one rehearsal encompassing all blocking, music (with at least piano accompaniment), and all choreography, including fight/stunt choreography (as applicable).  Such rehearsal shall also include use of props, weapons, costumes, and mechanical or pyrotechnical devices as deemed necessary.

In an emergency, if the above conditions have not been met, the Understudy may agree to read the part.

(D) Compensation for Understudy Assignment.

(1) Full Understudies.  Understudies may be hired on a standard contract at the tier under which the theatre operates.  The Understudy shall be paid according to the appropriate tier provisions of this Agreement and shall be subject to all rehearsal and performance provisions of that tier.  [See Rule 53--SALARIES AND ADDITIONAL COMPENSATION, Rule 47--REHEARSALS, and Rule 39--PERFORMANCES.]

(2) Standby Understudies.  If the Producer employees at least two Full Understudies, Standby Understudies may be hired on a standard contract utilizing the provisions outlined below.

(a) Salary and Rehearsal. Each year these salaries shall be increased by the same percentage as the minimum salary increase, rounded to the nearest dollar.

(i)    The Standby Understudy shall be employed at no less than the following minimum weekly salary to understudy one Principal role:

| Tier 1 | $ 249.00 |
| Tier 2 | $ 288.00 |
| Tier 3 | $ 327.00 |
| Tier 4 | $ 367.00 |
| Tier 5 | $ 406.00 |
| Tier 6 | $ 445.00 |

(ii) The Standby Understudy may rehearse for the first two weeks a total of 25 hours per week.  Thereafter the Understudy may rehearse 8 hours per week and view two performances per week, without additional compensation.

(b) Additional Compensation.  If a Standby Understudy is hired to understudy additional roles, said Standby Understudy shall be paid no less than an additional $25.00 per week for the second role and no less than an additional $35.00 per week for the third role.  Under no circumstances may a Standby Understudy cover more than a total of three roles.

(c) On Call.  Understudies hired under these provisions are to be "on call" by telephone 45 minutes prior to the performance.

(d) <u>Replacement</u>.  If a role the Standby Understudy has been understudying is vacated either through termination or through a leave of absence, the Standby Understudy may either:

    (i)    Assume the role for two weeks without the hiring of an additional understudy; or

    (ii)    Assume the role for an extended period of time with a replacement understudy being hired.

(E) <u>Payment for Performance.</u>  No Understudy shall perform in a Principal part to which said Understudy is assigned without additional compensation.

(1) If a Full Understudy or an internal Understudy performs in the Principal part that he understudies, he shall receive no less than a pro-rata payment based on his own contractual salary for each performance given.

(2) If a Standby Understudy performs, he shall receive no less than a pro-rata payment based on the minimum Tier salary at which the theatre is operating for each performance given.

(3) A cast member understudying a Star, if receiving less than $200 over minimum, shall be paid no less than $175 for each performance given in place of the Star.

(F) <u>Emergency Replacements.</u>

(1) If in an emergency, an Actor goes on as an Understudy in a Principal part not specified in the Actor's contract, the Actor shall be compensated for such performance at not less than 2/8ths of Actor's own contractual salary and shall thereafter be contracted and compensated for such Understudy duty at no less than the prescribed rate, subject to two week termination of the understudy assignment only without regard to requirements of Rule 60 (E) TERMINATION AND CLOSING NOTICE.  An understudy assignment so contracted may exceed the normal limitation on the number of understudy assignments provided for under (B) above for a period not to exceed two weeks.

(2) If, in an emergency, a Chorus Actor goes on for a "Chorus Part or Specialty" not specified in the Chorus Actor's contract, the Chorus Actor shall be compensated for such performance with a payment of no less than 2.5% of the applicable tier's minimum salary.  In addition, the Chorus Actor must be immediately signed and compensated for such understudy assignment at no less than the prescribed rate, subject to two-week termination of the understudy assignment only, without regard to requirements of Rule 60 (E) TERMINATION AND CLOSING NOTICE.

(3) If, in an emergency, a Chorus Actor substitutes in a chorus number for another Chorus Actor whose position in said number the Chorus Actor has not previously been assigned to swing, said Chorus Actor shall be compensated for such performance with a payment of no less than 2 ½% of the applicable tier's minimum salary.  In addition, the Chorus Actor must be immediately signed and compensated for such partial swing assignment at no less than the prescribed

minimum rate, subject to two week termination of the partial swing assignment only, without regard to requirements of Rule 60 (E) TERMINATION AND CLOSING NOTICE.

This payment and partial swing assignment shall be required when the Emergency Replacement is required to perform a function in a number involving a substantial amount of choreography, music or staging, which is specific in nature and with which the Actor is unfamiliar and previously unrehearsed.

This rule in no way prohibits the making of normal Chorus adjustments as directed by the Dance Captain, involving spacing, choreography, staging, etc., made necessary by a reduced complement of Chorus Actors in a number, nor shall it suggest that these adjustments shall require that additional compensation be paid to the Chorus Actors involved.

(G) Piano Rehearsal.  At the Producer's expense, the Producer shall provide a piano rehearsal for all Chorus Understudy and/or Replacement rehearsals.

63. **UNION SECURITY: DUES AND INITIATION FEES**

(A) All Actors who are members of Actors' Equity shall, as a condition of employment, continue to be members of the union in good standing for the life of this Agreement.  All Actors who are not now members of Equity shall, as a condition of employment, become members within 31 days following the signing of this Agreement and shall thereafter remain members of the union in good standing as a condition of continued employment.  All new employees hired as Actors shall, as a condition of employment, become members of the union 31 days from the date of commencement of their employment and shall thereafter continue to be members of the union in good standing as a condition of continued employment.  As defined and applied in this Agreement, the phrase "member of the union in good standing" means a person who pays initiation fees and dues (or the monetary equivalents thereof) to the union as financial obligations in accordance with the requirements of the National Labor Relations Act.

(B) Equity shall provide the Producer two weeks' written notice to discharge any Actor covered by this Agreement for non-payment of union dues or the initiation fee (or the monetary equivalents thereof).  Upon the Actor's failure to make such payment within the aforesaid period, the Producer agrees immediately to discharge the Actor, provided, however, that Equity shall withhold its demand for discharge if the Producer undertakes, with the consent of the Actor, to withhold from the Actor's salary a sum sufficient to correct the Actor's dues or initiation fee delinquency.

(C) The Producer shall deduct union dues and initiation fees from the weekly salary of every employee who is, or may become a member of Equity as provided for in this Agreement, provided that the Producer receives notification from Equity and the proper authorization agreed to and signed by the employee in time to make such deductions.

(D) Any monies deducted by the Producer from the wages of the employees pursuant to authorization shall be delivered to Equity not later than 10 days following the date on which the deductions are made.

74

64. **VACATIONS.**

(A) <u>Computation</u>.    Beginning with the first day of employment, Actor shall accrue vacation pay at the rate of 4% of contractual salary received up to a maximum of 4% of $2,000.00 per week.

At the end of each six months of employment, the Actor shall be entitled to take one week of vacation at the Actor's option.

If the Actor chooses to take the vacation, the Actor shall be paid the Actor's accrued vacation pay along with the last regular salary payment prior to the vacation.  If the Actor chooses not to take the vacation, the Actor shall be paid accrued vacation pay as salary in addition to the Actor's contractual salary.

(B) <u>Notice of Vacation</u>.  The Actor shall give the Producer five weeks' written notice of the date of the Actor's intended vacation.  Said date shall be approved or not approved by the Producer in writing within one week of receipt of the Actor's notice.

(C) <u>Termination</u>. When the Actor's contract terminates, the Actor shall receive all accrued, unpaid vacation pay.  Said vacation pay shall be included in the final salary payment made to the Actor at the conclusion of the Actor's employment.

(D) <u>Contributions and Deductions</u>.  The Producer shall make an 8% Pension contribution and a Equity Working Dues deduction on all vacation pay.  A health contribution is required during a workweek in which an Actor receives time off but is not required for vacation monies paid after an Actor's contract terminates.

## DURATION

This Agreement shall commence on  April 24, 2005 and expire on .  April 29, 2007. Any new rules when adopted shall be retroactive to said date unless otherwise stated.

All individual contracts of employment existing on, or signed on or subsequent to said date shall be modified in accordance with the new rules.  Equity may advise Actors that no Actor shall work for the Produce unless this Agreement is in effect.

**AGREEMENT AND RULES GOVERNING EMPLOYMENT IN MIDSIZE THEATRES: INDEPENDENT PRODUCER'S AGREEMENT**

---

### PRODUCER AGREEMENT

The undersigned Producer agrees to accept and abide by all the terms and conditions of the foregoing Agreement, acknowledges the receipt of a copy of this Agreement and full notice of all provisions, rules and regulations contained therein, and further agrees to be bound by any interim modifications and/or amendments to said Agreement which may become effective during its term.

**FOR ACTORS' EQUITY ASSOCIATION:**

---

---

**For the Producer**

_____ Date

# INDEX

Abandonment of Play..................................48
Absence from Rehearsal...........................48
Accident, Insurance...................................28
Accompaniment/Accompanist...............8, 72
ACTOR ......................................................17
   Duties .............................................52–57
   Minimum Weekly Salaries .....................58
   Obligation to Equity ................................1
Actor's Designated Call, Definition ...........17
Actors' Equity Foundation ...............10, 57
Actual Salary.............................................58
Addendum....................................................2
Additional Compensation .........................58
   Additional Duties ...................................58
   Chorus....................................................59
   Dance Captain.......................................59
   Extraordinary Risk .................................21
   Fight Captain .........................................59
   Long Term Salary Adjustment...............59
   Overtime...........................................59–60
   Per Diem ................................................19
   Standby Understudy...............................72
   Swing .....................................................59
   Tech Week, Stage Managers .................65
AFL-CIO ......................................................2
AFTRA ................................................44, 45
   Cast Album.............................................65
   Personal Appearances ..........................43
   Recordings Used in Production ..............45
AGENTS .................................................2–3
   As Casting Consultants ...........................3
   Attempted Breach of Contract .................9
   Commissions............................................2
   Equal Employment Opportunities ............4
   Franchise Holding ...................................2
   Non-representation...................................2
Air Conditioning, Dressing Rooms ...........55
Air Travel...................................................70
Air Travel Insurance .................................70
Aisles.........................................................56
   Guide Lights ...........................................56
   Public Announcements/Warnings...........42
   Ramped..................................................55
Aliens...........................................................3
Alleys to Stage Doors................................55
Alterations of Contract...............................15
Alternating with Understudy or Replacement .....50–51
Announcements.........................................42
   Aisles......................................................42
   Cameras and Recorders ........................42
   Changes in the Company .......................42
ARBITRATION ...............3, 9, 12, 19, 31, 68
   equity........................................................3
   expenses..................................................3
   Time Limit.................................................3
As Cast" Hiring..........................................16
ASSISTANT STAGE MANAGER ........17, 61
   Acting .....................................................62
   Breaks and Rest Periods.................46, 53
   Duties and Obligations .....................62–65
   Minimum Weekly Salaries .....................58
   Pregnancy...............................................69

   Pre-Production ........................................62
   Primary Responsibility...........................62
   Required.................................................61
   Tech Week ..............................................65
   Understudying........................................62
   Workweek...............................................65
Associated Actors and Artistes of America ...............1
AUDITIONS..................................................3
   Accompaniment.......................................8
   agent calls ..............................................4
   Audition Code..........................................8
   Callbacks............................................9, 17
   casting authority ......................................5
   Casting Authority Required.....................8
   During Equity Meetings ...........................8
   Equal Employment Opportunity...............4
   Extra......................................................22
   general provisions ...................................4
   Hearing Impaired.....................................5
   Notice ......................................................7
   Nudity ....................................................33
   Principal ...................................................5
   Safe and Sanitary Provisions .................8
   Spaces .....................................................5
   Stage Manager Interviews......................7
   Visually Impaired.....................................5
Automobile Travel .....................................71
Baggage.....................................................71
Bay Area Project Policy.............................53
Beards.......................................................14
Bereavement Leave ..................................26
Billing.........................................................41
   Equity Designation ................................41
   Errors and/or Omissions........................41
   House Boards.........................................41
   Rider......................................................41
   When an Actor Leaves a Production .................41
Biographical Material, Program...........40, 41
Bit Parts ...........................................15, 71
Blacklisting ..................................................9
Booth.........................................................55
Box Office Statement ................................52
BREACHES..................................................9
   Attempted ................................................9
   Handling of Claims ................................12
   Remedies...............................................10
Breaks........................................See REST PERIODS
BREAKS ....................................................46
   Cast Album Recordings.........................66
   Rehearsals.............................................46
Broadcasting.......................................43, 65
Brush-up Rehearsal ..................................49
Bus Transportation....................................71
Buy-Out Option, MRE ...............................31
Callbacks..............................................9, 17
Cameras Prohibited ..................................42
Cast Album ...............................................65
Cast List, Programs...................................40
Casting Authority.........................................8
Casting Consultant, Agent as.....................3
Certified Accounting, Potential Weekly Gross..........39
Change in Performance Schedule ......35, 36

Change in Seating Capacity, Ticket Prices, or Number
  of Performances ................................................39
Changes in Contract ..........................................15
Changes in the Company....................................41
Changing Room, Auditions ...............................7, 8
Checks ...............................................................58
CHORUS .............................................................17
  Agent Commissions ..........................................2
  Auditions ...........................................................6
  Clothes and Make-up .......................................14
  Definition .........................................................17
  Deputy .............................................................19
  Determination of Classification ...............10, 15
  Minimum Number of Equity Chorus Contracts ....10
  Playing a Part..................................................11
  Swing ..............................................................59
  Understudying Chorus Playing a Part ...............11
  Understudying Principal ....................................11
Chorus - Adjustments........................................74
Christmas, Holiday Pay......................................36
Christmas, Performances...................................36
Christmas, Rehearsals..................................36, 48
CLAIMS BY ACTORS ..........................................12
  Time Limit in Lodging ......................................12
  Waiver or Release Not Permissible...................12
Cleaning of Costumes........................................13
Closing Notice....................................................68
  Extension of Engagement .................................68
CLOTHES AND MAKE-UP ..........................12–15
  Chorus .............................................................14
  Cleaning and Upkeep.......................................13
  Costume Calls .................................................47
  Hair Color and Hair Style.................................14
  Hairpieces .......................................................14
  Hazardous Materials ........................................56
  Knee Pads and Protective Clothing...................14
  Rental .......................................................12–13
  Shoes ..............................................................14
  Skin Parts ........................................................13
  Towels .............................................................14
Clothing Personal, Loss or Damage.....................37
Commercial Photographs...................................38
Commercials, TV or Radio Spot..........................44
Commissions, Agent ......................................2–3
Company Closing Notice....................................68
Company Meetings ............................................15
Company Vote ........................................15, 38, 46
Concessions ......................................................15
Consecutive Engagements, Transportation ...........70
Contemplated Closing Date ................................18
Contingent and Subsidiary Rights........................53
Continuous Employment ..............................15, 46, 62
CONTRACT .........................................................15
  Attempted Breach.............................................9
  Breaches ...........................................................9
  Changes, Errors, and Alterations ......................15
  Chorus .............................................................10
  Concessions ....................................................15
  Contemplated Closing Date ..............................18
  Day(s) Off.........................................................53
  Determination of Classification .........................15
  Effective Date .................................................15
  File with Equity ...............................................16
  First Rehearsal Date .........................................16

Job Assignments ...............................................15
Replacement ...............................................27, 50
Riders ...............................................................15
Signing of .........................................................15
Stage Manager..................................................62
Term ...............................................15, 25, 69
Termination .................................................66–68
Contracts Department Report .............................52
Costume Calls....................................................47
Costumes..................See CLOTHES AND MAKE-UP
Cots...................................................................56
Council Powers ..................................................21
Curtain Down .....................................................35
Damaged Property of Actor...........................28–29
Dance Captain ...................................................16
  Assignment of..................................................11
  Minimum Salary...............................................59
Dance Shoes .....................................................14
  pointe shoes ....................................................14
Dance Surfaces..................................................56
Dancers, Auditions .............................................6
DAY OFF ............................................................53
  Change of...................................................43, 53
  Definition .........................................................18
  Extra Performances.........................................35
  Period Between................................................53
Defaults.............................................................17
DEFINITIONS ..............................................17–19
  Actor ...............................................................17
  Actor's Designated Call ...................................17
  Additional Duties .............................................58
  Callback ...........................................................17
  Chorus.............................................................17
  Contemplated Closing Date ..............................18
  Day Off ............................................................18
  Designated Tech Week .....................................18
  Extra................................................................22
  Extraordinary Risks ..........................................18
  Fight Captain ...................................................18
  Final Curtain ....................................................18
  MidsizeTheatre.................................................18
  Musical ............................................................18
  Opening...........................................................18
  Opening Week .................................................18
  Per Diem .........................................................19
  Principal Actor .................................................17
  Producer .........................................................19
  Production Contract..........................................19
  Prompt Book....................................................63
  Stage Manager.........................................17, 61
  Workweek.........................................................19
DEPUTIES ..........................................................19
  Chorus .............................................................19
  Election of........................................................46
  Termination of .................................................20
Designated Tech Week..................................18, 48
Determination of Classification ....................10, 15
Determination of Extraordinary Risk.....................21
Director at Auditions.......................................8, 17
Disability and Disability Leave.......................26–27
Discontinued Rehearsals ....................................48
DISCRIMINATION ...............................................19
  Union Activity...................................................20
DRESS REHEARSAL

Breaks ................................................46
DRESSING ROOMS...........................................36
    Actor's Personal Property....................36
    After Designated Performance Call...................50
    Children ...............................................54
    Cots ...................................................56
    Fire Extinguishers............................57
    Intercom System ...............................56
    Safe and Sanitary...........................54–55
    Smoking ...........................................54
Drinking Water ......................................56
Duties of the Actor...........................52–57
Duties of the Stage Manager ............62–65
Easter, Performances .........................36
Electronic Devises................................42
EMERGENCY
    After Designated Performance Call .................50
    Telephone ..........................................57
Emergency Replacements .....................73
Employment, Continuous ...........15, 46, 62
Employment, Long-Term.........................59
Employment, Term of.............................69
EQUAL EMPLOYMENT OPPORTUNITIES
    Auditions .............................................4
EQUITY
    Business, Rehearsal ........................46
    Contracts ...........................................15
    Council Powers .................................21
    Meetings.........................................8, 21
    Reports.........................................51–52
    Representation ..................................20
    Special Power to Act for Actor.............21
    Special Provisions.............................20
Equity Chorus Auditions ..........................6
Equity Motion Picture and/or Television Rights
    Agreement..........................................31
Equity Showcase, Subsidiary Rights.....................53
Equity-Approved Concessions ...............15
Equity-League Pension and Health Trust Funds
    Failure to File Reports ......................52
    Health Trust Fund...............................28
    Hospitalization and Medical Insurance ...............28
    Pension Fund .....................................28
    Reports Required ...............................51
Errors in Contract.................................16
Errors in Program.................................41
Extra Performances ..............................35
Extraordinary Risk.................................21
    Agreed to at Time of Contract Signing .............22
    Dangerous Conditions .......................21
    Determination .....................................21
    Determined Subsequent to Contract Signing ......22
EXTRAS.................................................22
    Auditions ...........................................22
    Conditions of Employment .................22
    Definition ...........................................22
    Salary.................................................22
Failure to File, Reports...........................52
Fight Captain  (see also STAGE
    FIGHTING/VIOLENCE/STUNTS)..................18
    Additional Compensation ..................59
    Assignment of.....................................60
    Definition ...........................................18

Fight/Stunt Director/Choreographer  (see also STAGE
    FIGHTING/VIOLENCE/STUNTS)....................60
Filming ..................................................65
    Application and Liability ......................65
    for Use in the Production ....................45
    News and Telecasts ...........................43
    TV or Radio Spot Commercials ..........44
Final Curtain .................................18, 35
Fire Safety..............................................57
Fire, Extraordinary Risk..........................18
Firearms Rehearsals...............................61
First Aid Kits..................................56, 61
First Rehearsal......................................46
    Contract..............................................16
    Equity Business ..................................46
    Notice to Equity ..................................46
Floors for Dancing .................................56
Fog..........................................................57
Four A's...................................................1
Free Program ........................................40
Full Swing ..............................................11
Future Productions, Rights in ................54
Good Friday, Performances ....................36
Guide Lights....................................55–56
Gunshots, Announcements .....................42
Hair Color, Change of ............................14
Hair Style, Change of..............................14
Hairpieces..............................................14
Hazard Pay .............................. See Extraordinary Risk
Hazardous Materials ..............................56
    Use and Storage of ............................57
Health Insurance ....................................28
Health Report.........................................51
Health Trust Fund...................................28
Heat, Audition Room ................................8
Heat, Stage Manager's Booth ................55
Hiring "As Cast".....................................16
Holidays.................................................35
    Performances .....................................35
    Rehearsals .........................................48
    Schedule Change...............................36
Hospitalization and Medical Insurance...................28
Hours, Rehearsal ............................65, 72
Housing..................................................23
    Accessible Accommodations...............24
    Family and Pets..................................24
    Hotel...................................................23
    Kitchen Facilities ...............................23
    Not Acceptable ...................................23
    Private Room.......................................23
    requirements.......................................23
    Security Measures...............................25
    Selection of Choice ............................24
    Telephone ...........................................23
    Theatre Owned....................................23
ILLNESS AND LEAVES OF ABSENCE.................25
Illness and Sick Leave ....................25–26
Illness, Temporary Replacement.....................50
Illness, Termination .....................25–26, 48
Independence Day, Performances..................36
Independent Manager's Agreement....................76
Individual Employment Contracts.....................15
Injury and Salary Continuance Insurance ...............28
Inspection, Safe and Sanitary .................57

INSURANCE ................................................27–29
   Air Travel.................................................................70
   Hospitalization ......................................................28
   Medical...................................................................28
   Social Security......................................................27
   Supplimental Worker's Compensation................28
   Unemployment ......................................................27
   Worker's Compensation .......................................28
Intercom System ..........................................................56
Interpretations, Oral and Written ................................21
Interviews, Employment ...................See AUDITIONS
Interviews, Personal Appearances.........................43
Intoxication .................................................................51
Inviolability of Designated Performance Call...........50
Jewelry, Lost or Stolen..........................................28–29
Job Assignments.........................................................15
Just Cause ...........................................................67–68
Juvenile Actors............................................................29
   Dressing Rooms...................................................29
   tutoring ..................................................................29
   Working Papers.....................................................29
Knee Pads ..................................................................14
Lasers .........................................................................57
Late Filing Penalty, Reports .......................................52
Lateness ..............................................................52–57
Lavatory and Toilet Facilities......................................55
Laws Governing ..........................................................29
Leave, Bereavement...................................................26
Leave, Disability....................................................26–27
Leave, Pregnancy .......................................................69
Leave, Sick ................................................................26
Liability Insurance
   Auditions ..................................................................8
Liability, Personal Property ...................................28–29
Lock-outs or Strikes....................................................32
Long Term Salary Adjustment (LOTSA)...................59
Los Angeles 99-Seat Theatre Plan ..........................53
Lost Property.........................................................28–29
Luggage ..........................................See Baggage
Make-up ...............................................................13, 56
Matinees ....................................................................35
MEALS
   Between Performances ........................................53
   During Travel........................................................70
Medical Insurance.......................................................28
Meetings, Company ....................................................15
Meetings, Equity....................................................8, 21
Membership Department Report.................................51
MidsizeTheatre, Definition ........................................18
Military Service............................................................29
Minimum Weekly Salaries...........................................58
Monies in Excess of Required Minimum ............30, 34
MORE REMUNERATIVE EMPLOYMENT.............30
   13-Day Blackout Period .......................................30
   Buy-Out Option.....................................................31
   Extended Blackout Period ....................................31
   Violation ................................................................31
Motion Picture and/or Television Rights....................31
MUSICAL PRODUCTIONS.......................................10
   Dance Captain......................................................11
   Definition ...............................................................18
   Equity Chorus Contracts ......................................10
   Piano Rehearsal ..................................................74
New Musicals ..............................................................10

New Year's Day, Performances ................................36
New Year's Day, Rehearsals ....................................48
News Telecast.............................................................43
No Strike or Lock-out ..................................................32
Nonresident Aliens ......................................................3
Non-traditional Casting.................................................4
Note Sessions.....................................................49, 63
Notice of MRE.............................................................30
NOTICES..............................................................66–69
   Company Closing .................................................68
   Serving of .............................................................66
   Termination ............................................16, 30, 66–68
   Written ...................................................................66
Nudity .........................................................................33
   Rehearsal & Performance ....................................33
Number of Performances ............................................34
Offset, Salary .............................................................10
Omissions in Program .................................................41
Opening Week, Definition ...........................................18
Opening, Definition .....................................................18
Oral and Written Interpretations ................................21
OVERTIME
   Costume Calls.......................................................47
   In Excess of 20 Hours Per Week.........................59
   Limitations .............................................................59
   Live Publicity Appearances .................................43
   Photo Calls .....................................................37, 38
   Rates...............................................................59–60
   Rehearsal After First Public Performance ..........49
   Stage Managers.......................................47, 53, 65
Overtime Rates ...........................................................49
Packager, Agent as......................................................3
Partial Swing ..............................................................11
Passover, Performances.............................................36
Pension Fund..............................................................28
Pension Report ..........................................................51
Per Diem ..............................................................19, 34
PERFORMANCES......................................................34
   After Designated Call ..........................................50
   Alternating with Understudy or Replacement ......50
   Break Between ......................................................53
   Change in Number of ...........................................39
   Extra Performance Pay ........................................35
   Final Curtain .........................................................35
   Holidays ...........................................................35–36
   Length ...................................................................35
   Matinee ..................................................................35
   Meals Between ......................................................53
   Number of..............................................................34
   Schedule Changes ...............................................35
   Twi-night................................................................35
Permanent Replacement .....................................38, 50
Personal Appearances................................................43
Personal Property ................................................28–29
   Actor's Property Used in Production....................37
Photo Calls..........................................................37–38
PHOTOGRAPHS...................................................39–40
   Credit.....................................................................38
   Notice ....................................................................38
   Nudity ...................................................................33
   Permanent Replacement......................................38
   Subsequent Use...................................................38
   TV or Radio Spot Commercials ...........................44
   Use with Commercial Product or Service ...........38

Picture Calls .......................................... See Photo Calls
Play Abandoned ......................................................48
Potential Box Office Chart .......................................39
Potential Weekly Gross ...........................................39
Pregnancy .............................................................69
Pre-Production, Stage Managers ..............................62
Principal Actor, Definition .......................................17
Principal Auditions ...................................................5
Principal, Agent Commissions ...................................2
Producer, Definition ...............................................19
Producer's Agreement ............................................60
Producer's Statement .............................................60
Production Contract, Definition ................................19
Production Prosecuted ............................................39
Program ................................................................40
    Biographical Material .......................................40
    Changes in the Company ..................................42
    Equity Designation ..........................................41
    Errors and/or Omissions ...................................41
    Reports Required .............................................52
    Understudies ...................................................40
Prompt Book ..........................................................63
Prop Moves ...........................................................60
Property, Loss or Damage ................................28–29
Props, Hazardous Materials .....................................56
Prosecuted Production ............................................39
Protective Clothing .................................................14
Public Announcements
    Electronic Devises ...........................................42
Public Announcements/Warnings .............................42
    Aisles .............................................................42
    Cameras, Videotape Recorders, Audio Recorders
        ......................................................42
    Gunshots ........................................................42
    Strobe Lights ..................................................42
PUBLICITY ............................................................43
    Live Appearances ............................................43
    News and Community Affairs Telecast ................43
    Performance Required ......................................43
    Personal Appearances and Interviews ................43
    Transportation Expenses ..................................43
    TV or Radio Spot Commercials ..........................44
    Websites .........................................................45
Put-in Rehearsal ....................................................49
Radio Broadcasting .................................................43
Radio Spot Commercial ...........................................44
Rail Transportation .................................................70
Raked Stages .........................................................57
Ramps, Safety Precautions ................................55, 56
Read-Through ..................................................46, 47
Recognition .............................................................1
Recorders Prohibited ..............................................42
Recording ..............................................................65
    Cast Album .....................................................65
Recordings Used in a Production ..............................45
Re-engagement of Actor ..........................................51
REHEARSALS .........................................................46
    Absence from .............................................31, 48
    ASM Requirement ............................................61
    Beginning of ...................................................46
    Breaks ...........................................................46
    Brush-up ........................................................49
    Continuous .....................................................46
    Costume Calls .................................................47

    Discontinued ...................................................48
    During Equity Meetings ....................................21
    Equity Business ...............................................46
    Filming or Taping for News and Community Affairs
        Telecast ....................................................43
    Firearms .........................................................61
    Holidays ....................................................36, 48
    Hours ....................................................48–49, 65
    Note Sessions .................................................49
    Notice of Rehearsal Call ..............................46, 49
    Overtime Rates ...............................................49
    Photo Calls .....................................................37
    Piano .............................................................74
    Read-Through .................................................47
    Replacement ..............................................49, 50
    Scheduling ......................................................49
    Space, Safe and Sanitary ..................................55
    Technical ........................................................47
    Understudies ...................................................72
    Understudies ..............................................49, 72
Release Not Permissible, Claims ...............................12
Rental of Clothing .............................................12–13
Reopening of a Play ................................................50
Replacement Contracts ...........................................27
Replacement of an Actor ....................................50, 73
Replacement Rehearsals .....................................49, 74
Replacement, Alternating with Actor .........................50
Replacement, Permanent ........................................50
Replacement, Temporary ...................................27, 50
Replacement, Understudy ........................................73
REPORTS ..........................................................51–52
    Box Office .......................................................52
    Contracts Department ......................................52
    Deputy ...........................................................19
    Equity-League Pension and Health ................51, 52
    Failure to File ..................................................52
    Failure to File as Breach ...................................52
    Filming or Taping ............................................44
    Health ............................................................51
    Membership Department (2% Dues) ...................51
    Pension ..........................................................51
    Program .........................................................52
    Safe and Sanitary Deficiencies ...........................57
    Understudies ...................................................52
    Unemployment Compensation Insurance ...........27
    W-2 Forms ......................................................52
    Weekly to Equity ..............................................51
Representatives, Equity ...........................................19
REST PERIODS  (see also BREAKS) .....................52–53
    Between Performances .....................................53
    Cast Album Recordings .....................................66
    Overnight, Actors ............................................52
    Penalty for Violation ........................................53
    Stage Managers ..........................................52, 53
RIDER
    Additional Duties .............................................58
    Alternating with Understudy or Replacement –
        Mutual consent ...........................................51
    Alternating with Understudy or Replacement with
        Actor's contsent ..........................................51
    Alternating with Understudy or Replacement
        without Actor's Consent ................................50
    Billing ............................................................41
    Cast Album .....................................................65

Clothing Rental.................................................12
Costume Calls..................................................47
Dance Captain..................................................16
Extended MRE Blackout Period .........................31
Fight Captain ...................................................61
More Remunerative Employment Buy-Out Option
    ....................................................................31
Nudity ..............................................................33
Per Diem ..........................................................34
Performance Schedule .......................................36
Read-Through ...................................................47
Stage Fighting/Violence/Stunts ..........................60
Rights in Future Productions ...................................54
Risks, Extraordinary ..............................................21
Rosh Hashanah, Performances ...............................36
Rulings, Oral and Written ........................................21
SAFE AND SANITARY CONDITIONS OF
    EMPLOYMENT .................................................54
Aisles Ramped ..................................................55
Auditions ...........................................................8
Cots .................................................................56
Dance Surfaces..............................................7, 56
Dressing Rooms...........................................54–55
Drinking Water...................................................56
Fire Safety.........................................................57
Firearms ...........................................................61
First Aid Kits ......................................................56
Guide Lights ................................................55–56
Hazardous Materials ..........................................56
Inspection and Compliance .................................57
Intercom System ...............................................56
Lasers ..............................................................57
Lavatory and Toilet Facilities...............................55
Make-up ............................................................56
Raked Stages ....................................................57
Rehearsal Space ...............................................55
Smoke and Fog .................................................57
Stage Fighting/Violence/Stunts ..........................60
Stage Manager's Booth ......................................55
Telephone .........................................................57
SAG .........................................................44, 45
SALARIES .......................................................57–60
Actor.................................................................58
Actual...............................................................58
Additional Compensation ....................................58
Additional Duties ...............................................58
Assistant Stage Manager ....................................58
Callbacks............................................................9
Cast Album Recording ........................................66
Checks ..............................................................58
Chorus Playing a Part ........................................11
Chorus Understudying Chorus Playing a Part.....11
Chorus Understudying Principal...........................11
Dance Captain...................................................59
Extended MRE Blackout Period .........................31
Extra Performances............................................35
Fight Captain ....................................................59
Holiday Pay .......................................................36
Long Term Salary Adjustment..............................59
Minimum Weekly, All Tiers ..................................58
More Remunerative Employment Buy-Out Option
    ....................................................................31
Overtime Rates ...........................................59–60
Payment Due.....................................................57

Re-engagement of Actor ....................................51
Replacement of an Actor...............................50, 51
Stage Manager...................................................58
Swing ...............................................................59
Tech Week, Assistant Stage Manager ................65
Tech Week, Stage Manager.................................65
Understudy...................................................58, 72
Schedule Change.............................................35, 36
Script Changes.......................................................50
Script Required .......................................................10
Script, Braille Copy...................................................5
Secret Ballot Vote..............................................38, 46
Security and Security Agreements ...........................60
Service, Military.......................................................29
Set Moves...............................................................60
Shoes.....................................................................14
Show Album............................................................65
Showcase, Subsidiary Rights...................................53
Showers..................................................................55
Sick Leave .......................................................25–26
Singers, Auditions ....................................................6
Skin Parts...............................................................13
Smoke and Haze......................................................57
Smoking Areas.....................................................8, 54
Social Security ...................................................27–28
Sound Recordings Used in Production ...................45
Specialty, Chorus ...................................................11
Spot Commercial.....................................................44
Stage Doors............................................................55
STAGE FIGHTING/VIOLENCE/STUNTS ...............60
Fight Captain ...............................................18, 60
Fight/Stunt Director/Choreographer ..................60
Firearms ..........................................................61
Rider.................................................................60
Understudies and Replacements ......................61
Stage Manager's Booth ...........................................55
STAGE MANAGERS ...............................................61
Acting/Understudying ........................................62
Activities Prohibited ..........................................64
Breaks and Rest Periods.........................46, 52, 53
Cast Album Recording .......................................65
Contract Required .............................................62
Counted Work ...................................................62
Definition ....................................................17, 61
Duties and Obligations ..................................62–65
Interviews ..........................................................7
Minimum Weekly Salaries ...................................58
Owning or Operating a Motor Vehicle ................65
Personal Appearances .......................................43
Pregnancy ........................................................69
Pre-Production ..................................................62
Primary Responsibility .......................................62
Read-Through ...................................................47
Required ...........................................................61
Tech Week ........................................................65
Telephone .........................................................57
TV or Radio Spot Commercials ..........................45
Workweek..........................................................65
Stage, Guide Lights.................................................56
Stage, Raked...........................................................57
Standby Understudies.............................................72
Strikes or Lock-outs ................................................32
Strobe Lights...........................................................42
Stunts.....................................................................60

Subsequent Use of Photographs ............................38
Subsidiary Rights ................................................53
Swing ..............................................................59
Tech Week
    13-Day Blackout Period (MRE) ..........................30
    Assistant Stage Manager ...................................65
    Designated Tech Week, Definition .....................18
    Rehearsal Hours ..............................................48
    Stage Manager .................................................65
Technical Rehearsals............................................47
Telephone .........................................................57
TELEVISING, ......................................................65
TELEVISING, FILMING, AND RECORDING ..........65
    Cast Album .....................................................65
    News and Community Affairs Telecast...............43
    Publicity, Performance Required ........................43
    Sale of Rights ..................................................31
    TV Spot Commercials ......................................44
Temporary Replacement....................................27, 50
Term Contract .......................................15, 25, 27, 69
Term of Employment..............................................69
TERMINATION ..............................................66–68
    After First Paid Public Performance ..................67
    Before Rehearsal ........................................66–67
    Breaches by the Producer.................................10
    Company Closing Notice ..................................68
    Deputy............................................................20
    During Rehearsal .............................................67
    Failure to File Contract ....................................16
    Illness ............................................................48
    Just Cause .................................................67–68
    More Remunerative Employment.................30, 31
    Notices ...........................................................66
    Pregnancy .......................................................69
    Production Prosecuted......................................40
    Re-engagement of Actor ...................................51
    Replacement of an Actor......................50, 51, 73
    Rights After Giving Notice ................................68
    Serving of .......................................................66
    Term Contracts................................................69
    Vacation Pay....................................................75
Thanksgiving, Performances...................................36
Thanksgiving, Rehearsals.......................................48
Time Limit, Lodging Claims....................................12
Toilet and Lavatory Facilities..................................55
Touring
    Not Permitted ...................................................1
Train Transportation..............................................70
TRANSPORTATION AND BAGGAGE..............69–75
    Air Travel........................................................70
    Air Travel Insurance ........................................70
    Automobile ......................................................71

    Baggage..........................................................71
    Bus.................................................................71
    Manner and Route............................................69
    Personal Appearances and Interviews ...............43
    Previous Consecutive Engagement ...................70
    Rail.................................................................70
    Responsibility for.............................................69
    Tickets or Cash Equivalent................................70
Twi-night Performances .........................................35
UNDERSTUDIES....................................................71
    Alternating with Actor ......................................50
    Assignment of..................................................71
    Assistant Stage Manager ..................................62
    Chorus for Chorus............................................11
    Chorus for Principal.........................................11
    Compensation for Understudy Assignment.........72
    Full Equity......................................................72
    Minimum Weekly Salaries ................................58
    On Call ..........................................................72
    Payment for Performance .................................73
    Performance....................................................71
    Principal, Additional Duties...............................59
    Program..........................................................40
    Rehearsals ...........................................49, 72, 74
    Replacement....................................................73
    Reports Required .............................................52
    Requirement....................................................71
    Stage Fighting/Violence/Stunts .........................61
    Standby ..........................................................72
Unemployment Insurance .......................................27
Use of Agreement ...................................................1
Vacations .............................................................9
    Contributions and Deductions ...........................75
    Eligibility and Computation ...............................75
    Notice ............................................................75
    Replacement of an Actor...................................50
Valuables ........................................................28–29
Voting .................................................15, 38, 46
W-2 Forms ..........................................................52
Waivers
    Claims by Actors .............................................12
    Contract..........................................................15
Wardrobe ...................See CLOTHES AND MAKE-UP
Water, Drinking ....................................................56
Water, Hot ...........................................................55
Weekly Report..................................................51–52
Wigs ............................................................14, 56
Worker's Compensation.........................................28
Workweek, Definition ............................................19
Written and Oral Interpretations .............................21
Yom Kippur, Performances ....................................36

# EXHIBIT C



RECEIVED

OCT 0 5 2006

ACTORS EQUITY
CHICAGO OFFICE

### INDEPENDENT PRODUCER'S AGREEMENT

#### Midsize Theatre Association

The undersigned employer agrees to accept and abide by all the terms and conditions of the Agreement between ACTORS' EQUITY ASSOCIATION and the MIDSIZE THEATRE ASSOCIATION (MTA) and acknowledges the receipt of a copy of the same an full notice of all provision, rules and regulations contained therein; and further agrees to be bound by any interim modifications and/or amendments to said agreement which may become effective during its' term.

PRODUCER
THE LOMBARDO ORGANIZATION, LLC

McKnight Theatre (Ordway)
THEATRE

August 22, 2006

DATE

KATHRYN V. LAMKEY
ACTORS' EQUITY ASSOCIATION

THE ACTOR HAS NO RIGHT OR POWER TO WAIVE ANY OF THE MINIMUM CONDITIONS SET FORTH IN THESE RULES WITHOUT THE PRIOR WRITTEN CONSENT OF ACTORS' EQUITY ASSOCIATION

Rev 8/96
MIDSIZE

165 West 46th Street New York 10036  Phone 212.869.8530  Fax 212.719.9815  www.actorsequity.org
125 South Clark Street Suite 1500 Chicago IL 60603, 312.641.0393    5757 Wilshire Boulevard Suite 1 Los Angeles CA 90036, 323.634.1750
350 Sansome Street Suite 900 San Francisco CA 94104, 415.391.3838    10319 Orangewood Boulevard Orlando FL 32821, 407.345.8600

# EXHIBIT D

# Online Filing Demand For Arbitration/Mediation Form

This concludes your filing.
Thank you for submitting your claim to the AAA.
Your claim confirmation number is: 002-XOQ-JG3

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your dispute has been filed in accordance with: Labor Arbitration Rules
                        This Claim has Been Filed For: Arbitration
                                    Filing Fee: $175.00

Additional Claim Information
        Claim Amount: $0.00
        Claim Description: Respondant's Imposition of $250,000.00 in penalties; Respondant's Declaration that
                            Producer/Claimant is in breach of the Midsize Agreement; Respondant's Failure to
                            abide by prior Ruling disposing of all matters between the parties; Respondant's
                            Failure to impose breach and apportion penalties upon Stephanie Zimbalist.
        Arbitration Clause: Rule 5: "Any controversy arising from the application or interpretation of this
                            Agreement or affecting the relationship between any Actor or Equity and the Producer,
                            including the disputes as to the existance or validity of any employment contract, shall
                            be submitted to Arbitration pursuant to the voluntary labor arbitration rules of the
                            American Arbitration Association".
Hearing Locale Requested: New York City, NY
        Contract Date: 04/24/2005
        Number of Neutrals: 1

Claimant                                            Representatives
The Lombardo Organization, LLC
Type of Business: Employer
        Name:                                       Name: Leslie Ben-Zvi
    Company Name: The Lombardo Organization, LLC    Company Name:
        Address: 675 West End Avenue                    Address: The Woolworth Building
                Suite 9d                                        233 Broadway 18th Floor
                New York, NY 10025                              New York, NY 10279
            Tel#: 917-686-9036                            Tel#: 212-719-5300
            Fax#:                                         Fax#: 212-406-2313
            Email: MMLombardo@aol.com                    Email: leslie@benzvilaw.com
        Include in
        Caption: Company

Respondent # 1                                      Representatives
Actors Equity Association
Type of Business: Union
        Name:
    Company Name: Actors Equity Association
        Address: 165 West 46th Street
                New York, NY 10036
            Tel#: 212-869-8530
            Fax#:
            Email:
        Include in
        Caption: Company

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.
Your demand/submission for arbitration/mediation was received by the American Arbitration Association on
12/19/2006 at 13:12 Eastern (US) time.

https://apps.adr.org/webcase2/viewPendingDocumentServlet?docId=17020          12/20/2006

# EXHIBIT E

SPIVAK, LIPTON, WATANABE, SPIVAK, MOSS & ORFAN LLP

ATTORNEYS AT LAW

1700 BROADWAY

NEW YORK, N.Y. 10019

HAROLD P. SPIVAK (1915-1999)

NEIL D. LIPTON
ROY N. WATANABE
STEVEN B. SPIVAK
FRANKLIN K. MOSS
ELIZABETH ORFAN*
JAMES M. MURPHY°
SARA A. CORELLO
SAMANTHA DULANEY°△
ADRIENNE L. SALDAÑA*□△
ERIC R. GREENE
GILLIAN COSTELLO

TELEPHONE
(212) 765-2100

TELECOPIERS
(212) 541-5429
(212) 765-8954

NICOLE CUDA PÉREZ
HOPE A. PORDY°
ROBERT M. LAFFERTY†◆
DENIS P. DUFFEY, JR.
LYDIA SIGELAKIS
MEREDITH W. NACHMAN

OF COUNSEL
STEVEN M. HOCHBERG
DALE W. SHORT*
JOHN B. SHEPHERD*

February 1, 2008

△ ALSO ADMITTED IN CA
* ALSO ADMITTED IN CT
◆ ALSO ADMITTED IN DC
△ ALSO ADMITTED IN IL
† ALSO ADMITTED IN MA
° ALSO ADMITTED IN NJ
◆ ALSO ADMITTED IN RI
□ ALSO ADMITTED IN VA
* NOT ADMITTED IN NY

VIA EMAIL &
FIRST CLASS MAIL
Matthew Lombardo
675 West End Avenue, #9D
New York, New York 10025

Re:    The Lombardo Organization & Actors' Equity Association
       AAA Case No. 13 300 02842 06

Dear Mr. Lombardo:

In accordance with the Arbitration Opinion and Award, and the Supplemental Award, issued by Arbitrator Daniel Brent on January 7, 2008 and January 22, 2008, respectively, please make the required payments immediately. If the payments are not received within ten (10) days of the issuance of the Supplemental Award, Equity shall seek to collect additional interest in the amount of 9% consistent with the Arbitrator's Award. Equity shall seek enforcement of the Award in court if payment is not timely made.

The total amount due as of today is $88,626.08. Payments shall be made as follows:

(1) **Payments Owed to Stephanie Zimbalist:**

Salary & Unreimbursed Expenses (incl. 6% interest)    $16,120.28

(2) **Payments Owed to Actors' Equity Association:**

Liquidated Damages   (incl. 6% interest)    $55,080.00

(3) **Payments owed to Equity-League Pension Fund:**

Pension Contributions for Stephanie Zimbalist
Plus Liquidated Damages (incl. 6% Interest)    $17,425.80

SPIVAK, LIPTON, WATANABE, SPIVAK, MOSS & ORFAN LLP

The checks must be made payable in the amounts indicated above to the appropriate individual or entity. Equity will only accept cashier's checks. Any personal checks will be immediately returned and timely payment will not have been made.

The checks must either be delivered in person to my office or mailed to Equity's office in Chicago to the attention of Kathryn V. Lamkey via overnight or priority mail.

If you have any questions, please do not hesitate to contact me so we may avoid any mistakes in connection with the issuance and/or delivery of the checks.

Thank you.

Sincerely,

Hope Pordy

cc (via email & facsimile):
    Kathryn V. Lamkey, Central Regional Director
    Leslie Ben-Zvi, Esq.

# EXHIBIT F

SPIVAK, LIPTON, WATANABE, SPIVAK, MOSS & ORFAN LLP

ATTORNEYS AT LAW

1700 BROADWAY

NEW YORK, N.Y. 10019

HAROLD P. SPIVAK (1915-1999)

NEIL D. LIPTON
ROY N. WATANABE
STEVEN B. SPIVAK
FRANKLIN K. MOSS
ELIZABETH ORFAN*
JAMES M. MURPHY°
SARA A. CORELLO
SAMANTHA DULANEY°△
ADRIENNE L. SALDAÑA*□△
ERIC R. GREENE
GILLIAN COSTELLO

TELEPHONE
(212) 765-2100

TELECOPIERS
(212) 541-5429
(212) 765-8954

NICOLE CUDA PÉREZ
HOPE A. PORDY°
ROBERT M. LAFFERTY†◇
DENIS P. DUFFEY, JR.
LYDIA SIGELAKIS
MEREDITH W. NACHMAN

OF COUNSEL
STEVEN M. HOCHBERG
DALE W. SHORT■
JOHN B. SHEPHERD■

△ ALSO ADMITTED IN CA
* ALSO ADMITTED IN CT
◇ ALSO ADMITTED IN DC
△ ALSO ADMITTED IN IL
† ALSO ADMITTED IN MA
° ALSO ADMITTED IN NJ
◇ ALSO ADMITTED IN RI
□ ALSO ADMITTED IN VA
■ NOT ADMITTED IN NY

February 15, 2008

VIA EMAIL &
PRIORITY MAIL
Matthew Lombardo
309 N.E. 11th Avenue
Fort Lauderdale, FL 33301

Re:    The Lombardo Organization & Actors' Equity Association
          AAA Case No. 13 300 02842 06

Dear Mr. Lombardo:

In accordance with the Arbitration Opinion and Award, and the Supplemental Award, issued by Arbitrator Daniel Brent on January 7, 2008 and January 22, 2008, respectively, please make the required payments immediately. Equity previously sent you a letter, dated February 1, 2008, requesting payment in the amount of $88,626.08, including the 6% interest provided for under the Award.

Since you did not timely make payment – and did not even contact Equity to discuss payment – Equity now seeks to collect additional interest at the enhanced rate of 9% consistent with the Arbitrator's Award. Equity shall seek enforcement of the Award in court if payment is not timely made.

The total amount due as of February 29, 2008 is $89,290.77. Payment shall be made as follows:

(1) Payments Owed to Stephanie Zimbalist:

Salary & Unreimbursed Expenses                    $16,241.18
(incl. 6% interest through 1/31/08 & 9% through 2/29/08)

SPIVAK, LIPTON, WATANABE, SPIVAK, MOSS & ORFAN LLP

Matthew Lombardo
AAA Case No. 13 300 02842 06
February 15, 2008
Page 2 of 2

   (2) <u>Payments Owed to Actors' Equity Association</u>:

      Liquidated Damages                        $55,493.10
      (incl. 6% interest through 1/31/08 & 9% through 2/29/08)

   (3) <u>Payments owed to Equity-League Pension Fund</u>:

      Pension Contributions for Stephanie Zimbalist
      Plus Liquidated Damages              $17,556.49
      (incl. 6% Interest through 1/31/08 & 9% through 2/29/08)

As stated in my February 1st letter, the checks must be made payable in the amounts indicated above to the appropriate individual or entity. Equity will only accept cashier's checks. Any personal checks will be immediately returned and timely payment will not have been made.

The checks must either be delivered in person to my office or mailed to Equity's office in Chicago to the attention of Kathryn V. Lamkey via overnight or priority mail.

If you have any questions, please do not hesitate to contact me so we may avoid any mistakes in connection with the issuance and/or delivery of the checks.

Thank you.

Sincerely,

Hope Pordy

cc (via email & facsimile):
      Kathryn V. Lamkey, Central Regional Director
      Leslie Ben-Zvi, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ACTORS EQUITY ASSOC.

_____

(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)

- against -

MATTHEW LOMBARDO
THE LOMBARDO ORGANIZATION

_____

_____

(In the space above enter the full name(s) of the defendant(s)/respondent(s).)

08 Civ. 02843 (___) (___)
LAK

**ANSWER**

## I
### ADMISSIONS AND DENIALS

*In this section, state which factual allegations in the complaint you admit to and which factual allegations you deny. You should refer to the complaint paragraph by paragraph (and sentence by sentence within each paragraph), in the same order as the paragraphs and sentences appear in the complaint. Attach additional sheets of papers as necessary.*

1. I ADMIT I OWE ACTRESS STEPHANIE ZIMBALIST APPROXIMATELY $17,000.00

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

## II
### DEFENSES

*In this section, state any legal theories that, even assuming that what plaintiff has alleged in the complaint is true, do not permit the plaintiff to win the case.  Attach additional sheets of paper as necessary.*

FIRST DEFENSE:

_____

SECOND DEFENSE:

_____

THIRD DEFENSE:

_____

**WHEREFORE** defendant asks this Court to dismiss the complaint and enter judgment in favor of defendant.

*[If you have any counterclaim against the plaintiff that arises out of the same events or transactions stated in the complaint, and/or any crossclaims against the other defendants that arise out of the same events or transactions stated in this complaint, and/or any third-party claims you have against third-parties (that is, someone not already named in the lawsuit) that arise out of the same events or transactions stated in the complaint, you should attach additional sheets of paper to set forth the facts and bases for any such claims.  See the Pro Se Manual for a further explanation.]*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this *19th* day of *MAY* , 200*8*.

Signature of Defendant _____

Address   309 NE 11th AVENUE

FORT LAUDERDALE

FL  33301

Telephone Number   917-686-9036

Fax Number (if you have one) _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*ACTORS EQUITY ASSOC.*

_____

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

08 Civ. 02843 ( ) ( )
LAK

**AFFIRMATION OF SERVICE**

- against -

*MATTHEW LOMBARDO*
*THE LOMBARDO ORG.*

_____

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

I, *MATTHEW LOMBARDO*, **declare under penalty of perjury** that I have
*(name)*

served a copy of the attached *ANSWER*
*(document you are serving)*

upon *HOPE PORDY* whose address is *SPIVAK LIPTON*
*(name of person served)*

*1700 BROADWAY NYC 10019* *PALM SPRINGS, CA*
*(where you served document)*

by *FEDERAL EXPRESS #8644 0488 5011* .
*(how you served document: For example - personal delivery, mail, overnight express, etc.)*

Dated: *PALM SPRINGS CA*
*(town/city)* *(state)*

*MAY* 19, 2008
*(month)* *(day)* *(year)*

Signature

*309 NE 11th AVENUE*
Address

*FORT LAUDERDALE FL*
City, State

*33301*
Zip Code

*917-686 9036*
Telephone Number

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_ACTORS EQUITY ASSOC._

(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)

- against -

_MATTHEW LOMBARDO_
_THE LOMBARDO ORG._

(In the space above enter the full name(s) of the defendant(s)/respondent(s).)

08 Civ. 02843 ( ) ( )
LAK

**NOTICE OF APPEARANCE**

Please take notice that I, _MATTHEW LOMBARDO_ , a defendant in
(name)
this action, hereby appear *pro se* and that all future correspondence and papers in connection with
this action are to be directed to me at the address indicated below.

Dated: _PALM SPRINGS_, _CA_
(town/city)        (state)

_MAY_  _9_, 20 _08_

_____
Signature of Defendant

_309 NE 11th AVENUE_
Address

_FORT LAUDERDALE, FL 33301_
City, State & Zip Code

_917 686 9036_
Telephone Number

_____
Fax Number (if you have one)

*Rev. 05/2007*                    4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_ACTORS EQUITY ASSOC._

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

- against -

_MATTHEW LOMBARDO_
_THE LOMBARDO ORG_

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

_08_ Civ _02843_ )(_)
_LAK_

**AFFIRMATION OF SERVICE**

I, _MATTHEW LOMBARD_ declare under penalty of perjury that I have
            *(name)*

served a copy of the attached ___ _ANSWER_ ___
                                    *(document you are serving)*

upon _HOPE PORDY_ whose address is _SPIVAK_ _LIPTON_
        *(name of person served)*

_1700 BROADWAY NYC 10019_
                    *(where you served document)*

by _FEDERAL EXPRESS  #8644 0488 5011_ .
        *(how you served document: For example - personal delivery, mail, overnight express, etc.)*

Dated: _PALM SPRINGS_ _CA_
        *(town/city)*    *(state)*

_MAY_ ___ _19_, 20_08_
*(month)*  *(day)* *(year)*

Signature

Address _309 NE 11th AVE._

City, State _FORT LAUDERDALE FL_

Zip Code _33301_

Telephone Number _917 666 9036_